**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **PATRICIA WHEELES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:07 CV1006-TFM** |
| | ) | |
| **NELSON'S ELECTRIC MOTOR** | ) | |
| **SERVICES, GARY NELSON,** | ) | |
| **individually and in his official** | ) | |
| **capacity, LOUISE PARTIKA,** | ) | |
| **individually and in her official** | ) | |
| **capacity, and RENEA MORGAN,** | ) | |
| **individually and in her official** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS

Come now the Defendants, Nelson's Electric Motor Services, Inc., Gary Nelson, Louise Partika and Renea Morgan in the above styled cause and submit the following memorandum brief and evidentiary materials in support of their motion for summary judgment.

## I.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS AND DEFENDANT'S DEFENSES

Plaintiff, Patricia Wheeles, a white female over the age of forty (40), alleges in her Complaint that she was discriminated against by the Defendants as follows:

1

Ms. Wheeles was subjected to a hostile work environment due to an "interpersonal relationship" being of a sexual nature between Defendant Gary Nelson and Defendant Renea Morgan and that Ms. Wheeles was caused to suffer ridicule over her religious beliefs. (See Complaint, paragraphs 21, 22).

Ms. Wheeles also claims that she was discriminated against due to her age and that Defendants treated Ms. Wheeles differently and terminated  Ms. Wheeles and assigned her job responsibilities to Defendant Renea Morgan, who was a younger woman.  (See Complaint, paragraphs 15, 28).

Ms. Wheeles invokes jurisdiction of this Court via 28 USC § 1331 but does not actually allege in her pleadings, a cause of action against Defendants pursuant to Title VII nor the ADEA.

This suit was filed on November 15, 2007 and answered by Defendants on December 6, 2007.   The Defendants seek summary judgment based on the premise that Ms. Wheeles' termination was based on legitimate, non-discriminatory reasons and that there is no evidence of pretext such that a question of fact exists as to age discrimination.  The Defendants also state that Ms. Wheeles fails to and cannot meet her burden of proof by substantial facts relating to her claims of a hostile work place due to her sex or religious beliefs.

## II.

### SUMMARY OF UNDISPUTED FACTS

A.    **The Parties:**

1.     Plaintiff, Patricia Wheeles was an employee of Nelson's Electric Motor Services, Inc. from August of 1999 to August 16, 2006.  (See Affidavit of Defendant Gary

Nelson – paragraph 1).  Her job responsibilities were as follows: Payroll, Accounts Payable, and General Ledger. (See Affidavit of Gary Nelson – paragraph 2).

2.    At the time of her termination on August 16, 2006, Ms. Wheeles held the same job duties and responsibilities.  (See Affidavit of Gary Nelson – paragraph 2).  Ms. Wheeles was 56 years of age at the time of her termination.  (See deposition of Wheeles – page 7, line 4).

3.    After Ms. Wheeles' termination, the job duties performed by Ms. Wheeles were assigned to Louise Partika, a female employee, who at the time of Ms. Wheeles termination, was substantially older than Ms. Wheeles. (See Affidavit of Gary Nelson – paragraph 3).

4.    Renea Morgan was later assigned one task previously performed by Ms. Wheeles which involved organizing the payroll information and forwarding this information on to their outside third party contractor, McBee Payroll, for processing.  This task took approximately 30 minutes to one hour each Wednesday of a forty (40) hour work week. (See Affidavit of Gary Nelson – paragraph 3).  This task was originally assigned to Louise Partika after Ms. Wheeles' termination but Partika could not perform this task properly so it was assigned to Renea Morgan. (See Affidavit of Renea Morgan – paragraph 4).

5.    Gary Nelson is the Owner and President of Nelson's Electric Motor Services, Inc. He was not the employer of Ms. Wheeles but was her supervisor.  (See Affidavit of Gary Nelson – paragraph 1).

6.    Louise Partika, a female employee of Nelson's Electric Motor Services, Inc. held the position of Office Manager and has been employed with Nelson's Electric Motors Services, Inc. since 1984 and was a co-worker of Ms. Wheeles. (See Affidavit of Louise Partika – paragraph 1).  At the time of Wheeles' termination, Partika was sixty (60) years of age. (See Affidavit of Gary Nelson – paragraph 3).

3

7.    Renea Morgan was hired by Nelson's Electric Motor Services, Inc. on May 5, 2005 and her position was inventory control. She was also a co-worker of Ms. Wheeles but not a supervisor of or employer of Wheeles. At the time of Ms. Wheeles' termination of August 16, Morgan was thirty- nine (39) years of age and turned 40 on September 13, 2006 . (See Affidavit of Renea Morgan – paragraph 2). Renea Morgan did not assume any of the duties of Ms. Wheeles' except gathering payroll information for McBee Payroll. (See Affidavit of Renea Morgan – paragraph 4).

8.    Nelson's Electric Motor Services, Inc. is a duly organized business corporation organized under the laws of Alabama and conducts its business in Alexander City, Alabama and Opelika, Alabama. Nelson's Electric Motor Services, Inc. employed the Plaintiffs and the Defendants. (See Affidavit of Gary Nelson – paragraph 1).

9.    Debra Keel was employed by Nelson's Electric on March 12, 2007, approximately seven (7) months after Ms. Wheeles' termination and separated her employment on July 18, 2007. She was responsible for inventory control in Alexander City and Opelika. Debra Keel was fifty-two (52) years of age at the time of her employment. (See Affidavit of Gary Nelson – paragraph 8).

**B.    The Work Place**

**1.    Hostile Environment Due to Plaintiff's Religious Beliefs.**

Plaintiff alleges that she was discriminated against due to her religious beliefs (Baptist [Deposition of Wheeles, page 15 line 20]) and as such was subjected to a hostile environment. This allegation is based on two incidents. Ms. Wheeles states that in March of 2006, she overheard Renea Morgan and Louise Partika talking and Renea commented on the

angel earrings worn by Plaintiff to which Louise asked if she thought the earrings were going to save and protect her? (Deposition of Wheeles, page 35 line 23 and page 36 lines 1-16.)

Ms. Wheeles also states that "cussing" goes on in the shop area by Ted "who cusses when he breathes". (Deposition of Wheeles, page 39 line 14). She was also cussed by Doug. However, she admits that Doug was not cussing at her but the worker's compensation issue he was involved with, quoting Doug and saying, "I don't have the blankety-blank time to sit and fool with this and write that down." (Deposition of Wheeles, page 40 lines 9-10).

2.       **Hostile Environment Due to Sex**

Plaintiff alleges that she was subjected to a hostile work environment as a result of the conduct of Gary Nelson and Renea Morgan.

Plaintiff states that quite a few times when she would walk back into the shop, Gary Nelson and Renea Morgan would be real close and Renea would be staring up into his eyes, batting her little eyelids and grinning in his face. (Deposition of Wheeles, page 42 lines 8-22). Ms. Wheeles admits the conduct was not directed toward her nor did Gary Nelson or anyone else harass her. (Deposition of Wheeles, page 43 lines 1-7).

Ms. Wheeles never saw Gary Nelson and Renea Morgan touch each other nor did she hear or care to hear any of their conversations. (Deposition of Wheeles, page 45 lines 12-21).

Ms. Wheeles really is complaining about Renea's attitude. (Deposition of Wheeles, page 47, lines 11-23 and page 48, lines 1-6).

Ms. Wheeles never confronted Gary Nelson about the alleged sexual relationship between him and Renea Morgan. (Deposition of Wheeles, page 48 lines 7-8) nor did she complain about the comments of Renea Morgan and Louise Partika regarding her angel earrings. (Deposition of Wheeles, page 48 lines 11-22).

5

Ms. Wheeles has never heard nor has anyone complained to her about sexual, religious or age discrimination at Nelson's Electric. (Deposition of Wheeles, page 50 lines 1-12).

C.    The Termination

Ms. Wheeles was employed to prepare payroll information for the third party McBee Payroll, and handles accounts payable and general ledger.  (See Affidavit of Gary Nelson – paragraph 2).

As a result of Russell Corporation downsizing in Alexander City, Nelson's Electric's Opelika shop was generating more business and income than the Alexander City office (See Affidavit of Gary Nelson – paragraph 4).  As a result, Gary Nelson determined to add an office position at Opelika and delete a position in Alexander City.  (See Affidavit of Gary Nelson – paragraph 4).  Ms. Wheeles' duties could be assigned to the Office Manager, Louise Partika without substantially increasing Louise Partika's work load. (See Affidavit of Gary Nelson – paragraph 4).  However, Ricky Lashley, the manager at the Opelika shop, objected to Wheeles assignment to Opelika based on their previous poor working relationship and would quit if Ms. Wheeles came to Opelika.  (See Affidavit of Ricky Lashley – paragraph 2 & 3).  As a result of this reaction from his manager in Opelika, Gary Nelson terminated Ms. Wheeles. (See Affidavit of Gary Nelson – paragraph 4).

Ms. Wheeles agrees that she was terminated due to Gary Nelson' decision to decrease the amount of personnel being paid in the Alexander City office. (Deposition of Wheeles, page 31 lines 9-13).

On examination by her attorney, Ms. Wheeles changed her testimony and claimed that she was terminated to make room for Debra Keel.  (Deposition of Wheeles, page 51 lines 22, 23).  Debra Keel, age 52, was employed to be in the shop not the office.  She left the employ of

Nelson's Electric on March 12, 2007 and her position has not been filled. Nelson's Electric now has only two (2) female employees in the Alexander City office. Ms. Wheeles' position has not been filled since her termination, only her duties have been assigned to Louise Partika. (See Affidavit of Gary Nelson – paragraph 8).

## III.

### ARGUMENT AND CONCLUSIONS OF LAW

**A. Standards Governing Summary Judgment**

"The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzales v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (Cir. 1998) (*Celotex Corp. v.* Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. Rule 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which [she] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; see also Real Estate Financing v. Resolution Trust Corp., 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of

summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. The non- moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574,586,106 S.Ct. 1348, 1356, 89 L.Ed.2d. 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

8

*Fitzpatrick*, 2 F.3d at 1116.

**B.      Argument**

**1.      Individual Liability**

From the onset, it should be stated that there is no individual liability pursuant to Title VII for race, sex, or religious discrimination.  Also, actions pursuant to the ADEA are against employers and not individuals.  Therefore, any and all claims brought under Title VII and ADEA against Gary Nelson, Louise Partika and Renea Morgan are due to be dismissed as a matter of law.  The relief granted under Title VII is against the *employer*, not the individual employees whose actions would constitute a violation of the Act. See *Clanton v. Orlean Parish School Board*, 649 F.2d 1084, 1099 and N. 19 (5th Circ. 1981); see also 42 U.S.C. 2000 e(b)(1988) (definition of employer); 42 U.S.C. § e-2 (1988) (violation for "employer" to discriminate; 42 U.S.C. § 2000 e-5(g) (1988) (relief for violation of § 2000 e-2).

Under 29 U.S.C.A. §626(b), an "employer" who violates the Age Discrimination in Employment Act (ADEA) is subject to damages.  There is no provision of the ADEA that would cause individual liability to anyone other than the employer.  The ADEA does not provide for individual liability of co-employees.

As a matter of law, the Plaintiff's co-employees, Gary Nelson, Louise Partika and Renea Morgan are due to be dismissed from this action as party defendants from any claims under Title VII and the ADEA.

**2.      Claims Regarding Hostile Work Environment Based Upon Religion.**

Plaintiff claims that she was subjected to a hostile work environment by Nelson's Electric based upon her religious beliefs.  In fact, Plaintiff, via her own testimony, cannot meet the burden required by the appellate courts.

Discriminatory conduct results in a hostile workplace when it is "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion or national origin, offending Title VII's broad rule of workplace equality. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22-24, 114 S. Ct., 367,371, 126 L. Ed. 2d 295 (1993). "To prevail on (his) hostile work environment claim, the plaintiff must establish that: (1) he belongs to a protected class; (2) he was subjected to unwelcome religious harassment; (3) the harassment was based on religion; and (4) the harassment affected a term, condition or privilege of employment. *Henson v. Dundee,* 682 F. 2d 897, 903-05 (11th Cir. 1982). Additionally, in order to hold the employer liable on a Title VII hostile work environment claim, the plaintiff must show either that: (1) the harasser is the employer or one of its agents; or (2) the employer knew or should have known of the harassment caused by co-workers, but failed to take corrective action. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir. 1987); see also *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F. 2d 317 (7th Circ. 1992).

To satisfy the fourth element, a plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., Id.* at 21. In determining this questions, courts must look to the totality of circumstances, *Id.* at 22-23, 114 S.Ct. at 371."

Wheeles asserts that in March of 2006, she overheard a discussion about the angel earrings she was wearing. Wheeles states that Renea Morgan and Louise Partika were discussing if she thought the earrings would save or protect her. (See deposition of Wheeles, page 35 line 11). This was the only incident that Ms. Wheeles can give which indicated any discussion or action taken toward her due to her religious beliefs.

10

In a further effort to support her claims of a hostile work environment, Plaintiff states that the men out in the workshop, Ted and Doug cursed in her presence when she was out in the shop. Ms. Wheeles indicated they used curse words regularly but the language was not directed to her and everyone in the shop was subjected to this language. (Deposition of Wheeles, page 39 lines 14-23, page 40, lines 1-15). To be actionable, the treatment must be disparate to the plaintiff and the treatment must be directed toward the plaintiff based upon her race, color, religion, sex or national origin. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed2 49 (1986). See also *Tillery v. ATSI*, N.D. Ala. 2003 WL 256999080). In Ms. Wheeles' case, she can prove neither, that the conduct was disparate or directed to her based upon her religious beliefs.

Plaintiff's entire claims regarding discrimination based upon a hostile environment due to her religious beliefs are based on; (1) a single non-occurring statement of a co-worker's commentary on the angel earrings and (2) curse language by men in the shop area that was not directed toward Plaintiff nor directed to Plaintiff due to her religious beliefs and therefore subjecting Plaintiff to disparate treatment due to her religion. Plaintiff has absolutely no evidence that some adverse employment action was taken against her due to her religious belief.

These incidents taken together do not constitute even a prima facie case that Plaintiff was subjected to a hostile workplace due to the harassment of Plaintiff based upon her religious beliefs and that she was treated differently due to her religious beliefs. Plaintiff fails to show that such conduct was so severe or pervasive as to alter her condition of employment and create an abusive working environment. In fact, Plaintiff never discussed the angel earring incident with her employer (Deposition of Wheeles, page 48 lines 7-10) nor did she complain to her employer about the cursing. (Deposition of Wheeles, page 48 lines 11-22).

11

**3.     Claim Regarding Hostile Work Environment Based Upon Plaintiff's Sex.**

To establish a hostile work environment claim on the basis of sexual harassment, a plaintiff must demonstrate: (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based upon her sex; (4) that the harassment was so severe or pervasive as to alter the terms and condition of employment and create a discriminatorily abusive working environment and (5) a basis for holding an employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Circuit 1999).

Plaintiff's allegation of sexual harassment/hostile work place is based upon her perception of an "interpersonal relationship of a sexual nature" as stated in her Complaint. (See Complaint, paragraphs 21, 22). Ms. Wheeles' evidence of this harassment is that Gary Nelson and Renea Morgan stood close to each other, looked into each other's eyes, eyes fluttered and sat close together. For the sake of argument in this motion only, even if this is true, it does not meet the fourth test under *Mendoza*, that the harassment was sufficiently severe or pervasive as to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *Mendoza v. Borden, Inc.*, *Id*. 1245. The fourth *Mendoza* element contains an objective and a subjective component. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Circ. 2002); *Smithers v. Wynne*, No. 07-11945, 2008 WL 53245, *2 (11th Circ. 2008). "When evaluating the objective severity of the conduct, [the court] consider[s] factors such as (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Smithers*, 2008 WL 53245, *2 (quoting *Miller,* 277 F.3d at 1276-77).

12

Ms. Wheeles must prove by some admissible evidence that the allegedly hostile work environment was motivated by Plaintiff's sex and that it was disparate treatment as to Plaintiff. Assuming that this conduct did take place, it obviously took place in the office and/or shop where others would have had full view of said conduct. This conduct does not come close to meeting any of the elements as set forth in *Mendoza*. At no time did Plaintiff feel threatened or humiliated due to her gender. (Deposition of Wheeles, page 41, line 23 and page 42, lines 1-7),

Title VII is fashioned to prevent disparate treatment based upon constitutionally protected rights. Under *Mendoza*, assuming all of Plaintiff's evidence is factual, the totality of the evidence does not meet the fourth element. None of the conduct was directed toward Plaintiff or to make her compliant with the employer's sexual demands, nor was it physically threatening to Plaintiff. *See Smithers*, 2008 WL 53245, *2.

In summary, as to the hostile work environment based upon religion or sex, the Plaintiff has failed to meet the "baseline" as set out in *Mendoza* and the Defendants are entitled to summary judgment as a matter of law.

**4.    Age Discrimination 29 U.S.C. §623 (a)(1)**

In the EEOC charge (See Exhibit F) and Plaintiff's Complaint, Ms. Wheeles alleges that she was discriminated against due to her age as a result of a female employee not within the protective class being employed and assuming her duties and/or she was terminated as a result of her age. On March 31, 2008, in her deposition testimony, Ms. Wheeles alleges that she was terminated to make way for Debra Keel, who was subsequently employed by Nelson's Electric. It should be noted that her deposition testimony is the very first and only time Ms. Wheeles has claimed that she was terminated for this reason. (See Exhibit F - EEOC Charge of Discrimination and Plaintiff's Complaint). Prior to her deposition testimony, her allegation was

13

solely directed to the employment of Defendant Renea Morgan.  Ms. Keel was fifty-two (52) years of age when she was employed by Nelson's Electric and was within the protective class, and was separated from the company on July 18, 2007. (See Affidavit of Gary Nelson – paragraph 8).

The ADEA states that it is "unlawful for an employer. . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623 (a)(1).  When a plaintiff alleges disparate treatment due to age, liability depends on whether the age of the plaintiff actually motivated the employer's decision.  Stated another way, age must have 'actually played a role in [the decision-making] process and had a determinative influence on the outcome.'  See *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L. Ed.2 338 (1993).

Since there is not statistical evidence of discriminatory intent, Ms. Wheeles must prove her claim by circumstantial evidence.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff must first establish a prima facie case of discrimination.  In the context of age discrimination, an employee must produce evidence that (1) she is a member of a protected group of persons between the ages of forty and seventy; (2) she was qualified for the position held; (3) she was subjected to an adverse employment action; and (4) a substantially younger person filled the position that she sought or from which she was discharged.  See *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Turlington,* 135 F.3d at 1432.

14

While demonstrating a prima facie case is not an onerous burden, (See *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Circ. 1997) (per curiam), Ms. Wheeles cannot meet the burden because there are no facts which are adequate to permit an inference of discrimination.

Ms. Wheeles was within the protected age group.  Ms. Morgan was employed in 2005 (age 39) for the purpose of inventory control in the shop area. (See Affidavit of Renea Morgan – paragraph 2).  Ms. Wheeles was in the office and continued her duties and responsibilities of payroll information, accounts payable and general ledger.  She maintained these duties until the date of her termination. (See Affidavit of Gary Nelson – paragraph 2).  Ms. Wheeles received a bonus of $600.00 on February 11, 2005 and another bonus of $675.00 on December 16, 2005 while Renea Morgan received only one (1) bonus of $250.00 on December 16, 2005. (See Affidavit of Louise Partika – paragraph 4).  At the time of her termination Ms. Wheeles was paid $11.85 per hour versus Ms. Morgan's rate of $11.50 per hour.  (See Affidavit of Gary Nelson – paragraph 2).  Ms. Wheeles has no evidence of any adverse employment decision as to her change of duties or decrease in compensation.

For the first time on March 31, 2008, Ms. Wheeles stated that she was terminated to make way for Debra Keel. (Deposition of Wheeles, page 51 lines 20, 23).  Ms. Keel was employed almost 7 months after the termination of Ms. Wheeles.  Ms. Keel worked at both the Alexander City office and the Opelika shop in inventory control.  Ms. Keel was also fifty-two (52) years of age at the time of her employment and was not substantially younger than Ms. Wheeles.  Ms. Keel was also within the class to be protected from discrimination. (See Affidavit of Gary Nelson – paragraph 8).

However, if this Court should determine that Plaintiff has made a prima facie case then the Defendants herein can meet its burden of producing legitimate non-discriminatory reason(s)

15

for its decision.  See *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed. 2d 207 (1981).  The Plaintiff was not subjected to adverse employment actions as to her age.  She was terminated based upon a non-discriminatory legitimate business reason.  As a result of the loss of a substantial part of its business in Alexander City, i.e. Russell Corporation, the employer was eliminating a position at the Alexander City office.  The employer determined to send Plaintiff to the Opelika shop because she had worked there before but was faced with losing his key man, Manager Ricky Lashley if Ms. Wheeles came to the Opelika shop.  As a result of these two occurrences, Ms. Wheeles' job was eliminated. (See Affidavit of Gary Nelson – paragraph 4).  (See Affidavit of Ricky Lashley – paragraph 3).  Ms. Wheeles' job duties were assumed by the Office Manager, Louise Partika who was actually older than the Plaintiff. (See Affidavit of Louise Partika – paragraph 3).

Once the employer has produced its legitimate, non-discriminatory reason for its termination of plaintiff, the burden now returns on the plaintiff to supply "evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reason for the adverse employment decision."  *Davis v. Qualico Miscellaneous, Inc.*, 161 F.Supp.2d 1314, 1322 (M.D. Ala. 2001) (citing *Chapman*, 229 F.3d at 1024).

The Plaintiff cannot meet this burden.  The decision maker, Gary Nelson as President of Nelson's Electric, was 46 at the time of Ms. Wheeles termination and the person which Plaintiff now states she was replaced by (Debra Keel) was fifty-two (52).  Even Ms. Morgan would have been forty (40) within four (4) weeks time of Ms. Wheeles' termination.

As stated in *Elrod v. Sears, Roebuck and Co.,* 939 F. 2d 1466, 1471 (11th Cir. 1991), an ADEA plaintiff faces a difficult burden [where] all of the primary players behind his termination

16

…. were well over age forty and within the class of persons protected by the ADEA." See also *Schweers v. Montgomery Public Schools*, 511 F.Supp. 2d 1128, 1138 (M.D. Ala. 2007).

More importantly, neither the job duties nor the position of the Plaintiff were taken by Renea Morgan (the only person outside the protected group) but were taken by Louise Partika, who had performed these duties earlier during her employment with Nelson's Electric.  (See Affidavit of Louise Partika – paragraph 3).

Even the Plaintiff agreed that she was terminated based upon a business decision by Gary Nelson.  (Deposition of Wheeles, page 31, lines 9-13) or that she doesn't know why she was terminated.  (Deposition of Wheeles, page 50 line 20-21)  Later during examination by her attorney, she stated she was terminated to make room for Ms. Keel. (Deposition of Wheeles, page 51, lines 20-23) who was actually employed approximately 7 months later.

The totality of Plaintiff's testimony indicates a disgruntled employee who did not have a good working relationship with co-employees, whether as a result of her conduct or their conduct but certainly not an employee who had been discriminated against due to her gender, religious beliefs or age.  *See Givens v. Chambers*, 2008 WL 268723 (M.D. Ala.)

## CONCLUSION

The Defendants, Gary Nelson, Louise Partika and Renea Morgan are individuals and are not liable as a matter of law to Plaintiff under any theory of Title VII and the ADEA.

Based upon the pleadings, deposition testimony of Plaintiff, Affidavits of Gary Nelson, Louise Partika, Renea Morgan and Ricky Lashley, there exists no genuine issue as to any material fact and the Defendant, Nelson's Electric Motor Services, Inc. is entitled to a judgment as a matter of law.

Respectfully submitted this the 2nd day of April, 2008.


/s/  *William Larkin Radney, III*
**WILLIAM LARKIN RADNEY, III (RAD001)**
**Attorney for named Defendants**

**OF COUNSEL:**
BARNES & RADNEY, P.C.
80 North Central Avenue
Post Office Drawer 877
Alexander City, Alabama 35011-0877
Telephone:    (256) 329-8438
Facsimile:    (256) 329-0809
Email      :    lradney@bellsouth.net

18

## EXHIBIT "A"

## AFFIDAVIT OF GARY NELSON

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **PATRICIA WHEELES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:07 CV1006-MEF** |
| | ) | |
| **NELSON'S ELECTRIC MOTOR** | ) | |
| **SERVICES, GARY NELSON,** | ) | |
| **individually and in his official** | ) | |
| **capacity, LOUISE PARTIKA,** | ) | |
| **individually and in her official** | ) | |
| **capacity, and RENEA MORGAN,** | ) | |
| **individually and in her official** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AFFIDAVIT OF GARY NELSON

**STATE OF ALABAMA**
**TALLAPOOSA COUNTY**

Before me, the undersigned authority, personally appeared, **GARY NELSON,** who being by me first duly sworn, doth depose and state as follows:

My name is **GARY NELSON,** and I am an adult resident of Alexander City, Tallapoosa County, Alabama. I have personal knowledge of the facts stated herein:

1.      NELSON'S ELECTRIC MOTOR SERVICES, INC. (hereinafter "Nelson's Electric") is a business corporation organized under the laws of Alabama with its principal place of business located in Alexander City, Alabama and Opelika, Alabama. Nelson's Electric is primarily in the business of repairing and maintaining industrial electric motors. I own all the shares of the corporation and I am the President and Chief Executive Officer of the company. At all times pertinent to the action filed against Nelson's Electric, the company employed twenty-five (25) persons or less. Patricia Wheeles was employed in August of 1999 and I was her supervisor.

2.    At the time of Patricia Wheeles' separation from Nelson's Electric on August 17, 2006, her duties with the company were as follows: Payroll, Accounts Payable and General Ledger.. Renea Morgan was employed by Nelson's Electric on the 5th day of May, 2005.  Ms. Morgan's duties with the company were for Inventory Control. Ms. Wheeles' job responsibilities did not change throughout her employment. At the time of Ms. Wheeles' termination she was making $11.85 per hour and Ms. Morgan was making $11.50 per hour and even though Ms. Morgan had twenty (20) years of experience in inventory control, she was still making less than Ms. Wheeles.

3.    I employed Louise Partika on the 19th day of October, 1984 and her position was Office Manager throughout her employment. At the time of Ms. Wheeles' separation, substantially all of Ms. Wheeles' duties and responsibilities were transferred to Louise Partika. At the time of Ms. Wheeles' separation, Ms. Partika was sixty (60) and older than Ms. Wheeles.  The only job responsibility previously held by Ms. Wheeles that was assigned to Renea Morgan was obtaining payroll information and transferring this information to a third party independent contractor, McBee Payroll which performed all payroll functions for Nelson's Electric.  This task takes approximately 30 minutes to 1 hour per work week.  This task was not a substantial part of Ms. Wheeles' job duties and is not a substantial part of the job duties continued by Ms. Morgan.

4.    Patricia Wheeles was terminated from the company for a legitimate business reason. Russell Corporation, which was Nelson Electric's largest business customer began a large scale downsizing and outsourcing of its production. The Nelson's Electric operation in Opelika became the company's largest producer of business and revenue.  Ricky Lashley, an employee of Nelson's Electric is the manager of the overall operation of Opelika shop.  I determined that the Opelika operation needed office support and determined to transfer Ms. Wheeles to the Opelika shop which constituted approximately a 40 minute commute from Alexander City.  When I conveyed this

information to Mr. Lashley, Mr. Lashley made it very clear to me that if Ms. Wheeles came to work in the Opelika shop then Mr. Lashley would quit his employment with Nelson's Electric. Mr. Lashley and Ms. Wheeles had worked together for a period of time over the seven (7) she was employed. Mr. Lashley and Ms. Wheeles did not have a good working relationship. Mr. Lashley refused to work with Ms. Wheeles. Mr. Lashley is my "key" man at the Opelika shop which now does substantially more business than the Alexander City office and I could not afford to lose Mr. Lashley as an employee so I determined to not send Ms. Wheeles to Opelika. My objective was to downsize the Alexander City office and send Ms. Wheeles to the Opelika shop which was in need of office personnel. I could not send her to the Opelika shop without losing my key man so I terminated Ms. Wheeles. Ms. Wheeles' duties were the easiest to incorporate into the duties of Louise Partika, the Office Manager who had performed these duties over many years during her employment with Nelson's Electric.

5.    Ms. Wheeles was not treated differently due to her age, religious beliefs or sex. Ms. Wheeles was not terminated due to her age and her job responsibilities were not assigned to Renea Morgan, the younger female but were assigned to Louise Partika, an older female and who is also within the protective age of the ADEA. Ms. Wheeles was terminated because of a legitimate business necessity. At all times, Ms. Wheeles' compensation was higher than that of Renea Morgan and her office was much more desirable than that of Renea Morgan.

6.    Ms. Wheeles complains that during the time we discussed the possibility of her going to work at the Opelika plant, she would not receive a $100 per month gas reimbursement as given to another employee, Brian Voss. Mr. Voss did receive this reimbursement but only because he used his personal vehicle to make deliveries of motors and parts on behalf of Nelson's Electric to customers in the area. This would not have been any part of Ms. Wheeles' responsibilities. Ms.

Wheeles was reimbursed for use of her vehicle in and about Alexander City during her employment.

7.     At the time of her termination, Ms. Wheeles attempted to work out an agreement which would provide a part-time job for her with Nelson's Electric which could work back into full-time employment. I thought it was best for the company to not enter into such an agreement. I was under the impression from Ms. Wheeles that she enjoyed working at Nelson's Electric and in lieu of her termination, would take on part-time work. Ms. Wheeles did not ever complain to or mention to me the presence of a hostile work environment due to either sexual connotations or religious persecution. If Ms. Wheeles had been in such a hostile environment then I do not think that she would have requested a part-time job at her termination.

8.     At her deposition taken on March 31, 2008, Ms. Wheeles said she was terminated to make way for another female employee, Debra Keel. Debra Keel was employed by Nelson's Electric on March 12, 2007, almost seven (7) months after Ms. Wheeles was terminated and worked until July 18, 2007. At the time of her employment, Ms. Keel was fifty-two (52) years old. Ms. Keel never worked in the office area and no one has been employed to replace Ms. Keel. Nelson's Electric now has only two (2) female employees in the Alexander City office performing Nelson's Electric duties.

9.     Renea Morgan and I have never had an improper interpersonal or sexual relationship.

10.    At the time of termination of Ms. Wheeles, I was 46 years old.

_____

**GARY NELSON**


Sworn to and subscribed before me this 2 nd day of APRIC 2008.

_____
Notary Public
My Commission Expires: 10/14/10

**SEAL**

## EXHIBIT "B"

## AFFIDAVIT OF LOUISE PARTIKA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| PATRICIA WHEELES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CASE NO. 3:07 CV1006-MEF** |
| | ) | |
| NELSON'S ELECTRIC MOTOR | ) | |
| SERVICES, GARY NELSON, | ) | |
| individually and in his official | ) | |
| capacity, LOUISE PARTIKA, | ) | |
| individually and in her official | ) | |
| capacity, and RENEA MORGAN, | ) | |
| individually and in her official | ) | |
| capacity, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF LOUISE PARTIKA

**STATE OF ALABAMA**
**TALLAPOOSA COUNTY**

Before me, the undersigned authority, personally appeared, **LOUISE PARTIKA,** who being by me first duly sworn, doth depose and state as follows:

My name is **LOUISE PARTIKA,** and I am an adult resident of Alexander City, Tallapoosa County, Alabama. I have personal knowledge of the facts stated herein:

1.     I was employed by NELSON'S ELECTRIC MOTOR SERVICES, INC. (hereinafter "Nelson's Electric") on the 19th day of October 1984 and have continued my employment to this date. During this period of time, I have been employed as the Office Manager. At the time of Ms. Wheeles termination, I was sixty (60) years of age.

2.     Patricia Wheeles was employed to replace an employee who had the responsibilities of payroll, accounts payable and general ledger. 3.    Upon Ms. Wheeles termination, all of her job

duties were assigned to me. Six (6) weeks after her termination, I did ask Renea Morgan to take on the payroll duties because I had made some errors. This duty was to accumulate the hours worked in the last pay period and forward this information to McBee Payroll. This task takes approximately 30 minutes to one hour on each Wednesday and is not a substantial part of the work performed by Ms. Wheeles.

4.    During the years of Ms. Wheeles' employment in which Ms. Morgan was employed (May 2005 to August 2006), Ms. Wheeles received company bonuses of $600.00 on February 11, 2005 and $675.00 on December 16, 2005. Ms. Morgan received one bonus on December 16, 2005 of $250.00. Also, Ms. Morgan's hourly pay rate was at all times less than Ms. Wheeles.

LOUISE PARTIKA

Sworn to and subscribed before me this _1st_ day of _APRil_ 2008.

Notary Public
My Commission Expires: _10/14/10_

SEAL

## EXHIBIT "C"

## AFFIDAVIT OF RENEA MORGAN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **PATRICIA WHEELES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 3:07 CV1006-MEF** |
| | ) | |
| **NELSON'S ELECTRIC MOTOR** | ) | |
| **SERVICES, GARY NELSON,** | ) | |
| **individually and in his official** | ) | |
| **capacity, LOUISE PARTIKA,** | ) | |
| **individually and in her official** | ) | |
| **capacity, and RENEA MORGAN,** | ) | |
| **individually and in her official** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AFFIDAVIT OF RENEA MORGAN

**STATE OF ALABAMA**
**TALLAPOOSA COUNTY**

Before me, the undersigned authority, personally appeared, **RENEA MORGAN,** who being by me first duly sworn, doth depose and state as follows:

My name is **RENEA MORGAN,** and I am an adult resident of Alexander City, Tallapoosa County, Alabama. I have personal knowledge of the facts stated herein:

1.      Prior to my employment with NELSON'S ELECTRIC MOTOR SERVICES, INC. (hereinafter "Nelson's Electric"), I was employed with Russell Corporation for twenty (20) years. I worked at the Central Supply office and my job duties were inventory control. As a result of Nelson's Electric's business relationship with Russell Corporation, I knew Gary Nelson (on a business level only). Russell Corporation was undergoing many changes during my last years of employment with Russell Corporation and in fact, was downsizing. As a result of this downsizing, when Mr. Nelson inquired if I had any interest in doing the same job at Nelson's Electric, I

determined to end my employment at Russell Corporation and become employed at Nelson's Electric.

2. At the age of 38, I was employed by Nelson's Electric on the 5th day of May, 2005 for inventory control. My duties were the same as I had at Russell Corporation. I did not take over any job duties of Patricia Wheeles. My office was located next to the men's bathroom in the shop area. I was not in the main office area. At the time of Ms. Wheeles' termination, (August 16, 2006) I was 39 years of age but would turn 40 on September 13, 2006.

3. At no time have I had an interpersonal or sexual relationship with Mr. Nelson. I respect Mr. Nelson as a business person and consider him a friend but I am happily married and deny that Mr. Nelson has ever approached me in any untoward fashion, sexually or otherwise nor have I approached him.

4. Upon Ms. Wheeles' termination from the company on the 17th of August, 2006, I continued with my normal responsibilities. Louise Partika took over the job responsibilities of Patricia Wheeles. After six (6) weeks, Louise Partika asked me to prepare the payroll information for McBee Payroll because she had not done well with this duty. This task takes approximately 30 minutes to an hour each Wednesday and is not a substantial part of my job.

RENEA MORGAN

Sworn to and subscribed before me this 15th day of April 2008.

Notary Public

My Commission Expires: 10/14/10

SEAL

**EXHIBIT "D"**

**AFFIDAVIT OF RICKY LASHLEY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| PATRICIA WHEELES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CASE NO. 3:07 CV1006-MEF** |
| | ) | |
| NELSON'S ELECTRIC MOTOR | ) | |
| SERVICES, GARY NELSON, | ) | |
| individually and in his official | ) | |
| capacity, LOUISE PARTIKA, | ) | |
| individually and in her official | ) | |
| capacity, and RENEA MORGAN, | ) | |
| individually and in her official | ) | |
| capacity, | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF RICKY LASHLEY

**STATE OF ALABAMA**
**TALLAPOOSA COUNTY**

Before me, the undersigned authority, personally appeared, **RICKY LASHLEY,** who being by me first duly sworn, doth depose and state as follows:

My name is **RICKY LASHLEY,** and I am an adult resident of Alexander City, Tallapoosa County, Alabama. I have personal knowledge of the facts stated herein:

1.    I am employed with NELSON'S ELECTRIC MOTOR SERVICES, INC. (hereinafter "Nelson's Electric"), as the manager of the Opelika office. I have been employed with Nelson's Electric from 1991 to the present date. My job responsibilities are the total management of the Opelika division of Nelson's Electric and I have held this position since 2003.

2.     I know Patricia Wheeles and have worked with her as a co-employee over a period of seven (7) years of which a part of that time, Ms. Wheeles was working in the Opelika shop with me.  Ms. Wheeles and I did not have a good working relationship and in fact, it was a bad working relationship.

3.     When Gary Nelson, President of Nelson's Electric advised me that he was sending Patricia Wheeles to the Opelika office, I objected and in fact, I told Mr. Nelson that if Ms. Wheeles came to the Opelika office then I would be terminating my position with Nelson's Electric and I would find employment elsewhere.

_____
RICKY LASHLEY

Sworn to and subscribed before me this __3/ST__ day of __MARCH__ 2008.

_____
Notary Public
My Commission Expires: __10/14/10__

**SEAL**

EXHIBIT "E"

DEPOSITION TESTIMONY
OF
PATRICIA WHEELES

DATED DECEMBER 14, 2006

AND

ACCOMPANYING DEFENDANTS' EXHIBITS #1 & #2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA


PATRICIA WHEELES,                   )
                                    )
     Plaintiff,                     )
                                    )
     VS.                            ) CASE NO.:
                                    ) 3:07 CV1006-TFM
NELSON'S ELECTRIC                   )
MOTOR SERVICES, GARY                ) DEPOSITION OF:
NELSON, individually                ) PATRICIA WHEELES
and in his official                 )
capacity, et. al.                   )
                                    )
     Defendant.                     )


                S T I P U L A T I O N S

     IT IS STIPULATED AND AGREED, by and

between the parties through their respective

counsel, that the deposition of:

                PATRICIA WHEELES

may be taken before Frances P. Looney,

Commissioner and Notary Public, State at

Large, at the law offices of Mr. Larkin Radney,

Barnes and Radney, 80 North Central Avenue,

Alexander City, Alabama 35010 on the 31st day of

March, 2008, commencing at approximately

10:00 a.m.

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 2

1    IT IS FURTHER STIPULATED AND AGREED that

2    the signature and the reading of the

3    deposition by the witness is waived, the

4    deposition to have the same force and effect

5    as if full compliance had been had with all

6    laws and rules of Court relating to the taking

7    of the depositions.

8    IT IS FURTHER STIPULATED AND AGREED that

9    it shall not be necessary for any objections

10    to be made by counsel to any questions, except

11    as to form or leading questions, and that

12    counsel for the parties may make objections

13    and assign grounds at the time of the trial,

14    or at the time said deposition is offered in

15    evidence, or prior thereto.

16                    * * *

17              A P P E A R A N C E S

18

19    ON BEHALF OF THE PLAINTIFF:

20        Hon. Derrick Blythe

21        Attorney at Law

22        126 Marshall Street

23        Alexander City, Alabama   35010

Page 3

1      ON BEHALF OF THE DEFENDANT:

2          Hon. Larkin Radney

3          Barnes and Radney

4          80 North Central Avenue

5          Alexander City, Alabama   35010

6

7      ALSO PRESENT:

8          Renea Morgan

9          Louise Partika

10             E X H I B I T   L I S T

11     Defendant's Exhibit 1 - notes - Page 17

12     Defendant's Exhibit 2 - agreement - Page 29

13

14     EXAMINATION BY MR. RADNEY:   Page 4, 62

15     EXAMINATION BY MR. BLYTHE:   Page 51

16

17         I, Frances P. Looney, a Court Reporter of

18     Alexander City, Alabama, and a Notary Public

19     for the State of Alabama at Large, acting as

20     commissioner, certify that on this date,

21     pursuant to the Alabama Rules of Civil

22     Procedure and the foregoing stipulation of

23     counsel, there came before me on the 31st day

1    of March, 2008, at the law offices of Mr. Larkin

2    Radney, 80 North Central Avenue, Alexander City,

3    Alabama 35010 commencing at approximately

4    10:00 a.m., PATRICIA WHEELES, witness in the

5    above cause, for oral examination, whereupon the

6    following proceedings were had:

7                    PATRICIA WHEELES

8    being first duly sworn, was examined and

9    testified as follows:

10                   EXAMINATION

11   BY MR. RADNEY:

12   Q.   State your name for the record, please.

13   A.   Patricia Wheeles.

14   Q.   Ms. Wheeles, of course, you know me.  I'm

15        Larkin Radney.  And I represent Nelson

16        Electric and the three individual defendants

17        in a lawsuit that's been filed on your

18        behalf in federal court.  I'm going to ask

19        you a series of questions about you, your

20        background, and the claims that you have

21        alleged in court.  If I ask a question that

22        you don't understand ask me to repeat myself

23        or make myself clear, and I'll attempt to do

Page 5

1      so.  If you answer, I'll have to assume that

2      you understood the question.  Is that fair

3      enough?

4   A.  Correct.

5   Q.  Have you ever been deposed before?  Have you

6      ever had a deposition taken of you before?

7   A.  Yes.

8   Q.  So I assume you know somewhat of the

9      background and the rules of the deposition.

10     You have to say yes or no so the court

11     reporter can pick that up instead of an

12     uh-huh and ugh-uh.  If you need a break,

13     we'll take a break.  If you need to confer

14     with your attorney we can certainly do

15     that.  But I expect you to answer the

16     questions that I ask fully and completely.

17  A.  Okay.

18  Q.  What is your address?

19  A.  1083 Moose Road, Alexander City, Alabama.

20  Q.  You're married to Terrel Wheeles?

21  A.  Yes, I am.

22  Q.  How long have you been married to Terrel?

23  A.  Thirteen years.

Page 6

1    Q.  And prior to that, were you married?

2    A.  Yes, I was.

3    Q.  To whom?

4    A.  Ronny Hannah.

5    Q.  You have two children?

6    A.  Yes, I do.

7    Q.  Who are they?

8    A.  Rhonda Hannah Blythe and Kevin Hannah.

9    Q.  Rhonda, of course, is your attorney's --

10   A.  Correct.

11   Q.  -- wife?  Your son what does he do?

12   A.  He is corporate controller for Russell

13       Corporation in Fruit.

14   Q.  What is your age?

15   A.  58.

16   Q.  And birth date?

17   A.  January the 1st, 1950 -- 20th, 1950.  I'm sorry.

18   Q.  You were employed by Nelson Electric in

19       1999?

20   A.  Correct.

21   Q.  How old were you then?

22   A.  51, 50.

23   Q.  And you left that employment in 2006; is

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 7

1          that correct?

2     A.   Correct.

3     Q.   How old were you then?

4     A.   I was 56.

5     Q.   Do you know Louise Partika?

6     A.   Yes, I do.

7     Q.   Do you know what her age is?

8     A.   No, I do not.

9     Q.   Is she older or younger than you?

10    A.   She's older.

11    Q.   Would you give me the benefit of your

12         educational background?

13    A.   Well, I have several semesters out at the junior

14         college.  And then I've also taken classes at

15         UAB in Birmingham.

16    Q.   Go ahead.

17    A.   Numerous workshops.

18    Q.   Do you have a degree in any particular

19         field?

20    A.   No.

21    Q.   Do you have an associate degree?

22    A.   No.

23    Q.   What did you study?

1     A.   Computers and -- just computers basically and

2          some accounting.

3     Q.   Where did you take your accounting courses?

4     A.   In Birmingham.

5     Q.   UAB?

6     A.   Yes.

7     Q.   But you did not get a degree?

8     A.   No.

9     Q.   Did you graduate from Benjamin Russell?

10    A.   No, I did not.

11    Q.   Where did you graduate high school?

12    A.   From Goodwater.

13    Q.   What was your maiden name?

14    A.   Cullars, C-u-l-l-a-r-s.

15    Q.   Upon graduation from high school, did you

16         immediately go into a college situation, or

17         did you become employed?

18    A.   No, I did not.  I went to work at Russell Corp.

19    Q.   How long did you work at Russell Corp?

20    A.   Twenty-two years.

21    Q.   Where did you next go for employment?

22    A.   Russell Lands.

23    Q.   Do you remember the year you went to Russell

Depo of Patricia Wheeles

Page 9

1       Lands?

2   A.  No, I do not exactly.

3   Q.  Approximately?

4   A.  No.  I'm not real sure to be able to say that

5       and be honest about it.

6   Q.  At some point you left the employment of

7       Russell Lands; is that correct?

8   A.  Yes, I did.

9   Q.  Did you file an EEOC charge against Russell

10      Lands?

11          MR. BLYTHE:  Now, Larkin, one thing -- you

12      might as well put this on the record -- we are

13      under a nondisclosure agreement with Russell

14      Lands in regards to anything surrounding that

15      claim.  I have instructed Ms. Wheeles --

16          MR. RADNEY:  Sure.  I just want to know if

17      she, in fact, filed one.

18          THE WITNESS:  I don't think we filed an EEOC

19      claim, did we?

20          MR. BLYTHE:  I think we did.

21          MR. RADNEY:  You had to.

22          MR. BLYTHE:  I have instructed her not to

23      answer questions in regards to that.  I'm not

Depo of Patricia Wheeles

Page 10

1    saying that if a judge says I'm ordering you

2    answer it.  But you know the obligation we're

3    under.

4            MR. RADNEY:  Absolutely, I do.

5    Q.  But you left the employment of Russell

6        Lands.  Did you file a court action against

7        Russell Lands?  I'm not asking you to

8        disclose what occurred.  I'm just asking did

9        you?  That's a matter of public record.

10           MR. BLYTHE:  It was an EEOC claim.  That's

11       as far as it got.  It was settled during

12       mediation.

13   Q.  Do you recall when that was settled?

14   A.  '99?

15           MR. BLYTHE:  Something like that.  That may

16       be close.

17   A.  Somewhere in that vicinity.

18   Q.  What were your job responsibilities at

19       Russell Corp?

20   A.  At Russell Corp?

21   Q.  Yes, ma'am.

22   A.  I did various things at Russell Corp.  I worked

23       out in the sewing room.  And then I worked in

Depo of Patricia Wheeles

Page 11

1      customer service, worked quality control, and

2      just various different things.

3    Q.  What did you do for Russell Lands?

4    A.  I worked at Willow Point Country Club as the

5      administrative assistant.

6    Q.  After your employment with Russell Lands did

7      you become employed with someone else?

8    A.  Yes.

9    Q.  Who was that?

10   A.  Nelson Electric.

11   Q.  When were you employed by Nelson Electric?

12   A.  In '99 I believe.

13   Q.  Were you actually working as a temp and were

14      assigned to Nelson Electric?

15   A.  Actually, I was not working as a temp.

16      Actually -- you want me to explain this?

17   Q.  Sure.

18   A.  Actually the girl that was over that temp force

19      was a friend of my daughter Rhonda's.  They were

20      needing someone to fill a position for a few

21      weeks or a few days at Nelson Electric until

22      they could hire someone.  She said, well, mother

23      is sitting at home, not doing anything, just

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 12

1          call her.  So she did, and I filled in.

2     Q.   What was the name of the temp?

3     A.   I don't remember.

4     Q.   What was the name of the girl that was

5          friends of Rhonda?

6     A.   I would have to ask Rhonda.  I don't remember

7          what her name was to be honest.

8     Q.   Do you have any source of income presently?

9     A.   I have a little small embroidery business.

10    Q.   How long have you had that business?

11    A.   I actually started it up after I lost my job.  I

12         had it as just something to -- a hobby.  Before

13         then it was just a hobby.  And it was just for

14         extra spending money.

15    Q.   As a hobby it did produce income for you; is

16         that correct?

17    A.   Some, not that much.  It was mostly I did things

18         for people for nothing.

19    Q.   This was during the time you were employed

20         by Nelson Electric that it was a hobby?

21    A.   Yes.  There were times I charged.  It depended

22         on what it was, and, you know.

23    Q.   Do you recall when you were separated from

Depo of Patricia Wheeles

Page 13

1           Nelson Electric?

2      A.   Pardon?

3      Q.   When were you separated from Nelson

4           Electric?

5      A.   August the 16th.

6      Q.   2000 and --

7      A.   5 or 6.  6, I'm sorry.  I had to stop and think.

8      Q.   Since that time do you have now have a

9           source of income through the embroidery

10          business?

11     A.   Yeah, it helps to pay the bills.

12     Q.   Do you advertise?

13     A.   No.

14     Q.   Do you have a sign out?

15     A.   I have a sign, yes.

16     Q.   Give me an idea or sense on a weekly basis

17          how much income you might draw from the

18          embroidery work?

19     A.   It just depends.  Sometimes a couple of hundred

20          dollars, sometimes maybe 100, sometimes 50.  I

21          just depends on what it is I'm doing for people.

22     Q.   Do you file --

23     A.   Income tax.  Yes, I do.

Depo of Patricia Wheeles

Page 14

1    Q.  Did you file one for 2006?

2    A.  Yes, I did.

3    Q.  Did you file one for 2007?

4    A.  Yes, I did.

5    Q.  What income did you show on you income tax?

6    A.  I think it was like 19,000.

7    Q.  19,000 for the year?

8    A.  I did not bring it with me, but I think it was

9         close to 19,000 for the year 2007.

10   Q.  What was it in 2006 if you recall?

11   A.  I didn't show very much at all with that.

12        MR. RADNEY:  Derrick, can I get you to get

13        to me the 2007 income tax return?

14        MR. BLYTHE:  Sure.

15        MR. RADNEY:  And also 2006.

16        MR. BLYTHE:  I was going to say, do you want

17        both of them?

18        MR. RADNEY:  Yeah.

19   Q.  Have you sought employment elsewhere since

20        your separation from Nelson Electric?

21   A.  No, I have not.

22   Q.  Have you attempted to seek employment

23        anywhere?

Depo of Patricia Wheeles

Page 15

1     A.   No.

2     Q.   Have you made a decision not to become

3          employed publicly or just work for yourself?

4     A.   I don't care to become employed with public

5          dealing with people like I have had to deal

6          with.

7     Q.   Are you just going to work for yourself so

8          to speak?

9     A.   Yep, as long as I can.

10    Q.   Your husband is retired, is he not?

11    A.   Yes, he is.

12    Q.   Did does he work anywhere?

13    A.   No, he does not.

14    Q.   He's retired from not only the fire

15         department, but Russell Lands?

16    A.   Correct.

17    Q.   Are you a member of a church?

18    A.   I was.  We closed our church.

19    Q.   What was the name of the church?

20    A.   Liberty Church at Willow Point.

21    Q.   Was that associated with the Baptist church?

22    A.   Yes.

23    Q.   Was it a part of the Southern Baptist

Page 16

1          Association?

2     A.   I don't think so.

3     Q.   And the church is now closed?

4     A.   Correct.

5     Q.   Is it reopening?  Do you know what the plans

6          are for the church?

7     A.   No, it did will not reopen.

8     Q.   Why did it close?

9     A.   The pastor's health.

10    Q.   Who was the pastor?

11    A.   Jerry Wheeles.

12    Q.   Is that your --

13    A.   Brother-in-law.

14    Q.   Do you attend a church now?

15    A.   I do.

16    Q.   Which one?

17    A.   Sixth Street Baptist.

18    Q.   You're not a member of it?  Is that what

19         you're telling me?

20    A.   Yes.  I've not joined that church.  We're just

21         basically going around deciding where we want to

22         spend our time and also First United Methodist.

23    Q.   Do you know what religious affiliation the

Page 17

1     other defendants in this case have?

2   A.  No, I do not.

3   Q.  I know you have been involved in, of course,

4       this lawsuit.  And you had an EEOC claim

5       against Russell Lands.  Have you filed any

6       other lawsuits?

7   A.  No.

8   Q.  You been a plaintiff in any other lawsuit?

9   A.  No.

10  Q.  Have you been a defendant in any lawsuits?

11  A.  No.

12  Q.  Patricia, I notice you've got some notes in

13      front of you?

14  A.  I do.

15  Q.  What are those?

16  A.  These were notes that I made on various things

17      that had gone on and things that were said.

18  Q.  May I see them?

19          MR. BLYTHE:  Sure.

20  A.  There you go.

21          (Defendant's Exhibit 1, notes, marked for

22           identification)

23  Q.  I'm made Defendant's Exhibit 1 notes that

Page 18

1          you have brought to this deposition today;

2          is that correct?

3     A.   Correct.

4     Q.   And do you have any other notes that you

5          have made that are not here?

6     A.   No.

7     Q.   Do you have any -- have you kept any of your

8          e-mails or e-mails of other employees of

9          Nelson Electric?

10    A.   No.

11    Q.   Have you made copies of e-mails?

12    A.   No.

13    Q.   Have you ever recorded the conversations of

14         anyone employed by Nelson Electric?

15    A.   Recorded like?

16    Q.   Like with a tape recorder.

17    A.   No.

18    Q.   Have you ever taken photographs of anyone --

19    A.   No.

20    Q.   -- at work at Nelson Electric?  Do you have

21         any memorandums or memos or notes that you

22         have made of anything or active that went on

23         at Nelson Electric --

1    A.  No.

2    Q.  -- while you were employed there?  Patricia,

3         you and I have got a bad habit.  That is we

4         interrupt the person we're talking with by

5         answering the question too fastly.  So if

6         you'll just let me finish my question, and

7         then you answer that will help Frances a

8         great deal.

9         When did you type these notes out?

10   A.  Actually, it was right after I lost my job.  I

11        had notes of everything.  And I typed them out

12        and gave them to Derrick.

13   Q.  Where are the notes that you gave to Derrick

14        that you took this from, or are these the

15        notes that you gave to Derrick?

16   A.  Uh-huh.

17   Q.  That's a yes?

18   A.  Yes.

19   Q.  So there are no other notes?

20   A.  No.

21   Q.  Did you have some and destroy them, or is

22        this the notes you're talking about?

23   A.  Those are the notes.  I just typed them, and,

Depo of Patricia Wheeles

Page 20

1      yes, I destroyed the handwritten ones.  I just

2      threw them away.

3   Q.  When did you start taking notes about when

4      things were happening at Nelson Electric?

5   A.  Well, actually I guess about the time Renea came

6      to work because of some things that had been

7      said to me before she came.

8   Q.  Patricia, I have read your complaint that's

9      filed in federal court.  If I understand it

10     correctly, you claim that you have been

11     discriminated against due to your age, that

12     you were terminated due to your age; is that

13     correct?

14  A.  Well, he had to make room for people.  He had to

15     make room for people.

16  Q.  Then are you saying that you weren't

17     terminated due to your age?

18  A.  Well, you read what he told me because I put

19     that on there.  What he did he had hired Renea.

20     And he told me there was not room for three of

21     us.  He couldn't afford to pay three of us to

22     work in that office.  And then after he let me

23     go if I'm not mistaken within before -- on or

Page 21

1      about the 31st of August, he hired Debra Keel

2      from Russell which she was one of his contacts

3      at Russell also.

4    Q.  Do you know what Debra Keel is doing?

5    A.  From my knowledge is they did a rotation thing.

6        Debra Keel took over Renea's job.  Renea took

7        over Louise's job, and Louise took mine.

8    Q.  What is the source of your information?

9    A.  People that were previously employed there that

10       had left the company also.

11   Q.  Who are they?

12   A.  Mike Taylor for one.

13   Q.  Who else?

14   A.  We'll just stay with him.

15   Q.  No.  If I ask, you've got to answer.

16   A.  I understand that.  The others I'm not -- Mike

17       Taylor was mainly the one that told me about

18       that.

19   Q.  I need to know anybody else that talked to

20       you about what was happening at Nelson

21       Electric after you left?

22       MR. BLYTHE:  Go ahead and answer the

23       question, Patricia.

Depo of Patricia Wheeles

Page 22

1    A.   I was trying to think of their name is what I
2         was trying to think of.  It was a black guy that
3         came there and took care of Gary's vehicles that
4         I did embroidery for his church, cleaned Gary's
5         vehicles up.
6    Q.   You don't recall his name?
7    A.   I can't think of his name right now.
8    Q.   Look at this list of people that you have
9         typed out as being employed at --
10   A.   Yes, while I was there at different times.
11   Q.   Do you recognize names on that list?
12   A.   Mike Taylor was the only one on this list.
13   Q.   So Mike Taylor would be the person that you
14        mainly gained your information from --
15   A.   Right.
16   Q.   -- what has occurred at Nelson Electric as
17        far as job duties after you left; is that
18        correct?
19   A.   Correct.  He was the one that told me that they
20        had hired Debra Keel.
21            MR. RADNEY:  Let me for the record state
22        that Defendant's Exhibit 1 is four pages and
23        clipped back together.

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 23

1          MR. BLYTHE:  Larkin, just so the record is

2          preserved I'm just going to object to the use of

3          that as attorney/client privileged information

4          and/or work product, but go ahead.

5    Q.  Well, let me ask you this, Patricia.  Why

6       were you terminated?

7    A.  Gary Nelson just told me that he didn't have

8       room for three of us in the office and that he

9       wanted Renea to take over the office, that

10      Louise would be retiring in about four years.

11      By then Renea would learn how to do things.

12   Q.  So he was making a decision based upon the

13      fact that he didn't need that additional

14      employee?

15   A.  That's what he said.

16   Q.  Do you have anything to refute that

17      decision?

18   A.  Undoubtedly he must have needed someone because

19      she took that over, and he hired Debra to do

20      Renea's job out in the shop.

21   Q.  Do you know how old Debra Keel is?

22   A.  No, I do not.

23   Q.  Is she over 40, under 40?

Depo of Patricia Wheeles

Page 24

1   A.   I have no idea.  I have never met her, only
2        talked with her on the phone.
3   Q.   When did you talk with her on the telephone?
4   A.   While I worked at Nelson Electric.
5   Q.   Due to business?
6   A.   Yes.
7   Q.   At the time that you were first employed at
8        Nelson Electric, tell me what your job
9        duties were.
10  A.   I did payroll, did the payables, and did the
11       bank statements.  And I made all the deposits
12       for the company and whatever he needed me to do.
13  Q.   Louise was also in the office; is that
14       correct?
15  A.   Yes.
16  Q.   Were y'all the only two ladies in the
17       office?
18  A.   Yes.
19  Q.   And what were your job duties at the time
20       that Renea Morgan was employed?
21  A.   Same thing I had done it for seven years.
22  Q.   What were your job duties at the time of the
23       termination?

Depo of Patricia Wheeles

Page 25

| | | |
|---|---|---|
| 1 | A. | Actually, nothing really because Louise had |
| 2 | | given Renea her job, her job responsibilities; |
| 3 | | and Louise had taken mine. |
| 4 | Q. | At the time of your termination? |
| 5 | A. | Yes. |
| 6 | Q. | Louise had give them to Renea? |
| 7 | A. | All of her responsibilities or the majority of |
| 8 | | them.  She took mine. |
| 9 | Q. | Louise took yours? |
| 10 | A. | Uh-huh, all except payroll.  I was still doing |
| 11 | | payroll.  That was basically all they had left |
| 12 | | just about for me to do. |
| 13 | Q. | What do you have to do for payroll? |
| 14 | A. | Basically, have to do a report on everyone's |
| 15 | | hours and then I had -- well, I faxed them over |
| 16 | | to the company that was doing the payroll which |
| 17 | | they in turn faxed -- well, they in turn paid |
| 18 | | over with Wachovia Bank is where our payroll |
| 19 | | came through.  It's direct deposited. |
| 20 | Q. | You had or Nelson Electric had what we call |
| 21 | | a third party administrator for payroll |
| 22 | | called McBee payroll? |
| 23 | A. | Correct. |

Depo of Patricia Wheeles

Page 26

1    Q.   You would furnish to McBee Payroll the

2         information for them to transfer and get

3         moneys to the employees?

4    A.   Correct.

5    Q.   Did you work 40 hours a week?

6    A.   Yes, I did.

7    Q.   Did you do this particular job, payroll job,

8         on a particular day?

9    A.   Yes, I did.

10   Q.   What day was that?

11   A.   I had to do it on Wednesday because everything

12        had to be faxed in on Wednesday due to McBee

13        having to get the direct deposits ready.

14   Q.   So whatever you did to organize the payroll

15        information for McBee, you did it on

16        Wednesday; is that correct?

17   A.   Wednesday mornings, yes.

18   Q.   Do you know what Renea's duties were with

19        Nelson Electric immediately after your

20        termination?

21   A.   No, I do not.

22   Q.   Do you know whether or not she has taken

23        over any of your job responsibilities?

Depo of Patricia Wheeles

Page 27

1    A.   I do not.

2    Q.   Do you know if her job duties have changed

3         at all since your termination?

4    A.   I'm not there.  I don't have a clue.

5    Q.   I understand your testimony is that you were

6         terminated because Mr. Nelson made a

7         decision that there wasn't sufficient amount

8         of work to be done in the office by three

9         ladies; is that correct?

10   A.   That's what he said.

11   Q.   Did you and he discuss you going to Opelika

12        to the Opelika branch?

13   A.   Yes.

14   Q.   You obviously did not go?

15   A.   No.

16   Q.   Do you know why you didn't go?

17   A.   He told me on the day he let me go that he had

18        changed his mind.  He decided that I would not

19        go, that he was just going to let me go.

20   Q.   Did he tell you why he wasn't going to send

21        you to Opelika?

22   A.   No.

23   Q.   Did he discuss with you Ricky Lashley and

1       Ricky Lashley would fire you the moment that

2       you walked into the plant?

3    A. Gary said he would see to it Ricky Lashley fired

4       me.

5    Q. Did you have a good working relationship

6       with Ricky Lashley?

7    A. Well, we talked.  He was always stopping by my

8       office and talking about different things.

9    Q. Did you consider yourself to have a good

10      working relationship with Ricky Lashley?

11   A. I guess.

12   Q. That mean you don't know?

13   A. To my knowledge, yes.

14   Q. Did you type up an agreement and give to

15      Gary concerning your termination?

16   A. Well, yes.  Would you like for me to explain

17      that?

18   Q. I'm going to ask you about that.  What was

19      that?

20   A. Actually, everything Gary offered to me I

21      accepted because I needed to have a job to have

22      insurance and help pay bills.  So the last time

23      that he came in there the day before he let me

Page 29

1    go, he started discussing with me, well, I will

2    pay you "X" amount of dollars to leave.  And

3    then I'll pay your insurance, and you can work

4    part-time.  And I will cover your insurance with

5    that.  I agreed on that.

6    Q.   So you agreed to work part-time or as

7    needed?

8    A.   Yes, to cover the insurance.

9    (Defendant's Exhibit 2, agreement, marked

10    for identification)

11    Q.   I'm going to show you what I've marked as

12    Defendant's Exhibit 2 and ask if that's a

13    copy of the agreement that you're

14    discussing?

15    A.   I'll have to get my glasses.

16    Q.   Sure.

17    A.   Okay.  I believe it is.

18    Q.   This is the agreement you're talking about

19    --

20    A.   Yes.

21    Q.   -- that he would provide you certain

22    consideration and insurance, but you would

23    agree to work part-time if necessary; is

Page 30

1              that correct?

2     A.     I would work part-time, and then come back full

3              time when it was needed.

4     Q.     So you felt like you could still do your job

5              at Nelson Electric regardless of what all

6              was going on with Renea or Louise or anybody

7              else that you had interpersonal

8              relationships with?

9     A.     I was going to attempt that because I needed the

10             money to pay bills and insurance.

11    Q.     But you would come back based on this

12             agreement?

13    A.     Well, I agreed to do that.  I agreed with

14             everything he asked me to do.

15    Q.     What happened to the agreement?

16    A.     Gary changed his mind.

17    Q.     Do you know why?  Did he tell you why he

18             changed his mind?  That's a no.  She has to

19             write that.

20    A.     No, I'm not sorry.

21    Q.     Let me ask you this way.  If, in fact, y'all

22             had gone through this agreement and y'all

23             both agreed to it and he had called you back

Depo of Patricia Wheeles

Page 31

1       to work part-time or even full time, would

2       you have gone back and worked part-time

3       and/or full time?

4    A. Yes, I would have due to the fact that I needed

5       the money.

6    Q. That's pretty much -- a lot of people work

7       for that reason, do they not?

8    A. Yeah, got to have that.

9    Q. As far as you can tell me today, Mr. Nelson

10      terminated you based upon his business

11      decision to, I suppose, decrease the amount

12      of personnel he's paying in the office?

13   A. I guess, yes.

14   Q. When you were employed at Nelson's Electric

15      Motor Service, did you have a title?

16   A. No.

17   Q. Your employer was, in fact, Nelson Electric

18      Services, the corporation, was it not?

19   A. Yes.

20   Q. Louise Partika nor Renea Morgan employed

21      you, nor did they supervise you, did they?

22   A. Louise was a supervisor, yes.

23   Q. She was a supervisor?

Depo of Patricia Wheeles

Page 32

1    A.  Yes.

2    Q.  In your complaint you indicate that Gary

3        Nelson was your supervisor?

4    A.  He was also.

5    Q.  You had two supervisors?

6    A.  Yes.

7    Q.  Renea was not a supervisor?

8    A.  No.

9    Q.  Want to be sure I'm clear about this because

10       I'm confused about what everybody's duties

11       were.  Your job duties didn't change from

12       the day you were employed in 1999 till the

13       day you were terminated or separated in

14       2006; is that correct?

15   A.  Well, only when Louise took over a portion of my

16       job of the payables, yes.  I still cut the

17       checks to make the payables, but she took over a

18       large portion of that.

19   Q.  But Renea didn't take over your job?

20   A.  No, Renea took Louise's job.

21   Q.  What were your wages while you were working

22       at Nelson Electric?

23   A.  I really don't remember to be honest.

Depo of Patricia Wheeles

Page 33

1    Q.  Do you recall what your annual income was

2        from Nelson Electric?

3    A.  About 23 -- I believe around 23,000 a year,

4        somewhere in that vicinity.

5    Q.  Did you have certain benefits?

6    A.  Yes, I did.

7    Q.  What benefits did you have?

8    A.  I had a 401K and insurance and -- well, all

9        type, you know, the cancer insurance as well as

10       health and dental.

11   Q.  Did you pay for that or the company pay for

12       it?

13   A.  The company paid for it.

14   Q.  Did you pay any portion of it?

15   A.  Not on health and dental.  Cancer I paid all of

16       it.

17   Q.  On the 401K did the company place money in

18       that account for you, or did you place the

19       money in the account for you?

20   A.  A portion of it was mine, and the other portion

21       was Nelson Electric.

22   Q.  When you terminated, did you obtain your

23       401K funds?

Depo of Patricia Wheeles

Page 34

1    A.   I did eventually.

2    Q.   Did you roll those over into an IRA?

3    A.   Yes, I did.

4    Q.   Do you have presently have insurance?

5    A.   Yes, I do.

6    Q.   With whom?

7    A.   Blue Cross-Blue Shield.

8    Q.   Who pays that?

9    A.   I do.

10   Q.   Does your husband not having insurance

11        through the retirement system?

12   A.   Yes, he does.

13   Q.   You can't get on his policy?

14   A.   No.

15   Q.   Why?

16   A.   Well, his is like Medicaid and Medicare.  His is

17        not like retirement from Russell Lands.  That

18        doesn't carry over.

19   Q.   If I understand the job delineations and

20        duties, then Louise replaced you so to speak

21        with your job duties is that; is that

22        correct now?

23   A.   Yes.

Depo of Patricia Wheeles

Page 35

1    Q.   In your complaint you seem to allege that

2         you worked in a hostile work environment?

3    A.   Yes.

4    Q.   Would you describe that for me?  What do you

5         mean by that?

6    A.   Well, false accusations for one.

7    Q.   Okay.  People telling things about you or

8         saying things about you that weren't true?

9    A.   Correct.

10   Q.   What else?

11   A.   Just a lot of cussing and all going on there.

12   Q.   Anything else?

13   A.   Not that I can think of.

14   Q.   Have you read your complaint that you have

15        filed?

16   A.   Yes, I have.

17   Q.   You make statements in there about some sort

18        of religious persecution.  What do you mean

19        by that?

20   A.   It was statements that Louise and Renea had

21        made.

22   Q.   What did they say to you?

23   A.   I had purchased some little angel earrings.  And

1       Renea made a statement to Louise have you seen

2       Patricia's little angel earrings?  I wonder if

3       she thinks they're going to save her and protect

4       her?  And then a little while later on in the

5       month, Louise -- well, Renea made the statement

6       does Patricia not realize everything that we're

7       doing to her and saying to her is things that

8       Gary Nelson has told us to say and do?  And

9       Louise's response was, yeah, I wonder where her

10      Jesus is going to be when Gary does what he does

11      to her?

12  Q.  What did you think they meant by that, when

13      Gary does what he's going to do to her?

14  A.  I have no idea.  I wondered myself.

15  Q.  What did Gary do to you?

16  A.  Well, a few days later he came in there and told

17      me I was going Opelika or a few weeks later.  I

18      thought, well, that must have been what they

19      were talking about.

20  Q.  Well, you didn't mind going to Opelika

21      though, did you?

22  A.  Well, I didn't care to drive to Opelika.  I had

23      already done that before for him.

Depo of Patricia Wheeles

1   Q.   But you were willing to go back?

2   A.   To have a job I didn't have a choice.  That's

3        exactly what he told me.  If you want to work

4        for Nelson Electric you will go to the Opelika

5        shop.

6   Q.   I want to be sure I understand.  You say in

7        March I purchased a pair of angel earrings.

8        I'm reading Defendant's Exhibit 1.  March, I

9        purchased a pair angel earrings.  I wore

10       them to work.  Louise and Renea made sure I

11       heard their conversation concerning --

12  A.   Correct.

13  Q.   And that happened in March then?

14  A.   Yes.

15  Q.   According to your notes?

16  A.   Yes.

17  Q.   Was there anything else that you can recall

18       or tell me today that anyone at Nelson

19       Electric did that would make the work place

20       hostile as far as your religious beliefs?

21  A.   Well, just, you know, the cussing that goes on.

22       You know, it was awful.  Ted, every time you'd

23       go back there is was G-D this, M-F this.  It was

Page 38

1       a constant thing.

2  Q.   When you say go back there you mean go back

3       to the shop?

4  A.   Go back to the back of the shop.

5  Q.   Did you ask them not to cuss in front of

6       you?

7  A.   I did.

8  Q.   What about anything else on the front of the

9       office side of the building?  Did anybody

10      else in any way discriminate -- excuse me,

11      discriminate against you due to your

12      religion?

13 A.   No.  Just the making fun of the earrings and

14      where's her Jesus.

15 Q.   Where is her Jesus now statement occurred

16      when?  Could it have been in March also?

17 A.   Could have been.

18 Q.   March of 2006?

19 A.   Uh-huh.

20 Q.   Is that a yes?

21 A.   Yes.  I'm sorry.

22 Q.   Anything else concerning religious

23      discrimination other than the cussing in the

Page 39

1          back of the shop and that one instance?

2      A.  The two incidents.

3      Q.  Cussing in the back of the shop and that

4          incident; is that correct?

5      A.  Those are two different incidents right there

6          with Louise and Renea's conversations were at

7          two different times.

8      Q.  And that occurred in March you think of

9          2006?

10     A.  Correct.

11     Q.  As far as the cussing in the back of the

12         shop, were they cussing at you or just

13         cussing in general?

14     A.  Ted just cusses when he breaths.

15     Q.  Ted who?

16     A.  Ted Bradika.

17     Q.  Anyone else cuss back there?

18     A.  Yes, Doug.

19     Q.  Were they cussing at you, or were they

20         cussing in general?

21     A.  Doug cussed me out one day for doing my job.  I

22         had to take care of worker's comp.  I had to go

23         back there one day and get him to sit down.  He

Page 40

1      had gotten injured.  I said would you please sit

2      down with me.  I need to get this paperwork in

3      to worker's comp.  Well, he just flew off the

4      handle and started cussing.  I told Gary about

5      it when he got there.  And Gary said, oh, he

6      cussed you for doing your job?  And I said,

7      yeah, I was trying to do my job.

8   Q.  What did he say to you?

9   A.  I don't have blankety-blank time to sit and fool

10     with this and write that down.  It don't matter

11     whether worker's comp gets it or not.  They need

12     to just be paying it.

13  Q.  He wasn't cussing you then?  Just cussing

14     the situation?

15  A.  Cussing while he was talking.

16  Q.  Anything else you can think of?  Is that a

17     no?

18  A.  No.  I was thinking.  I'm sorry.  Trying to

19     think.

20  Q.  Do you know what Renea Morgan was making at

21     the time of your termination?  Was she

22     making more or less than you?

23  A.  She was making $.25 an hour less than me.

1     Q.  Do you know what sort of bonus she received

2         the Christmas before or whenever the bonuses

3         were delivered?

4     A.  I'm the one that did the bonuses, but I can't

5         tell you right off the top of my head.

6     Q.  Was her bonus less or more than yours?

7     A.  It's not a whole lot of difference.  I think

8         hers was less.

9     Q.  You make a statement in the complaint that

10        you purchased a vehicle that would use less

11        gas so you could travel to Opelika?

12    A.  Correct.

13    Q.  That Gary made it clear to you that he was

14        not going to pay you gas mileage, but he

15        paid Brian Voss' gas mileage?

16    A.  Correct.

17    Q.  When you ran errands for Nelson Electric in

18        and around Alexander City, you were

19        reimbursed for your gas, were you not?

20    A.  Once a month they would pay for a fill-up.

21    Q.  Right.  And that's for your running around

22        doing Nelson Electric business in Alexander

23        City?

Page 42

1    A.    Correct.

2    Q.    Did you understand that Bryan Voss was also

3          delivering items to customers in and about

4          Opelika and Alex. City with his vehicle?

5    A.    Well, I do not know because I was just told he

6          was being reimbursed for his gas going back and

7          forth every month to Nelson Electric in Opelika.

8    Q.    You state in your complaint that you also

9          worked in a hostile environment due to a

10         sexual relationship between Renea and Gary.

11         Tell me facts that you know concerning that

12         sexual relationship.

13   A.    Well, there was quite a few times that I would

14         walk out into the shop and they would be like

15         real close up to each other.  And she'd be

16         staring up in his eyes batting her little

17         eyelids and grinning in his face.  And then they

18         would be like sitting right up real close to

19         each other sometimes.  And when you'd walk up

20         one of them would scatter.  And then it was some

21         things that Renea had said.

22   Q.    Let me make sure I understand.  The sexual

23         relationships you're talking about were not

1     directed toward you?

2  A.  No.

3  Q.  I mean Gary Nelson or anyone else sexually

4     harassed you --

5  A.  No.

6  Q.  -- directly?

7  A.  No.

8  Q.  But your testimony is that there was some

9     sexual relationship between Gary and Renea?

10  A.  That was from statements that Renea had made

11     also.

12  Q.  What did Renea tell you?

13  A.  Well, one day she asked me she said, Patricia,

14     has Gary never told you that he and I have been

15     the best of friends for 17 years and that all

16     the intimate conversations that he and I have

17     had.  I said, no, and you're not either.  Then

18     there was another time she made the statement --

19     she was talking about Julia being a very strong

20     person.  I said, yes, she is.  I said to go

21     through the cancer that she had she had to be a

22     strong person because she never complained about

23     the chemo.  And she never complained about the

Page 44

1       radiation she had to take.  And she said, yeah,

2       I'm glad she's a strong person because she'll

3       survive when things come out about me and Gary.

4   Q.  Anything else?

5   A.  And Louise made a statement before Renea came to

6       work there that she knew that Renea was the one

7       that Gary Nelson was having an affair with.  She

8       had always accused him of having an affair with

9       someone ever since I had been there.  But the

10      day that she found out Renea was coming and what

11      he was going to start Renea off at she said I

12      know for a fact that's who he's been having an

13      affair with because he hangs out over there all

14      the time with her.  And he's never started a

15      woman off in this office at top dollar like he

16      is her.

17  Q.  Anything else you can think of?

18  A.  Not right off the top of my head, no.

19  Q.  When did you last recall seeing Gary and

20      Renea together in a away that you describe

21      either being close or talking very close

22      together?

23  A.  The day before Gary let me go.

Page 45

1    Q.   And when did the conversation occur with
2         Louise?
3    A.   The conversation that Louise made about Gary
4         having the affair that he knew that Renea was
5         the one that he had been having an affair with
6         all these years, the two days before she came to
7         work.
8    Q.   Did you warn Gary about Renea before he
9         hired her?
10   A.   No, I did not.  I did talk with him after Renea
11        made the statement to me that she made.
12   Q.   Did you ever see them actually touch each
13        other?
14   A.   No.
15   Q.   Did you ever hear them talk with each other
16        or what they were talking about?
17   A.   I didn't try to listen.
18   Q.   So it's simply their close contact in the
19        business place and the conversation you had
20        with Louise; is that correct?
21   A.   Correct.
22   Q.   As a result of that could you continue to do
23        your job?

a2d79574-13e9-42a9-95ec-b3349e8d8461

Depo of Patricia Wheeles

Page 46

| | | |
|---|---|---|
| 1 | A. | I still did my job. |
| 2 | Q. | I mean it didn't affect your ability to do |
| 3 | | the job in the work place, did it? |
| 4 | A. | No. |
| 5 | Q. | Did either the religious or sexual |
| 6 | | discrimination that you claim didn't affect |
| 7 | | your ability to come to work every day and |
| 8 | | work -- |
| 9 | A. | Well, it was hard, Larkin.  It was very hard to |
| 10 | | have to go in there.  And just like the thievery |
| 11 | | that Renea accused me of about water.  Gary |
| 12 | | liked bottled water.  I liked it.  From the time |
| 13 | | I started working there, I started bringing |
| 14 | | bottled water to work there.  Then Gary would |
| 15 | | drink it.  Finally, one day he came in there.  I |
| 16 | | knew someone was drinking it, but I could have |
| 17 | | cared less.  And he came in there and said, |
| 18 | | Patricia, I've been drinking some of your water, |
| 19 | | your bottled water.  I said, well, that's fine. |
| 20 | | And he said how about getting some money and |
| 21 | | going and buying me and you some water.  So from |
| 22 | | that day on for every case that I purchased |
| 23 | | through Nelson Electric with Gary Nelson's |

Depo of Patricia Wheeles

Page 47

1          money, I purchased a case with mine.  And

2          anybody -- it didn't matter who it was,

3          customers, whoever, wanted water, they knew that

4          that bottled water was in the refrigerator.  And

5          they got it.

6     Q.   Anything else that you can think of

7          regarding your work that you couldn't

8          perform due to either the sexual

9          connotations as you saw it between Renea and

10         Gary and/or the religious issues?

11    A.   Well, there was just a lot of conflict there.

12    Q.   Other than sexual and religious?  Is that

13         what you're saying?

14    A.   There was just a lot of conflict with remarks

15         being made every day.  And Renea would walk by

16         my office.  I talked to Gary about it one day.

17         I said she'll walk by my office, and if I turn

18         and look she'll stick out her tongue or she'll

19         make a face.  So she finally stopped that.

20         She'd just start giving me dirty looks when

21         she'd walk by if I turned around and looked to

22         see who was coming in the door.

23    Q.   That had nothing to do with your religion or

Depo of Patricia Wheeles

Page 48

1      religious beliefs, did it, her sticking her

2      tongue out?

3   A.  No, it was just her attitude.

4   Q.  Wasn't any sort of sexual connotation of

5      what was going on in the office?

6   A.  Just her attitude.

7   Q.  Did you complain to Gary about what you saw

8      or what you conceived it to be a sexual

9      relationship between he and Renea?

10  A.  No, I did not complain to him about that.

11  Q.  Did you complain to him about any of the

12     religious persecution issues you've talked

13     about?

14  A.  As a matter of fact, I was going to talk with

15     him about that one day.  Then he told me that he

16     didn't care what Renea or Louise either one did

17     or said, nor anyone else as far as that was

18     concerned.

19  Q.  So you didn't get to talk to him about it?

20  A.  No.

21  Q.  About the religious issues?

22  A.  Correct.

23  Q.  During the last two years were you employed

Depo of Patricia Wheeles

Page 49

1    by the church?

2    A.    I was not employed by the church.  I was never

3          employed by the church.

4    Q.    Have you ever been treated by a psychologist

5          or psychiatrist or anyone in the mental

6          health industry?

7    A.    No.

8    Q.    Did you seek treatment for any mental

9          distress or emotions since your termination

10         from Nelson Electric?

11   A.    No.  But my nerves have certainly calmed down

12         quite a bit.

13   Q.    Since your termination?

14   A.    Since I'm away from them every day.

15   Q.    Derrick has given to me a copy of what in

16         federal court we call initial disclosures.

17         And he has named you as a witness, and he's

18         also named employees at Nelson Electric as

19         potential witnesses.  Do you know of any

20         other witnesses outside of Nelson Electric

21         that may testify on your behalf?

22   A.    No, I do not.

23   Q.    Do you know of anyone else that's ever

1       complained to you or have you heard of

2       anyone complain regarding either sexual,

3       religious, or age discrimination at Nelson

4       Electric?

5   A.  No, not on age.

6   Q.  How about sexual discrimination?  You know

7       anybody that's been sexually discriminated

8       there?

9   A.  No.

10  Q.  And religiously persecuted or discriminated

11      against at Nelson Electric?

12  A.  No.

13  Q.  You were not terminated due to some sexual

14      discrimination, were you?

15  A.  He never told me why.

16  Q.  Well, and you weren't discriminated against

17      by termination due to your religious

18      beliefs, were you?

19  A.  He never told me why.

20  Q.  So you don't know why you were terminated?

21  A.  No, I do not.

22          MR. RADNEY:  Thank you, ma'am.  Give me one

23      second.

Page 51

1                           (Break)

2              MR. RADNEY:  That's all I have.

3        Thank you.

4              MR. BLYTHE:  I have got a few questions just

5        to follow up.

6                        EXAMINATION

7    BY MR. BLYTHE:

8    Q.  Patricia, one thing that we need to clear

9        up.  Did you file -- and I think this

10       happened since we started this particular

11       lawsuit.  Did you file a small claims court

12       collection on somebody who didn't pay you?

13   A.  Yes, I have, but it's not been --

14   Q.  It's still hanging?

15   A.  Uh-huh.

16             MR. BLYTHE:  You had asked that question,

17       Larkin.  And I knew she had, but she didn't

18       remember it.

19             MR. RADNEY:  No problem.

20   Q.  And let me just get straight to this,

21       Patricia.  Were you fired to make room for

22       Debra Keel?

23   A.  Yes, I believe I was.  She was hired shortly

1          after.

2     Q.   And do you have any idea how old Debra is?

3     A.   Not really.  But I know she's younger than I am.

4     Q.   And I know that Gary had said that he

5          couldn't keep three, I think, office

6          employees or something like that?

7     A.   Three ladies in the office.

8     Q.   And that was the reason he was going to let

9          you go?

10    A.   Correct.

11    Q.   How soon after he let you go did he hire

12         Debra Keel?

13    A.   Within a couple of weeks to my understanding.

14    Q.   And you make reference that she was a,

15         quote, contact at Russell Corporation.  Why

16         is that important?

17    A.   Because she was just like Renea.  Renea was one

18         of his contacts at Russell also.  They worked in

19         the office where he placed his orders.  They

20         would contact him to see if he needed anything

21         when they were placing their orders, or they

22         would order through Gary actually.  Actually,

23         it's what it was for things that they needed

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 53

1        they ordered through Gary.

2    Q.  Why would Renea and Debra come to work from

3        Russell for Gary?  Do you have any idea?

4    A.  They were his contacts.  And Debra I know was

5        losing her job because they were closing -- I

6        presume she was losing her job because they were

7        closing yarn and dye.

8    Q.  What about Renea when she came?

9    A.  Renea's job to my knowledge was not in jeopardy.

10   Q.  Did you do anything in preparation to go to

11       work in Opelika for Mr. Nelson?

12   A.  Yes, I purchased a vehicle.

13   Q.  What did you purchase?

14   A.  2002 Volvo.

15   Q.  How much did you pay for that?

16   A.  About 16,000.

17   Q.  And did you have a vehicle at that time?

18   A.  Yes, I did.

19   Q.  What did you have?

20   A.  Dodge Durango 2002.

21   Q.  Why did you purchase this Volvo?

22   A.  Because of the gas being so high.  The Volvo

23       would have been a lot cheaper to drive back and

Page 54

1   forth to Opelika gas wise.  And the Durango is a

2   lot more expensive.

3   Q.  Were there other employees with Nelson

4       Electric that had to drive back and forth to

5       Opelika?

6   A.  Yes, there was.

7   Q.  Who were they?

8   A.  Well, Ricky Lashley for one.  But, of course, he

9       used a company vehicle to drive back and forth.

10      He was purchased a new one.  Well, he first took

11      Ricky Patterson's truck.  Then they purchased

12      him a new one later on.  And then Brian Voss

13      drove back and forth in his personal vehicle.

14  Q.  Let me stop you first about the first guy.

15      What was his name?

16  A.  Ricky Lashley.

17  Q.  And you say they purchased a company

18      vehicle.  Do you mean Mr. Nelson purchased

19      him a company vehicle?

20  A.  Yes.

21  Q.  That was for him to drive back and forth in?

22  A.  Yes, and to do company business in.

23  Q.  You say Mr. Voss drove back and forth?

1    A.   Yes, he did.

2    Q.   Is that Brian Voss?

3    A.   That is correct.

4    Q.   Were there any special considerations made

5         by Mr. Nelson for Mr. Voss?

6    A.   Well, he paid him once -- well, sometimes twice

7         a month, at least once a month and every once in

8         a while it was twice a month $100 on each check

9         that he gave him for gas money.  That's what was

10        put on the check.  It was for gas.

11   Q.   Did he make and I say he -- did Mr. Nelson

12        make any provision to buy you gas or

13        anything like that?

14   A.   No, he did not.

15   Q.   To your knowledge is Brian Voss still

16        employed with Nelson Electric?

17   A.   To my knowledge, yes.

18   Q.   And, Patricia, did you need this job with

19        Nelson Electric?

20   A.   Yes, I did.

21   Q.   Why?

22   A.   You know, we have to have food on the table and

23        pay bills.

Depo of Patricia Wheeles

Page 56

1    Q.   When you started having trouble towards the
2         end of your employment with Nelson Electric,
3         were there certain things that Gary had
4         asked of you?
5    A.   Yes.
6    Q.   Just explain that to me.  What was going on
7         there at the end?
8    A.   Well, asking me to go to Opelika.  And I talked
9         with him about that.  I said, you know, I don't
10        think it's right that I should be the one to
11        have to go.  I'm the only one that does this
12        job.  There's Cara Lee, Renea, and Louise all
13        three did the same job.  None did what I did.
14        Why should I be the one having to go to
15        Opelika?  They were wanting to let Cara Lee go
16        according to Ricky Lashley because she was
17        always out of work.
18   Q.   Who is this Cara Lee?  Where was she
19        employed?
20   A.   At the Opelika shop.
21   Q.   You had actually been working for Nelson
22        Electric longer than Renea; is that correct?
23   A.   Yes, it is.

1    Q.  Was there any explanation given to you why

2        Renea was not the person that was going to

3        have to drive to Opelika?

4    A.  Yes, it was.

5    Q.  What was that?

6    A.  Gary said he did not want her down there.  He

7        wanted her at the Alexander City office.  That's

8        when he told me that Louise would be retiring in

9        four years and that Renea by then would be able

10       to run that office by herself, and there would

11       be only one female in that office within four

12       years because by then the work load for the

13       Alexander City office would be so low it would

14       require only one person, one lady, to work in

15       the office.  And all the business would be in

16       the Opelika shop where there would be one or

17       more females in the office there.

18   Q.  Did this seem fair to you, Patricia?

19           MR. RADNEY:  Object to the form.

20   Q.  Go ahead and answer the question.

21   A.  No, I do not think it's fair.

22   Q.  Let me ask you this.  As far as you know

23       today, how many females are working in the

Depo of Patricia Wheeles

Page 58

1          office at Nelson Electric?

2    A.    The one in Alexander City, there's three.

3    Q.    Okay.

4    A.    And I presume there's still just Cara Lee at the

5          Opelika shop.

6    Q.    Is there some reason that you feel like that

7          Mr. Nelson didn't want to send Renea to

8          Opelika other than what he told you?

9    A.    He said he wanted her up here at the Alex. City

10         office.

11   Q.    After you left --

12   A.    Let me verify something.  When I say the office,

13         that includes the office and the shop where

14         there's Louise and Renea in the front office and

15         then there's the office in the shop where I was

16         told Debra Keel was working.  That was Renea's

17         office when I left.

18   Q.    That's just geography, is it not?

19   A.    Yes.

20   Q.    They're still doing office work?

21   A.    Office work, correct.

22   Q.    Patricia, I know I'm asking you to base this

23         next question on things that have been told

Page 59

1        to you and things.  But since you left do

2        you have any idea about your specific job

3        duties and who's doing those now?

4    A.  I do not have a clue other what I was told.

5    Q.  And what were you told?

6    A.  I was told that Debra Keel was hired.  And she

7        went in for the office in the shop to replace

8        Renea.  Renea went into Louise's office to

9        replace Louise.  Louise went into my old office

10       to do my job and replace me.

11   Q.  This was after you were told that the

12       business would not support this many

13       employees?

14   A.  Correct.

15   Q.  Now, Patricia, do you feel like you were

16       treated differently than Renea?

17   A.  Yes, I do.

18   Q.  Why is that?

19   A.  Well, you know, it was pay raises and just the

20       way he acted in general.

21   Q.  I'm not asking what he did.  I'm asking why

22       do you think he treated her better than

23       you?

Depo of Patricia Wheeles

Page 60

1    A.  Well, she's younger than I am.

2    Q.  Well, do you believe there was some type

3        inappropriate relationship between the two?

4    A.  I do according to the statements that Renea made

5        and just from the looks of things with the two

6        of them.

7    Q.  You think that's the reason you were treated

8        differently?

9    A.  I feel like it was.

10   Q.  Now, these things that Louise and Renea said

11       about your Jesus, how did that make you

12       feel?

13   A.  It was very uncomfortable because, you know, I

14       love my Jesus, and I'm proud of him.  And I'm

15       proud of him today.  He supports me 24/7.  And

16       I'm going to be there for him 24/7.

17   Q.  Did that make you feel like they were

18       somehow ridiculing you for being a

19       Christian?

20   A.  Yes, I do.

21   Q.  Do you think they wouldn't have made these

22       remarks if you were not a Christian?

23   A.  I don't think they would.

Depo of Patricia Wheeles

Page 61

| | | |
|---|---|---|
| 1 | Q. | How much were you making per year at Nelson |
| 2 | | Electric when you left? |
| 3 | A. | Somewhere around 23.  I'm not positive about the |
| 4 | | exact amount right now.  I can pull income tax |
| 5 | | and see.  But to my knowledge somewhere close to |
| 6 | | 23,000 a year. |
| 7 | Q. | And, Patricia, when you first started |
| 8 | | working for Gary did you enjoy that job? |
| 9 | A. | Yes, I did. |
| 10 | Q. | And what about in the end? |
| 11 | A. | No.  It was very uncomfortable to go to work |
| 12 | | there.  I went because I had bills to pay. |
| 13 | Q. | And one final question, Patricia.  And I |
| 14 | | know that Mr. Radney had asked this question |
| 15 | | in one form.  I'm just going to ask it very |
| 16 | | directly.  Has Mr. Nelson ever put his hands |
| 17 | | on you? |
| 18 | A. | Yes, he did. |
| 19 | Q. | Explain that to me. |
| 20 | A. | The very last day after he had let me go I was |
| 21 | | packing my personal belongings.  I knew I had |
| 22 | | some discs over there with my personal things on |
| 23 | | there and to verify some other things.  And on |

Page 62

1      that was my resume' that I had taken.  And there

2      was some church business on there.  I picked the

3      two discs up to put them in my box.  When I did,

4      Gary grabbed me by my right arm and jerked the

5      discs out of my hand.

6   Q. When you say he grabbed you by your right

7      arm, what do you mean?  Did he place his

8      hand on you?

9   A. No, he grabbed me.  He held my arm very

10     strongly.

11  Q. Would you characterize that as an act of

12     aggression?

13  A. Yes, I do.  I sure do.  The way he jumped up and

14     grabbed me, yes, I do.

15  Q. Would you characterize that as some people

16     might say man handling you?

17  A. Yes.

18         MR. BLYTHE:  That's all the questions I

19     have.

20                   EXAMINATION

21  BY MR. RADNEY:

22  Q. I take it when Gary touched you, it wasn't a

23     in a sexual manner, was it?

Depo of Patricia Wheeles

Page 63

1    A.   No, it was aggressive.

2    Q.   This was after he had already let you go?

3    A.   Yes, I was packing my things.

4    Q.   Do you know whether or not Debra Keel is

5         presently employed at Nelson Electric?

6    A.   No, I do not.

7    Q.   Do you know when she was employed?

8    A.   All I know is I was told she came there a couple

9         of weeks after I left.

10   Q.   In your EEOC charge you never mentioned the

11        name of Debra Keel.  Why is that?

12   A.   Well, we did the day we were there because I

13        found out the night before we went.

14   Q.   And in your complaint that you filed against

15        Nelson Electric, you never mentioned the

16        name Debra Keel, did you, when you filed

17        this 15 November, 2007?  Do you see her name

18        in this complaint?

19   A.   No, it's not.

20        MR. RADNEY:  Thank you, ma'am.  That's all I

21        have.

22                END OF PROCEEDINGS

23

Page 64

1              C E R T I F I C A T E

2

3      STATE OF ALABAMA                )

4                                      )

5      TALLAPOOSA COUNTY               )

6                                      )

7           I hereby certify that the above and

8      foregoing matter was taken down by me in

9      stenotype and was thereto reduced to computer

10     print under my supervision, and that the

11     foregoing represents a true and correct

12     transcript of said matter.

13          I further certify that I am neither of

14     counsel nor of kin to the parties to the

15     action, nor am I in anywise interested in the

16     result of the said cause.

17

18

19     _____

20         FRANCES P. LOONEY, COMMISSIONER

21           ABCR NO. 81

22

23     My commission expires 12.27.2009.

May 5, 2005 Renea started to work with us, Gary had her to come see about all her paper work she needed to fill out. I gave it to her instead of staying in the office with me to fill it out, she went to the office where Gary was at. When Renea brought her paper work back she said in a very smart way here is my paper work back, I then ask her what her pay rate would be, since I did payroll, her response again in very smart way was I'm here now I guess we'll no before the is over.

In June of 2005, Gary had gotten two (2) cases of colored paper from Internet after they had closed. We were having Vacation Bible School and I had ask if he would give some to our children to use , his answer was get some of each color, so I did. Renea saw me taking two (2) packs out one afternoon, she then went straight to Louise and told her. Louise said something to Gary about it. The next morning first thing Renea went straight to Louise and ask if she told Gary about the paper. Louise said yes she had. Renea then wanted to know if he was going to fire me for stealing the paper, Louise said he did not answer he, he only turned and walked away.

Also, in June of 2005 I always picked up cases of water for Gary and while there I would always purchase a case , for every case of water Gary paid for I also paid for a case. He and I always kept our water in the refrigerator ( bottled water ) and never had a problem with this for six ( 6 ) years, until Renea Morgan came to work with us. Renea accused me of stealing water that I had paid for with my on money, this more than one time.

At different times over next few months I would be filing in the office next to Louise, I could hear Renea and Louise talking about me. Renea accused me of taking illegal drugs., she even came out ask me what kind of drugs I was on, I told her I don't take any illegal drugs, I do good to make myself take what the doctor tells me to take. This went on for months with her making false statements about me from one thing to another.

July , I was making copies of checks to file, Renea came to the copy machine and was looking at the checks, I put my hand up so she could not see the what each employee was paid. Renea then walked over to Louise and said, she has no idea that I am going to start doing payroll does she. Louise told her I had turned around and I could hear what she was saying. I then finished went back to my office, Renea went to lunch.

One morning while at the post office ran into Morris Morgan ( Renea's father-in- law) he told me he had heard that I was taking an early retirement and if that date had not been set , my response was yea in about ten (10) or so years. Morris then told he had heard it was going to be very soon.

During the months of August, September, October, November, and December things were a little quiet for me, for Louise's daughter and her husband Steve were having trouble in their marriage, so she and Renea had a lot to discuss with out down dogging me. Renea had to get the low down on Louise's daughter every morning on what happened the night before. Renea was giving her legal advice and telling Louise how and what attorney's to use for the divorce.

January of 2006, I had the worker's comp audit all of my other work to do, Louise gave me the 401K audit to do. Louise and Gary piled the work on me in December of 2005 and January of 2006. I never complained about how much work they piled on me, when the guy's would say why don't you complain, my remark was that's just job security.

February of 2006, Louise decided she would take a portion of my job, then she would issue out each invoice I was allowed to pay. I told Gary that I had all the audits finished and I would need that work to do until Harry of Hare & Dunlap could close us out, I would then be snowed under again balancing the bank statements. On Friday, Feb. 10th @ 7:45, Louise was talking very loud to Ricky Lashley, laughing so hard she could hardly talk, telling him that I was screaming for work and how funny she thought it was that she gave Renea part of her job and she took a large portion of mine. At 9:45 the same morning Renea went to Louise's office same ole seniority took place. Louise told Renea that she had to go to court with her

daughter Mandy for she to go before Judge Young and they were not worried because Mandy and Judge Young were very good friends. Louise also made the statement, she wish she would be called to testify because she could sit in any court room and lie and not a person there would ever no she was lying. Louise also made the statement to Renea that Steve and Jacob both told her she was going to die and go to hell for all the lies she tells on people.

March, I purchase a pair of angel ear rings, I wore them to work, Louise and Renea made sure I heard their conversation, " Louise, does she think those angel ear rings are going to help her and watch over her " Renea " I sure hope not with what we're going to do to her before it's over".

May of 2006, Louise was standing in the door of Renea's office while I was in the shop, Renea said to Louise "Patricia dose not know that everything we're doing and saying is what Gary tells us to do and say does she" Louise response was No and I wonder where her Jesus is going to be when Gary does to her what he's going to do".

June of 2006, Gary came to my office closed the door and sat down, come over here he said, this is what I am going to do with the pay raises, I'm showing you now because you do payroll . I'm (Gary) am going to give Renea a 15% pay raise and you a 10% pay raise. What do you have to say? I 'm already prepared for that! (Gary ) what do you mean ? (myself) I already no and that's okay! The last week of June Gary came to my office and close the door and set down, he wanted to talk about a few things, my response was okay! Gary began going over the company's that were closing or had already closed and or sold that we are not aloud to service any more, ( Interment closed, Robinson Foundry, Avondale Coosa and Alex City plants, and Russell Corp. were sold . Gary said, so this means you (Patricia) are going to have to start going to the Opelika shop and work if you want to work for Nelson Electric Motor Services , this will take place no later than August the 31st and you have no choice in the matter and you need to start making plans to go the Opelika shop. Gary also told me he was not going to help with gas expenses for me, but he gives Brian Voss a check once and some time twice a month for gas driving back and forth to Opelika to work $ 100.00. The trip each day will be one (1) hour and 15 mins. He assured me their would be no help with gas and no extra pay increase except the 10% as a normal pay raise. My husband ( Terrell) and I began looking for a car that was better on gas than my Durango , finally we found one and purchased it thinking I was going to the Opelika Shop to work.

August 15, 2006 , Louise came to my office wanting to know if I could get information form American Express , my answer was yes. She then ask me to call and find out why they were declining charges Renea was making. I call, the lady I spoke with said there had not been any charges declined. I then called in Renea's office and ask what number she was using , when I said here name she began screaming " what in the do you mean calling in here asking me damn questions about any thing". I then told here what American Express said and ask what number she was using, she then told me in very ugly way she gave me the number. I called American Express back after lunch at noon and the lady told me that was an old card number and they upgraded Gary's card with a new number. I then call Gary in at the Opelika shop to get the pin number off the back of the card for Renea and Louise both in order to give them the new number. I explain to Gary about the card situation and Gary told me when "Renea comes back from lunch go out there and give her the new number and take the old print out of the card she was using". I went to Renea's office and told her what Gary said and gave her the new number and along with the pin number Gary gave me off the back of his card. Renea began screaming at me again and I told her I was doing what Gary had said for me to do , she continued to scream at me and I went in her office closed the door and told her, she could keep her attitude to herself and that I did not come out there for her to be screaming at me, I then went back to my office.

August 16,2006 at 3:35 PM, Gary came in my office and said, Louise told him Renea was very upset about what happen on Tuesday, I said I should have been the one upset, she was screaming at me and cussing me I just told her to keep her attitude to herself , I don't come to work to be screamed and cussed at. Gary's response was " I don't care what Renea or Louise say's to you or how they say it to you, or what they do to

you, all I care about is Renea was upset because you called in her office and ask her a question and you also went in her office". Gary , went on to say, he did not like it when Renea was upset about anything, and he did not care how much anyone else got upset, just her". Gary then called Gary Kennedy on the radio and ask what Russell gave as severance packages to their employees. Gary Kennedy told him ex- amount of dollars per year and paid their insurance all but the amount each employee paid . The insurance was the same pay as they were paying while working, no changes on insurance . Gary, then told me he would give me a severance package of $5,000.00 and put me on as part time subject to be called back as full time at any given time and pay my insurance . I agreed to this only because it was a severance package. He continue to tell me about four ( 4 ) or five ( 5 ) times what a good job , how dependable and honest I've been and how much he really appreciated it for the pass seven ( 7 ) years.

Thursday, August 17, 2006, I had typed the agreement we had discussed on Wednesday afternoon for both of us to sign, but at 9:45 AM , Gary said he had changed his mind and there would not be a severance package and he would not pay my insurance, nor ,would I be working part time. Gary went on to say, Louise would only be working about four ( 4 ) more years and would be retiring and by then Renea would know enough that she could run the office by herself. He then ask what my feeling were about his decision? My response was I don't think that is right for I had been a dedicated employee for seven ( 7 ) years and Renea had only been with the company for 15 months and Carolee ( Opelika shop ) only seventeen ( 17 ) months.

Louise, Carolee and Renea all do the same job , so why am I the only one loosing my job? I do payroll, payables, post checks, journal entries , workers comp., bank statements for three (3 ) bank accounts, run all office errands, for both the Alex-City and Opelika shops. Gary then told me OKAY, you report to Opelika first thing tomorrow morning, I said okay. He then said the minute you walk in the door Ricky Lashley will fire you, because I'll see to that. My response was oh you want Ricky to fire me, because he does enjoy firing people. Gary then told me to just give him my keys ( my response), Gary did you just fire me, ( his response ) yes. I'll get a box and pack personal belongs, he told me NO he would have them packed and brought to me, I then told him, I brought them in as I came and I'll take them with me as I go. Gary sat and watch me the whole time I was packing up my personal belongs and I left as I was told.

While , I was packing my personal things, I picked up 2 (two) disks on the desk by the computer. Gary, grabbed me by my right arm and grabbed the disk out of my hand. I ask, what did you do that far?

Alex - City shop

Gary Nelson
Louise Partika
Renea Morgan
Patricia Wheeles
Steve Blair
Ted Brodka
Doug Suggs
Dean Duck
Donald Neese
Jimmy Phillips
Ricky Strickland
Mike Taylor
Mark Tate

Opelika Shop

Ricky Lashley
Carolee Holley
Scott Daughtery
Kenny Patterson
Rodney Renfroe
Tony Sheppard
Brian Voss
Shane Walton
Scott Potter
Robert Cook



DEFENDANT'S
EXHIBIT
*2*

~tricia Wheeles resign from a full time employee to part time only.

In this agreement **Gary Nelson** will pay me **$ 5,000.00** cash money and **Health and Dental Insurance** that Nelson Electric Motor Services provides for any and all full time employees, with the agreement of being pulled back as a full time employee when needed for insurance purposes or for any reason.

With this letter **Gary Nelson** will **agree** that there will not be any pressure put on me to give up the part time job or if called back as full time employee at any given time. Also, there will be **no** discussion of my reason for leaving a full time position from the following personnel with any member of **Nelson Electric Motor Services** or any **persons outside Nelson Electric Motor Services**: **Gary Nelson, Louise Partika, Renea Morgan and Ricky Lashley , for if so then that means the agreement has been broken.** I, Patricia Wheeles will not discuss any business transaction with anyone about Nelson Electric Motor Services for the pass seven (7) years.

**EXHIBIT "F"**

**EEOC NOTICE OF CHARGE OF DISCRIMINATION**
**OF**
**PATRICIA WHEELES**

**DATED DECEMBER 14, 2006**

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | |
|---|---|
| ☐ **Gary Nelson, Owner**<br>**NELSON'S ELECTRIC MOTOR SRVC**<br>**1919 Radio Road**<br>**Alex City, AL 35010** ☐ | PERSON FILING CHARGE<br><br>**Patricia Wheeles** |

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**420-2007-01048**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act     [ ] The Americans with Disabilities Act

[X] The Age Discrimination in Employment Act     [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **14-JAN-07** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **29-DEC-06** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033**
   If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| **Debra B. Leo,**<br>**ADR Coordinator**<br>*EEOC Representative*<br><br>Telephone     **(205) 212-2146** | **Birmingham District Office - 420**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

Enclosure(s):  [X]  Copy of Charge

### CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] RACE   [ ] COLOR   [ ] SEX   [X] RELIGION   [ ] NATIONAL ORIGIN   [X] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

**See enclosed copy of charge of discrimination.**

| Date<br><br>**December 14, 2006** | Name / Title of Authorized Official<br><br>**Deiner Franklin-Thomas,**<br>**District Director** | Signature<br><br>*Delner Franklin-Thomas*<br>*(RRM)* |

The Complainant, PATRICIA WHEELES, was the victim of discrimination based on her age, hostile work environment, and her religious beliefs while working at Nelson's Electric Motor Service. Her dismissal from Nelson's Electric Motor Service was the result of being a victim of these discriminatory practices.

The Complainant, PATRICIA WHEELES, began her employment at Nelson's Electric Motor Service on or about August of 1999 and she was employed in an office information position. On or about May 5, 2005, the Complainant, PATRICIA WHEELES, began to be treated differently and thereafter her job duties were changed. Also, on or about May 5, 2005 a significantly younger female employee was hired. The Complainant's, PATRICIA WHEELES, position and job duties were delegated to the new younger female employee, which eventually resulted in the dismissal of the Complainant, PATRICIA WHEELES, from Nelson's Electric Motor Service. This dismissal was without justification or reason, as the Complainant, PATRICIA WHEELES, had been an exemplary employee. This dismissal was a result of the Complainant, PATRICIA WHEELES, being replaced by a younger employee. Said younger employee developed an interpersonal relationship with the owner of said company, said relationship being of a sexual nature resulting additionally in a hostile work environment and/or sexual harassment. Other employees ridiculed the Complainant, PATRICIA WHEELES, for her religious beliefs, such as stating "after Gary gets through with her, let's see what her Jesus will do for her now." Said conduct was allowed to continue in the workplace.

The Complainant, PATRICIA WHEELES, is above the age of 40 years of age. She was qualified for the job duties in which she was assigned, as can be seen in her length of employment, exemplary employment record, and the fact that she was given additional job duties after being hired. The Complainant, PATRICIA WHEELES, was replaced by a substantially younger employee or applicant. The Complainant, PATRICIA WHEELES, possessed the same or better qualifications

than the person promoted to and/or hired to replace her. This replacement employee was treated more favorably than the Complainant, PATRICIA WHEELES, shortly after her hire.

Additionally, the Complainant, PATRICIA WHEELES, was caused to work in a hostile work environment in that the other female employees were treated more favorably due to their personal relationship with the owner of said company, said relationship being more than business. The resulting hostile work environment caused the Complainant, PATRICIA WHEELES, to be treated unfairly. It is believed that the other female employee in question received more favorable treatment due to this personal relationship of a sexual nature with the owner of said company.

Additionally, the Complainant, PATRICIA WHEELES, was mistreated, ridiculed, and made fun of by other employees due to her religious beliefs. The treatment was allowed to continue by the owner of said company.

For these reasons, we believe that the Complainant, PATRICIA WHEELES, was discriminated against based on her age, as well as, being the victim of sexual harassment and/or hostile work environment, and a victim of religious persecution.

RECEIVED
EEOC

DEC 0 6 2006
BIRMINGHAM DISTRICT OFFICE