# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **PATRICIA WHEELES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.  3:07-cv-1006-TFM** |
| | ) |
| **NELSON'S ELECTRIC MOTOR,** | ) |
| **SERVICES, GARY NELSON,** | ) |
| **individually, and in his official capacity,** | ) |
| **LOUISE PARTIKA, individually, and** | ) |
| **in her official capacity, and RENEA** | ) |
| **MORGAN, individually, and in her** | ) |
| **official capacity,** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Patricia Wheeles, Plaintiff in the above-styled cause, and files her Response in Opposition to Defendants' Motion for Summary Judgment. The Defendants' Motion for Summary Judgment is due to be denied.  As grounds for so moving, Plaintiff sets down and assigns the following:

## INTRODUCTION

The Plaintiff, Patricia Wheeles, a former employee of Nelson's Electric Motor Services, brought the instant case alleging that she was discriminated by the Defendants due to her age, religious beliefs, was subjected to a hostile work environment, and as a result of this discrimination, was wrongfully terminated.  (Plaintiff's Complaint).  This suit followed the Plaintiff's filing of a Charge of Discrimination with the EEOC on December 5, 2006, and the EEOC's mailing of its Dismissal and Notice of Rights to the Plaintiff on August 27, 2007.  (See

EEOC Charge of Discrimination and Dismissal and Notice of Rights, attached hereto as Exhibit 1).

## STATEMENT OF FACTS

1.    Plaintiff was employed by Nelson's Electric Motor Services from on or about August 1999 until on or about August 2006, when she was wrongfully terminated. (Plaintiff's Complaint; Deposition of Patricia Wheeles, attached hereto as Exhibit 2, page 6, ll. 18-20).

2.    On or about May 5, 2005, the Plaintiff, Patricia Wheeles, began to be treated differently and thereafter her job duties were changed. (Plaintiff's Complaint).

3.    On or about May 5, 2005, a significantly younger female, the Defendant, Renea Morgan, was hired. (Plaintiff's Complaint).

4.    After the hiring of Defendant Renea Morgan, the Plaintiff's position and job duties were delegated to the Defendant, Renea Morgan, which eventually resulted in the dismissal of the Plaintiff from her employment with the Defendant, Nelson's Electric Motor Services. (Plaintiff's Complaint).

5.    The Plaintiff's dismissal from her employment with the Defendant, Nelson's Electric Motor Services, was without justification or reason. The Defendant told the Plaintiff that the company no longer could support three office personnel, and as such, she was fired. (Deposition of Patricia Wheeles, Exhibit 2, p. 52, ll.4-10).

6.    After the termination of the Plaintiff, the Defendant hired a third office employee, after telling the Plaintiff that the company could not support three office personnel. (Deposition of Patricia Wheeles, Exhibit 2, p. 52, ll.11-13; Affidavit of Gary Nelson, attached to Defendants' Motion for Summary Judgment).

7.    The Defendants Gary Nelson and Renea Morgan began an interpersonal relationship resulting in a hostile work environment for the Plaintiff.  (Plaintiff's Complaint; Deposition of Patricia Wheeles, Exhibit 2, p. 60, ll.1-23).

8.    As a result of the Defendants Gary Nelson and Renea Morgan's relationship, the Plaintiff was caused to endure ridicule from other employees regarding her religious beliefs. (Plaintiff's Complaint; Deposition of Patricia Wheeles, Exhibit 2, p.60, ll.1-23).

9.    When the Plaintiff attempted to inform the Defendant, Gary Nelson, of the hostility she was being forced to endure, the Defendant refused to listen, telling her he didn't care. (Deposition of Patricia Wheeles, Exhibit 2, p. 48, ll.11-22).

10.    In June 2006, Defendant Gary Nelson, stated to the Plaintiff that he was going to give Defendant Renea Morgan a 15% raise, and that the Plaintiff would only receive a 10% raise. (Plaintiff's Complaint).

11.    Later in June 2006, the Defendant, Gary Nelson, again approached the Plaintiff, this time to inform her that if she wished to continue working for Nelson's Electric Motor Service, that she would have to do so at the Opelika Shop.  (Plaintiff's Complaint; Deposition of Patricia Wheeles, p. 53, ll.10-23).

12.    The Plaintiff was told by Defendant Gary Nelson, that she was to begin working at the Opelika Shop no later than August 31, 2006.  (Plaintiff's Complaint).

13.    The Defendant, Gary Nelson, made sure that the Plaintiff was made aware that unlike the male employee Brian Voss, who travels to the Opelika Shop and receives a reimbursement check for gas expenses associated with his travel, that she would not receive any reimbursement for gas, nor would she receive a pay increase other than her 10% raise. (Plaintiff's Complaint; Deposition of Patricia Wheeles, Exhibit 2, p. 55, ll.4-17).

3

14.    In reliance on the aforementioned statements made to the Plaintiff regarding her working at the Opelika Shop, the Plaintiff purchased a more gas efficient vehicle. (Plaintiff's Complaint; Deposition of Patricia Wheeles, p. 53, ll.10-23).

15.    Upon the Plaintiff's termination from her employment with the Defendant, the Plaintiff was caused to suffer physically hostile treatment from Defendant, Gary Nelson. The Defendant grabbed the Plaintiff's arm and yanked two CD's out of her hand. (Deposition of Patricia Wheeles, p. 62, ll.1-17).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

"[I]f the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is inappropriate. *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989); *Livernois v. Medical Disposables, Inc.,* 837 F.2d 1018, 1021-22 (11th Cir.1988). "[T]he substantive law will identify which facts are material"; the district court "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 248, 254, 106 S.Ct. at 2513. The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Id.* at 255, 106 S.Ct. at 2513-14; *Bannum,* 901 F.2d at 996; *Livernois,* 837 F.2d at 1022. If, so viewed, reasonable jurors could find a verdict for the nonmoving party under the substantive evidentiary standard, the nonmoving party can defeat

summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Cable/Home Communication v. Network Productions,* 902 F.2d 829, 841 (11th Cir.1990); *Carlin Communication, Inc. v. Southern Bell Tel. & Tel.,* 802 F.2d 1352, 1356 (11th Cir.1986).

## ARGUMENT

I.    **PLAINTIFF'S CLAIMS AGAINST THE EMPLOYEES OF NELSON'S ELECTRIC SHOULD NOT BE DISMISSED.**

Under Alabama case law, an employer is liable for the torts of an employee (1) if the employee was acting within the line and scope of his employment or (2) if the employer ratified, confirmed, or adopted the unauthorized wrongful conduct of the employee. *Moman v. Gregerson's Foods,* Inc., 570 So.2d 1215, 1216 (Ala.1990).

In the instant matter, the allegations made the basis of the Plaintiff's Complaint as they pertain to the individual employees, were ratified, confirmed, or adopted by Gary Nelson, the Plaintiff's employer. Nelson's refusal to deter the "shop workers" use of profanity in the presence of the Plaintiff resulted in his ratifying this behavior. Furthermore, when the Plaintiff attempted to communicate the problems that she had been having with the ladies in the office, in particular Renea Morgan and Louise Partika, Gary Nelson told her that he didn't care what Renea or Louise either one did or said, nor anyone else as far as that was concerned. (Deposition of Patricia Wheeles, Exhibit 2, p. 48, ll.11-18). Nelson's refusal to address the problems that the Plaintiff was having in the workplace, was in effect his ratifying these behaviors. As such, the Defendants' Motion to Dismiss the Plaintiff's claims as to the individual employees of Nelson's is due to be denied.

II.   **PLAINTIFF HAS STATED FACTS SUFFICIENT TO ALLEGE A VIOLATION OF HER RIGHTS UNDER TITLE VII.**

This Court has stated:

As a prerequisite to filing a lawsuit, a Title VII employee must exhaust his or her administrative remedies by timely filing a charge of discrimination with the EEOC. *See Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1332 (11th Cir.2000) (citing 42 U.S.C. § 2000e-5). The EEOC charge must "contain, among other things, '[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices.' " *Id.* (quoting 29 C.F.R. § 1601.12(a)(3)). "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. In the latter regard, the Eleventh Circuit has stated: "As long as allegations in the judicial complaint and proof are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exist, the court will entertain them." *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir.1989) (citations omitted). "Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." *Id.*

*Cobb v. Marshall*, 481 F.Supp.2d 1248, 1254 (M.D. Ala. 2007).

The Plaintiff's claims all are claims that can reasonably be expected to grow out of the charge of discrimination. The Defendants state that the Plaintiff originally alleges that Reana Morgan was the employee that replaced her. (Defendants' Memorandum Brief in Support of Motion for Summary Judgment). Notwithstanding the Defendant Nelson's hiring of Debra Keel, and her subsequent separation from employment with the same, the Plaintiff maintains that she was fired to make room for Reana Morgan's advancement within the company. (Deposition of Patricia Wheeles, Exhibit 2, p. 23, ll. 5-11). During the Plaintiff's Deposition, while on direct examination by counsel for the Defendants, the following was stated:

Q.    Well, let me ask you this, Patricia. Whey were you terminated?

A.    Gary Nelson just told me that he didn't have room for three of us in the office and that he wanted Renea to take over the office, that Louise would be retiring in about four years. By then Renea would learn how to do things.

*Id.*

6

The Plaintiff's Notice of Charge of Discrimination, filed with the EEOC on or about December 14, 2006, stated in relation to her dismissal from employment with Nelson's the following:

> ...This dismissal was without justification or reason, as the Complainant, Patricia Wheeles, had been an exemplary employee. This dismissal was the result of the Complainant, Patricia Wheeles, being replaced by a younger employee. Said younger employee developed an interpersonal relationship with the owner of said company, ... resulting additionally in a hostile work environment and/or sexual harassment. ...

(See EEOC Charge of Discrimination, attached hereto as Exhibit 1).

The Defendant's hiring of another female, within the same age range as the Plaintiff, following the Plaintiff's termination from employment, does not negate the Plaintiff's claims. Rather, the Defendant's hiring of another female office worker following the Plaintiff's termination, ratifies the Plaintiff's position that she was wrongfully terminated. The Defendant told the Plaintiff that she was being terminated because the company could no longer support three office personnel. Once the Plaintiff was terminated, the Defendant hired a third office person, thus lending credence to the Plaintiff's claim that she was unjustly terminated. (Defendants' Motion for Summary Judgment).

### A.    Hostile Work Environment Claim

The Defendants cite to *Harris v. Forklift Sys. Inc.*, regarding the requirements for establishing a claim for hostile workplace. Assuming *arguendo* that this is the proper standard for discrimination claims, the Plaintiff has met the requirements thereto.

*Harris* sets forth the following standard to establish discriminatory conduct resulting in a hostile workplace, the conduct must be "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion or national origin..." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22-24, 114 S. Ct. 347, 371, 126 L. Ed. 2d 295 (1993).

The Plaintiff has alleged that the Defendants discriminated against her based upon her gender and her religion. (Plaintiff's Complaint) Furthermore, the Plaintiff testified in her deposition that the hostility shown towards her, in particularly that of Renea Morgan, created a hostile work environment.

Ms. Morgan's treatment towards the Plaintiff, her comments regarding the Plaintiff's religious beliefs, her berating the Plaintiff, her flaunting of her relationship with Mr. Nelson, etc., created an environment that was, according to the Plaintiff in her deposition, "[...]was very uncomfortable to go to work there. I went because I had bills to pay." (Deposition of Patricia Wheeles, Exhibit 2, p. 61, ll. 11, 12). Furthermore, the Plaintiff testified in her deposition that the shop workers routinely cussed around the office, even to the Plaintiff directly. (Deposition of Patricia Wheeles, Exhibit 2, p. 39, ll.11-23; p. 40, ll.1-15). In addition, the Plaintiff testified that Gary Nelson physically assaulted her while she was packing her belongings. (Deposition of Patricia Wheeles, Exhibit 2, p. 62, ll.1-17).

The Plaintiff has identified several incidents where she was discriminated against while employed with the Defendant's company. These were not isolated incidents that should be viewed lightly or dismissed as the Defendants would have this Court do. Rather, these incidents, when viewed together, show a pattern of discriminatory actions, that resulted in a hostile workplace, that the Plaintiff was forced to suffer due to her need for income. As such, the Defendants' Motion for Summary Judgment should be denied.

       **i.**    **The harasser is the employer or one of its agents (or) the employer knew or should have known of the harassment caused by co-workers, but failed to take corrective action.**

The Plaintiff must show that the either: the harasser is the employer or one of its agents; or the employer knew of should have known of the harassment caused by the co-workers, but

8

failed to take corrective action. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir. 1987). In the instant case, not only was the harasser the employer, but the employer knew of the harassment caused by the co-workers and failed to take corrective action. The Plaintiff testified in her deposition that Gary Nelson physically assaulted her. (Deposition of Patricia Wheeles, Exhibit 2, p. 62, ll. 1-17). Furthermore, the Plaintiff attempted to inform Gary Nelson of other discriminatory acts by the employees at Nelson, but was informed by Nelson that he didn't care. (Deposition of Patricia Wheeles, Exhibit 2, p. 48, ll.11-22). Because the employer was the harasser and the employer knew or should have known of the harassment caused by the co-workers and failed to take corrective actions, the Defendants' Motion for Summary Judgment should be denied.

### III. PLAINTIFF HAS ALLEGED FACTS SUFFICIENT TO ESTABLISH A VIOLATION OF HER RIGHTS UNDER THE ADEA.

That Plaintiff has alleged facts sufficient to establish a violation of her rights under the ADEA. The ADEA states,

a) Employer practices

It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply.

29 U.S.C.A. § 623.

The Plaintiff's Complaint alleges that she was terminated by the Defendant, in order to make room for a younger, less qualified, female employee. (Plaintiff's Complaint). The Defendants assert that the Plaintiff was fired for a legitimate, non-discriminatory reason. This

issue is material to this litigation, and is very contested and disputed. The standard set forth by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the plaintiff must establish a prima facie case of discrimination. The Plaintiff in the instant matter has met this burden as she was terminated for a job that she was well qualified for, without justification, and the employer informed her that a significantly younger, less qualified candidate would be running the office in time -- in other words, this significantly younger female, who is less qualified that the Plaintiff would be taking over the duties of the office and the Plaintiff was no longer needed.

As the Defendants asserted, where age discrimination is concerned, the Plaintiff must establish the following:  that 1) she is a member of a protected group of persons between the ages of forty and seventy; 2) she was qualified for the position held; 3) she was subjected to an adverse employment action; and 4) a substantially younger person filled the position that she sought or from which she was discharged. See *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1359 (11th Cir. 1999).

In the instant matter, the Plaintiff was between the ages of forty and seventy, at the times of the incidents made the basis of the Complaint. The Plaintiff was qualified of her position, as illustrated by her length of time of employment with the Defendant Company.  (Plaintiff's Complaint)  The Plaintiff was subjected to an adverse employment action in that she was terminated. (Plaintiff's Complaint)  Renea Morgan, a substantially younger female, has assumed the responsibility of the Plaintiff in that she is responsible for the payroll that was previously the responsibility of the Plaintiff while the Plaintiff was employed by the Defendant Company. (Plaintiff's Complaint; Defendants' Motion for Summary Judgment).  As such, the Plaintiff has

established a prima facie case for age discrimination and the Defendants' Motion for Summary Judgment should be denied.

The Defendants contend that even if the Plaintiff has met her burden of establishing a prima facie case, the Plaintiff was terminated for a legitimate, non-discriminatory reason. The Defendants contend that as a result of the loss of a substantial part of its business in Alexander City, the employer was eliminating a position at the Alexander City office. Presumably this position was that of the Plaintiff's. However, the Defendant Company later employed a third employee. (Defendants' Motion for Summary Judgment). The Plaintiff was told that she was being terminated because the company could not support three office personnel positions. (Deposition of Patricia Wheeles, Exhibit 2, p. 52, ll.11-13), even though the Defendant subsequently hired a third person. Furthermore, the Defendants assert that the Plaintiff was not sent to the Opelika office, as she was originally told was going to happen resulting in the Plaintiff purchasing a more fuel economic vehicle in reliance of the same, because of the employee Ricky Lashley stating that if the Plaintiff was moved to the Opelika office, he was quit. (Defendants' Motion for Summary Judgment). The Defendants maintain that the Plaintiff and Lashley did not have a good working relationship, however, this is not the position of the Plaintiff. (Deposition of Patricia Wheeles, Exhibit 2, p. 28, ll.5-13). In fact, the Defendant, Gary Nelson, told the Plaintiff that if she was transferred to the Opelika office, that he would make sure that Ricky Lashley would fire her the moment she walked into the plant. (Deposition of Patricia Wheeles, Exhibit 2, p. 28, ll. 1-4). As such, the Defendants cannot establish a legitimate, non discriminatory reason for the termination of the Plaintiff, the Defendants' Motion for Summary Judgment should be denied.

## IV.    PLAINTIFF HAS ALLEGED FACTS SUFFICIENT TO ESTABLISH A GENUINE ISSUE OF MATERIAL FACT.

There does exist a genuine issue of material fact in the instant matter so as to preclude the Defendants' Motion for Summary Judgment. The Plaintiff contends that she was discriminated against during her employment with the Defendant Company, and has testified in her deposition to the same. The Defendants assert that the Plaintiff was either not caused to suffer discrimination during her employment with the Defendant Company, or if she was caused to endure those instances that she complains, they were insignificant and do not rise to discrimination. The reason for the Plaintiff's termination from the Defendant Company is in dispute, and because the reason for termination is the basis of this suit, the Defendants' Motion for Summary Judgment should be denied. Furthermore, whether the Plaintiff was caused to suffer a hostile workplace is in dispute and because it is a material fact necessary to the Plaintiff's Complaint, the Defendants' Motion for Summary Judgment should be denied.

## CONCLUSION

Based on the foregoing, the Defendants' Motion for Summary Judgment is due to be denied because there exists material facts as issue in the instant matter. Therefore, Plaintiff respectfully requests that this Honorable Court enter an Order denying Defendants' Motion for Summary Judgment.

Respectfully submitted, this _22_ day of April, 2008.

_____
Derrick Blythe, [BLY002]
Attorney for Plaintiff
126 Marshall Street
Alexander City, AL  35010
(256)234-4101

12

## CERTIFICATE OF SERVICE

I hereby certify that on the $2^2$ day of April, 2008, that I have served a copy of the foregoing upon the following by placing a true and correct copy of the same, postage prepaid, via U.S. Mail, addressed as follows:

William Larkin Radney, III, Esq.
Barnes & Radney, P.C., Law Firm
80 North Central Avenue
Post Office Drawer 877
Alexander City, Alabama 35011-0877

OF COUNSEL

# Exhibit 1

# EEOC Charge of Discrimination and Dismissal and Notice of Rights

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Ms. Patricia Wheeles<br>1083 Moose Road<br>Alexander City, AL 35010 | From: **Birmingham District Office**<br>**Ridge Park Place**<br>**1130 22nd Street, South**<br>**Birmingham, AL 35205** |

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **420-2007-01048** | **Ollie M. Croom,**<br>Investigator | **(205) 212-2140** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| **X** | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

_Delner Franklin-Thomas_      8/27/7

Enclosures(s)

**Delner Franklin-Thomas,**
**District Director**

(Date Mailed)

cc: **NELSON'S ELECTRIC MOTOR SRVC**
**1919 Radio Road**
**Alex City, AL 35010**

**Derrick Blythe, Attorney**
**126 Marshall Street**
**Alex City, AL 35010**

**Larkin Radney, Attorney**
**Barnes & Radney, PC**
**Post Office Drawer 877**
**Alexander City, AL 35011-0877**

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit 2

# Deposition of Patricia Wheeles

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3

 4   PATRICIA WHEELES,              )
                                    )
 5       Plaintiff,                 )
                                    )
 6       VS.                        ) CASE NO.:
                                    ) 3:07 CV1006-TFM
 7   NELSON'S ELECTRIC             )
     MOTOR SERVICES, GARY          )
 8   NELSON, individually          ) DEPOSITION OF:
     and in his official           ) PATRICIA WHEELES
 9   capacity, et. al.             )
                                    )
10       Defendant.                 )

11

12          S T I P U L A T I O N S

13      IT IS STIPULATED AND AGREED, by and

14   between the parties through their respective

15   counsel, that the deposition of:

16          PATRICIA WHEELES

17   may be taken before Frances P. Looney,

18   Commissioner and Notary Public, State at

19   Large, at the law offices of Mr. Larkin Radney,

20   Barnes and Radney, 80 North Central Avenue,

21   Alexander City, Alabama 35010 on the 31st day of

22   March, 2008, commencing at approximately

23   10:00 a.m.
```

Page 2

1    IT IS FURTHER STIPULATED AND AGREED that
2  the signature and the reading of the
3  deposition by the witness is waived, the
4  deposition to have the same force and effect
5  as if full compliance had been had with all
6  laws and rules of Court relating to the taking
7  of the depositions.
8    IT IS FURTHER STIPULATED AND AGREED that
9  it shall not be necessary for any objections
10  to be made by counsel to any questions, except
11  as to form or leading questions, and that
12  counsel for the parties may make objections
13  and assign grounds at the time of the trial,
14  or at the time said deposition is offered in
15  evidence, or prior thereto.
16              ***
17      A P P E A R A N C E S
18
19  ON BEHALF OF THE PLAINTIFF:
20    Hon. Derrick Blythe
21    Attorney at Law
22    126 Marshall Street
23    Alexander City, Alabama  35010

Page 3

1    ON BEHALF OF THE DEFENDANT:
2      Hon. Larkin Radney
3      Barnes and Radney
4      80 North Central Avenue
5      Alexander City, Alabama  35010
6
7    ALSO PRESENT:
8      Renea Morgan
9      Louise Partika
10        E X H I B I T   L I S T
11  Defendant's Exhibit 1 - notes - Page 17
12  Defendant's Exhibit 2 - agreement - Page 29
13
14  EXAMINATION BY MR. RADNEY:  Page 4, 62
15  EXAMINATION BY MR. BLYTHE:  Page 51
16
17    I, Frances P. Looney, a Court Reporter of
18  Alexander City, Alabama, and a Notary Public
19  for the State of Alabama at Large, acting as
20  commissioner, certify that on this date,
21  pursuant to the Alabama Rules of Civil
22  Procedure and the foregoing stipulation of
23  counsel, there came before me on the 31st day

Page 4

1  of March, 2008, at the law offices of Mr. Larkin
2  Radney, 80 North Central Avenue, Alexander City,
3  Alabama 35010 commencing at approximately
4  10:00 a.m., PATRICIA WHEELES, witness in the
5  above cause, for oral examination, whereupon the
6  following proceedings were had:
7          PATRICIA WHEELES
8  being first duly sworn, was examined and
9  testified as follows:
10          EXAMINATION
11  BY MR. RADNEY:
12  Q. State your name for the record, please.
13  A. Patricia Wheeles.
14  Q. Ms. Wheeles, of course, you know me.  I'm
15    Larkin Radney.  And I represent Nelson
16    Electric and the three individual defendants
17    in a lawsuit that's been filed on your
18    behalf in federal court.  I'm going to ask
19    you a series of questions about you, your
20    background, and the claims that you have
21    alleged in court.  If I ask a question that
22    you don't understand ask me to repeat myself
23    or make myself clear, and I'll attempt to do

Page 5

1    so.  If you answer, I'll have to assume that
2    you understood the question.  Is that fair
3    enough?
4  A. Correct.
5  Q. Have you ever been deposed before?  Have you
6    ever had a deposition taken of you before?
7  A. Yes.
8  Q. So I assume you know somewhat of the
9    background and the rules of the deposition.
10    You have to say yes or no so the court
11    reporter can pick that up instead of an
12    uh-huh and ugh-uh.  If you need a break,
13    we'll take a break.  If you need to confer
14    with your attorney we can certainly do
15    that.  But I expect you to answer the
16    questions that I ask fully and completely.
17  A. Okay.
18  Q. What is your address?
19  A. 1083 Moose Road, Alexander City, Alabama.
20  Q. You're married to Terrel Wheeles?
21  A. Yes, I am.
22  Q. How long have you been married to Terrel?
23  A. Thirteen years.

Page 6

1  Q. And prior to that, were you married?
2  A. Yes, I was.
3  Q. To whom?
4  A. Ronny Hannah.
5  Q. You have two children?
6  A. Yes, I do.
7  Q. Who are they?
8  A. Rhonda Hannah Blythe and Kevin Hannah.
9  Q. Rhonda, of course, is your attorney's --
10  A. Correct.
11  Q. -- wife? Your son what does he do?
12  A. He is corporate controller for Russell
13     Corporation in Fruit.
14  Q. What is your age?
15  A. 58.
16  Q. And birth date?
17  A. January the 1st, 1950 -- 20th, 1950. I'm sorry.
18  Q. You were employed by Nelson Electric in
19     1999?
20  A. Correct.
21  Q. How old were you then?
22  A. 51, 50.
23  Q. And you left that employment in 2006; is

Page 7

1     that correct?
2  A. Correct.
3  Q. How old were you then?
4  A. I was 56.
5  Q. Do you know Louise Partika?
6  A. Yes, I do.
7  Q. Do you know what her age is?
8  A. No, I do not.
9  Q. Is she older or younger than you?
10  A. She's older.
11  Q. Would you give me the benefit of your
12     educational background?
13  A. Well, I have several semesters out at the junior
14     college. And then I've also taken classes at
15     UAB in Birmingham.
16  Q. Go ahead.
17  A. Numerous workshops.
18  Q. Do you have a degree in any particular
19     field?
20  A. No.
21  Q. Do you have an associate degree?
22  A. No.
23  Q. What did you study?

Page 8

1  A. Computers and -- just computers basically and
2     some accounting.
3  Q. Where did you take your accounting courses?
4  A. In Birmingham.
5  Q. UAB?
6  A. Yes.
7  Q. But you did not get a degree?
8  A. No.
9  Q. Did you graduate from Benjamin Russell?
10  A. No, I did not.
11  Q. Where did you graduate high school?
12  A. From Goodwater.
13  Q. What was your maiden name?
14  A. Cullars, C-u-l-l-a-r-s.
15  Q. Upon graduation from high school, did you
16     immediately go into a college situation, or
17     did you become employed?
18  A. No, I did not. I went to work at Russell Corp.
19  Q. How long did you work at Russell Corp?
20  A. Twenty-two years.
21  Q. Where did you next go for employment?
22  A. Russell Lands.
23  Q. Do you remember the year you went to Russell

Page 9

1     Lands?
2  A. No, I do not exactly.
3  Q. Approximately?
4  A. No. I'm not real sure to be able to say that
5     and be honest about it.
6  Q. At some point you left the employment of
7     Russell Lands; is that correct?
8  A. Yes, I did.
9  Q. Did you file an EEOC charge against Russell
10     Lands?
11     MR. BLYTHE: Now, Larkin, one thing -- you
12  might as well put this on the record -- we are
13  under a nondisclosure agreement with Russell
14  Lands in regards to anything surrounding that
15  claim. I have instructed Ms. Wheeles --
16     MR. RADNEY: Sure. I just want to know if
17  she, in fact, filed one.
18     THE WITNESS: I don't think we filed an EEOC
19  claim, did we?
20     MR. BLYTHE: I think we did.
21     MR. RADNEY: You had to.
22     MR. BLYTHE: I have instructed her not to
23  answer questions in regards to that. I'm not

Page 10

1  saying that if a judge says I'm ordering you
2  answer it. But you know the obligation we're
3  under.
4      MR. RADNEY: Absolutely, I do.
5  Q. But you left the employment of Russell
6  Lands. Did you file a court action against
7  Russell Lands? I'm not asking you to
8  disclose what occurred. I'm just asking did
9  you? That's a matter of public record.
10     MR. BLYTHE: It was an EEOC claim. That's
11  as far as it got. It was settled during
12  mediation.
13  Q. Do you recall when that was settled?
14  A. '99?
15     MR. BLYTHE: Something like that. That may
16  be close.
17  A. Somewhere in that vicinity.
18  Q. What were your job responsibilities at
19  Russell Corp?
20  A. At Russell Corp?
21  Q. Yes, ma'am.
22  A. I did various things at Russell Corp. I worked
23  out in the sewing room. And then I worked in

Page 11

1  customer service, worked quality control, and
2  just various different things.
3  Q. What did you do for Russell Lands?
4  A. I worked at Willow Point Country Club as the
5  administrative assistant.
6  Q. After your employment with Russell Lands did
7  you become employed with someone else?
8  A. Yes.
9  Q. Who was that?
10  A. Nelson Electric.
11  Q. When were you employed by Nelson Electric?
12  A. In '99 I believe.
13  Q. Were you actually working as a temp and were
14  assigned to Nelson Electric?
15  A. Actually, I was not working as a temp.
16  Actually -- you want me to explain this?
17  Q. Sure.
18  A. Actually the girl that was over that temp force
19  was a friend of my daughter Rhonda's. They were
20  needing someone to fill a position for a few
21  weeks or a few days at Nelson Electric until
22  they could hire someone. She said, well, mother
23  is sitting at home, not doing anything, just

Page 12

1  call her. So she did, and I filled in.
2  Q. What was the name of the temp?
3  A. I don't remember.
4  Q. What was the name of the girl that was
5  friends of Rhonda?
6  A. I would have to ask Rhonda. I don't remember
7  what her name was to be honest.
8  Q. Do you have any source of income presently?
9  A. I have a little small embroidery business.
10  Q. How long have you had that business?
11  A. I actually started it up after I lost my job. I
12  had it as just something to -- a hobby. Before
13  then it was just a hobby. And it was just for
14  extra spending money.
15  Q. As a hobby it did produce income for you; is
16  that correct?
17  A. Some, not that much. It was mostly I did things
18  for people for nothing.
19  Q. This was during the time you were employed
20  by Nelson Electric that it was a hobby?
21  A. Yes. There were times I charged. It depended
22  on what it was, and, you know.
23  Q. Do you recall when you were separated from

Page 13

1  Nelson Electric?
2  A. Pardon?
3  Q. When were you separated from Nelson
4  Electric?
5  A. August the 16th.
6  Q. 2000 and --
7  A. 5 or 6. 6, I'm sorry. I had to stop and think.
8  Q. Since that time do you have now have a
9  source of income through the embroidery
10  business?
11  A. Yeah, it helps to pay the bills.
12  Q. Do you advertise?
13  A. No.
14  Q. Do you have a sign out?
15  A. I have a sign, yes.
16  Q. Give me an idea or sense on a weekly basis
17  how much income you might draw from the
18  embroidery work?
19  A. It just depends. Sometimes a couple of hundred
20  dollars, sometimes maybe 100, sometimes 50. I
21  just depends on what it is I'm doing for people.
22  Q. Do you file --
23  A. Income tax. Yes, I do.

Page 14

| 1 | Q. Did you file one for 2006? |
| 2 | A. Yes, I did. |
| 3 | Q. Did you file one for 2007? |
| 4 | A. Yes, I did. |
| 5 | Q. What income did you show on you income tax? |
| 6 | A. I think it was like 19,000. |
| 7 | Q. 19,000 for the year? |
| 8 | A. I did not bring it with me, but I think it was |
| 9 | close to 19,000 for the year 2007. |
| 10 | Q. What was it in 2006 if you recall? |
| 11 | A. I didn't show very much at all with that. |
| 12 | MR. RADNEY: Derrick, can I get you to get |
| 13 | to me the 2007 income tax return? |
| 14 | MR. BLYTHE: Sure. |
| 15 | MR. RADNEY: And also 2006. |
| 16 | MR. BLYTHE: I was going to say, do you want |
| 17 | both of them? |
| 18 | MR. RADNEY: Yeah. |
| 19 | Q. Have you sought employment elsewhere since |
| 20 | your separation from Nelson Electric? |
| 21 | A. No, I have not. |
| 22 | Q. Have you attempted to seek employment |
| 23 | anywhere? |

Page 15

| 1 | A. No. |
| 2 | Q. Have you made a decision not to become |
| 3 | employed publicly or just work for yourself? |
| 4 | A. I don't care to become employed with public |
| 5 | dealing with people like I have had to deal |
| 6 | with. |
| 7 | Q. Are you just going to work for yourself so |
| 8 | to speak? |
| 9 | A. Yep, as long as I can. |
| 10 | Q. Your husband is retired, is he not? |
| 11 | A. Yes, he is. |
| 12 | Q. Did does he work anywhere? |
| 13 | A. No, he does not. |
| 14 | Q. He's retired from not only the fire |
| 15 | department, but Russell Lands? |
| 16 | A. Correct. |
| 17 | Q. Are you a member of a church? |
| 18 | A. I was. We closed our church. |
| 19 | Q. What was the name of the church? |
| 20 | A. Liberty Church at Willow Point. |
| 21 | Q. Was that associated with the Baptist church? |
| 22 | A. Yes. |
| 23 | Q. Was it a part of the Southern Baptist |

Page 16

| 1 | Association? |
| 2 | A. I don't think so. |
| 3 | Q. And the church is now closed? |
| 4 | A. Correct. |
| 5 | Q. Is it reopening? Do you know what the plans |
| 6 | are for the church? |
| 7 | A. No, it did will not reopen. |
| 8 | Q. Why did it close? |
| 9 | A. The pastor's health. |
| 10 | Q. Who was the pastor? |
| 11 | A. Jerry Wheeles. |
| 12 | Q. Is that your -- |
| 13 | A. Brother-in-law. |
| 14 | Q. Do you attend a church now? |
| 15 | A. I do. |
| 16 | Q. Which one? |
| 17 | A. Sixth Street Baptist. |
| 18 | Q. You're not a member of it? Is that what |
| 19 | you're telling me? |
| 20 | A. Yes. I've not joined that church. We're just |
| 21 | basically going around deciding where we want to |
| 22 | spend our time and also First United Methodist. |
| 23 | Q. Do you know what religious affiliation the |

Page 17

| 1 | other defendants in this case have? |
| 2 | A. No, I do not. |
| 3 | Q. I know you have been involved in, of course, |
| 4 | this lawsuit. And you had an EEOC claim |
| 5 | against Russell Lands. Have you filed any |
| 6 | other lawsuits? |
| 7 | A. No. |
| 8 | Q. You been a plaintiff in any other lawsuit? |
| 9 | A. No. |
| 10 | Q. Have you been a defendant in any lawsuits? |
| 11 | A. No. |
| 12 | Q. Patricia, I notice you've got some notes in |
| 13 | front of you? |
| 14 | A. I do. |
| 15 | Q. What are those? |
| 16 | A. These were notes that I made on various things |
| 17 | that had gone on and things that were said. |
| 18 | Q. May I see them? |
| 19 | MR. BLYTHE: Sure. |
| 20 | A. There you go. |
| 21 | (Defendant's Exhibit 1, notes, marked for |
| 22 | identification) |
| 23 | Q. I'm made Defendant's Exhibit 1 notes that |

Page 18

1    you have brought to this deposition today;
2    is that correct?
3    A. Correct.
4    Q. And do you have any other notes that you
5       have made that are not here?
6    A. No.
7    Q. Do you have any -- have you kept any of your
8       e-mails or e-mails of other employees of
9       Nelson Electric?
10   A. No.
11   Q. Have you made copies of e-mails?
12   A. No.
13   Q. Have you ever recorded the conversations of
14      anyone employed by Nelson Electric?
15   A. Recorded like?
16   Q. Like with a tape recorder.
17   A. No.
18   Q. Have you ever taken photographs of anyone --
19   A. No.
20   Q. -- at work at Nelson Electric? Do you have
21      any memorandums or memos or notes that you
22      have made of anything or active that went on
23      at Nelson Electric --

Page 19

1    A. No.
2    Q. -- while you were employed there? Patricia,
3       you and I have got a bad habit. That is we
4       interrupt the person we're talking with by
5       answering the question too fastly. So if
6       you'll just let me finish my question, and
7       then you answer that will help Frances a
8       great deal.
9          When did you type these notes out?
10   A. Actually, it was right after I lost my job. I
11      had notes of everything. And I typed them out
12      and gave them to Derrick.
13   Q. Where are the notes that you gave to Derrick
14      that you took this from, or are these the
15      notes that you gave to Derrick?
16   A. Uh-huh.
17   Q. That's a yes?
18   A. Yes.
19   Q. So there are no other notes?
20   A. No.
21   Q. Did you have some and destroy them, or is
22      this the notes you're talking about?
23   A. Those are the notes. I just typed them, and,

Page 20

1    yes, I destroyed the handwritten ones. I just
2    threw them away.
3    Q. When did you start taking notes about when
4       things were happening at Nelson Electric?
5    A. Well, actually I guess about the time Renea came
6       to work because of some things that had been
7       said to me before she came.
8    Q. Patricia, I have read your complaint that's
9       filed in federal court. If I understand it
10      correctly, you claim that you have been
11      discriminated against due to your age, that
12      you were terminated due to your age; is that
13      correct?
14   A. Well, he had to make room for people. He had to
15      make room for people.
16   Q. Then are you saying that you weren't
17      terminated due to your age?
18   A. Well, you read what he told me because I put
19      that on there. What he did he had hired Renea.
20      And he told me there was not room for three of
21      us. He couldn't afford to pay three of us to
22      work in that office. And then after he let me
23      go if I'm not mistaken within before -- on or

Page 21

1    about the 31st of August, he hired Debra Keel
2    from Russell which she was one of his contacts
3    at Russell also.
4    Q. Do you know what Debra Keel is doing?
5    A. From my knowledge is they did a rotation thing.
6       Debra Keel took over Renea's job. Renea took
7       over Louise's job, and Louise took mine.
8    Q. What is the source of your information?
9    A. People that were previously employed there that
10      had left the company also.
11   Q. Who are they?
12   A. Mike Taylor for one.
13   Q. Who else?
14   A. We'll just stay with him.
15   Q. No. If I ask, you've got to answer.
16   A. I understand that. The others I'm not -- Mike
17      Taylor was mainly the one that told me about
18      that.
19   Q. I need to know anybody else that talked to
20      you about what was happening at Nelson
21      Electric after you left?
22      MR. BLYTHE: Go ahead and answer the
23   question, Patricia.

Page 22

1   A. I was trying to think of their name is what I
2      was trying to think of. It was a black guy that
3      came there and took care of Gary's vehicles that
4      I did embroidery for his church, cleaned Gary's
5      vehicles up.
6   Q. You don't recall his name?
7   A. I can't think of his name right now.
8   Q. Look at this list of people that you have
9      typed out as being employed at --
10  A. Yes, while I was there at different times.
11  Q. Do you recognize names on that list?
12  A. Mike Taylor was the only one on this list.
13  Q. So Mike Taylor would be the person that you
14     mainly gained your information from --
15  A. Right.
16  Q. -- what has occurred at Nelson Electric as
17     far as job duties after you left; is that
18     correct?
19  A. Correct. He was the one that told me that they
20     had hired Debra Keel.
21     MR. RADNEY: Let me for the record state
22     that Defendant's Exhibit 1 is four pages and
23     clipped back together.

Page 23

1      MR. BLYTHE: Larkin, just so the record is
2      preserved I'm just going to object to the use of
3      that as attorney/client privileged information
4      and/or work product, but go ahead.
5   Q. Well, let me ask you this, Patricia. Why
6      were you terminated?
7   A. Gary Nelson just told me that he didn't have
8      room for three of us in the office and that he
9      wanted Renea to take over the office, that
10     Louise would be retiring in about four years.
11     By then Renea would learn how to do things.
12  Q. So he was making a decision based upon the
13     fact that he didn't need that additional
14     employee?
15  A. That's what he said.
16  Q. Do you have anything to refute that
17     decision?
18  A. Undoubtedly he must have needed someone because
19     she took that over, and he hired Debra to do
20     Renea's job out in the shop.
21  Q. Do you know how old Debra Keel is?
22  A. No, I do not.
23  Q. Is she over 40, under 40?

Page 24

1   A. I have no idea. I have never met her, only
2      talked with her on the phone.
3   Q. When did you talk with her on the telephone?
4   A. While I worked at Nelson Electric.
5   Q. Due to business?
6   A. Yes.
7   Q. At the time that you were first employed at
8      Nelson Electric, tell me what your job
9      duties were.
10  A. I did payroll, did the payables, and did the
11     bank statements. And I made all the deposits
12     for the company and whatever he needed me to do.
13  Q. Louise was also in the office; is that
14     correct?
15  A. Yes.
16  Q. Were y'all the only two ladies in the
17     office?
18  A. Yes.
19  Q. And what were your job duties at the time
20     that Renea Morgan was employed?
21  A. Same thing I had done it for seven years.
22  Q. What were your job duties at the time of the
23     termination?

Page 25

1   A. Actually, nothing really because Louise had
2      given Renea her job, her job responsibilities;
3      and Louise had taken mine.
4   Q. At the time of your termination?
5   A. Yes.
6   Q. Louise had give them to Renea?
7   A. All of her responsibilities or the majority of
8      them. She took mine.
9   Q. Louise took yours?
10  A. Uh-huh, all except payroll. I was still doing
11     payroll. That was basically all they had left
12     just about for me to do.
13  Q. What do you have to do for payroll?
14  A. Basically, have to do a report on everyone's
15     hours and then I had -- well, I faxed them over
16     to the company that was doing the payroll which
17     they in turn faxed -- well, they in turn paid
18     over with Wachovia Bank is where our payroll
19     came through. It's direct deposited.
20  Q. You had or Nelson Electric had what we call
21     a third party administrator for payroll
22     called McBee payroll?
23  A. Correct.

Page 26

1  Q. You would furnish to McBee Payroll the
2     information for them to transfer and get
3     moneys to the employees?
4  A. Correct.
5  Q. Did you work 40 hours a week?
6  A. Yes, I did.
7  Q. Did you do this particular job, payroll job,
8     on a particular day?
9  A. Yes, I did.
10 Q. What day was that?
11 A. I had to do it on Wednesday because everything
12    had to be faxed in on Wednesday due to McBee
13    having to get the direct deposits ready.
14 Q. So whatever you did to organize the payroll
15    information for McBee, you did it on
16    Wednesday; is that correct?
17 A. Wednesday mornings, yes.
18 Q. Do you know what Renea's duties were with
19    Nelson Electric immediately after your
20    termination?
21 A. No, I do not.
22 Q. Do you know whether or not she has taken
23    over any of your job responsibilities?

Page 27

1  A. I do not.
2  Q. Do you know if her job duties have changed
3     at all since your termination?
4  A. I'm not there. I don't have a clue.
5  Q. I understand your testimony is that you were
6     terminated because Mr. Nelson made a
7     decision that there wasn't sufficient amount
8     of work to be done in the office by three
9     ladies; is that correct?
10 A. That's what he said.
11 Q. Did you and he discuss you going to Opelika
12    to the Opelika branch?
13 A. Yes.
14 Q. You obviously did not go?
15 A. No.
16 Q. Do you know why you didn't go?
17 A. He told me on the day he let me go that he had
18    changed his mind. He decided that I would not
19    go, that he was just going to let me go.
20 Q. Did he tell you why he wasn't going to send
21    you to Opelika?
22 A. No.
23 Q. Did he discuss with you Ricky Lashley and

Page 28

1     Ricky Lashley would fire you the moment that
2     you walked into the plant?
3  A. Gary said he would see to it Ricky Lashley fired
4     me.
5  Q. Did you have a good working relationship
6     with Ricky Lashley?
7  A. Well, we talked. He was always stopping by my
8     office and talking about different things.
9  Q. Did you consider yourself to have a good
10    working relationship with Ricky Lashley?
11 A. I guess.
12 Q. That mean you don't know?
13 A. To my knowledge, yes.
14 Q. Did you type up an agreement and give to
15    Gary concerning your termination?
16 A. Well, yes. Would you like for me to explain
17    that?
18 Q. I'm going to ask you about that. What was
19    that?
20 A. Actually, everything Gary offered to me I
21    accepted because I needed to have a job to have
22    insurance and help pay bills. So the last time
23    that he came in there the day before he let me

Page 29

1     go, he started discussing with me, well, I will
2     pay you "X" amount of dollars to leave. And
3     then I'll pay your insurance, and you can work
4     part-time. And I will cover your insurance with
5     that. I agreed on that.
6  Q. So you agreed to work part-time or as
7     needed?
8  A. Yes, to cover the insurance.
9        (Defendant's Exhibit 2, agreement, marked
10        for identification)
11 Q. I'm going to show you what I've marked as
12    Defendant's Exhibit 2 and ask if that's a
13    copy of the agreement that you're
14    discussing?
15 A. I'll have to get my glasses.
16 Q. Sure.
17 A. Okay. I believe it is.
18 Q. This is the agreement you're talking about
19    --
20 A. Yes.
21 Q. -- that he would provide you certain
22    consideration and insurance, but you would
23    agree to work part-time if necessary; is

Page 30

1 that correct?
2 A. I would work part-time, and then come back full
3 time when it was needed.
4 Q. So you felt like you could still do your job
5 at Nelson Electric regardless of what all
6 was going on with Renea or Louise or anybody
7 else that you had interpersonal
8 relationships with?
9 A. I was going to attempt that because I needed the
10 money to pay bills and insurance.
11 Q. But you would come back based on this
12 agreement?
13 A. Well, I agreed to do that. I agreed with
14 everything he asked me to do.
15 Q. What happened to the agreement?
16 A. Gary changed his mind.
17 Q. Do you know why? Did he tell you why he
18 changed his mind? That's a no. She has to
19 write that.
20 A. No, I'm not sorry.
21 Q. Let me ask you this way. If, in fact, y'all
22 had gone through this agreement and y'all
23 both agreed to it and he had called you back

Page 31

1 to work part-time or even full time, would
2 you have gone back and worked part-time
3 and/or full time?
4 A. Yes, I would have due to the fact that I needed
5 the money.
6 Q. That's pretty much -- a lot of people work
7 for that reason, do they not?
8 A. Yeah, got to have that.
9 Q. As far as you can tell me today, Mr. Nelson
10 terminated you based upon his business
11 decision to, I suppose, decrease the amount
12 of personnel he's paying in the office?
13 A. I guess, yes.
14 Q. When you were employed at Nelson's Electric
15 Motor Service, did you have a title?
16 A. No.
17 Q. Your employer was, in fact, Nelson Electric
18 Services, the corporation, was it not?
19 A. Yes.
20 Q. Louise Partika nor Renea Morgan employed
21 you, nor did they supervise you, did they?
22 A. Louise was a supervisor, yes.
23 Q. She was a supervisor?

Page 32

1 A. Yes.
2 Q. In your complaint you indicate that Gary
3 Nelson was your supervisor?
4 A. He was also.
5 Q. You had two supervisors?
6 A. Yes.
7 Q. Renea was not a supervisor?
8 A. No.
9 Q. Want to be sure I'm clear about this because
10 I'm confused about what everybody's duties
11 were. Your job duties didn't change from
12 the day you were employed in 1999 till the
13 day you were terminated or separated in
14 2006; is that correct?
15 A. Well, only when Louise took over a portion of my
16 job of the payables, yes. I still cut the
17 checks to make the payables, but she took over a
18 large portion of that.
19 Q. But Renea didn't take over your job?
20 A. No, Renea took Louise's job.
21 Q. What were your wages while you were working
22 at Nelson Electric?
23 A. I really don't remember to be honest.

Page 33

1 Q. Do you recall what your annual income was
2 from Nelson Electric?
3 A. About 23 -- I believe around 23,000 a year,
4 somewhere in that vicinity.
5 Q. Did you have certain benefits?
6 A. Yes, I did.
7 Q. What benefits did you have?
8 A. I had a 401K and insurance and -- well, all
9 type, you know, the cancer insurance as well as
10 health and dental.
11 Q. Did you pay for that or the company pay for
12 it?
13 A. The company paid for it.
14 Q. Did you pay any portion of it?
15 A. Not on health and dental. Cancer I paid all of
16 it.
17 Q. On the 401K did the company place money in
18 that account for you, or did you place the
19 money in the account for you?
20 A. A portion of it was mine, and the other portion
21 was Nelson Electric.
22 Q. When you terminated, did you obtain your
23 401K funds?

Page 34

1  A. I did eventually.
2  Q. Did you roll those over into an IRA?
3  A. Yes, I did.
4  Q. Do you have presently have insurance?
5  A. Yes, I do.
6  Q. With whom?
7  A. Blue Cross-Blue Shield.
8  Q. Who pays that?
9  A. I do.
10  Q. Does your husband not having insurance
11      through the retirement system?
12  A. Yes, he does.
13  Q. You can't get on his policy?
14  A. No.
15  Q. Why?
16  A. Well, his is like Medicaid and Medicare. His is
17      not like retirement from Russell Lands. That
18      doesn't carry over.
19  Q. If I understand the job delineations and
20      duties, then Louise replaced you so to speak
21      with your job duties is that; is that
22      correct now?
23  A. Yes.

Page 35

1  Q. In your complaint you seem to allege that
2      you worked in a hostile work environment?
3  A. Yes.
4  Q. Would you describe that for me? What do you
5      mean by that?
6  A. Well, false accusations for one.
7  Q. Okay. People telling things about you or
8      saying things about you that weren't true?
9  A. Correct.
10  Q. What else?
11  A. Just a lot of cussing and all going on there.
12  Q. Anything else?
13  A. Not that I can think of.
14  Q. Have you read your complaint that you have
15      filed?
16  A. Yes, I have.
17  Q. You make statements in there about some sort
18      of religious persecution. What do you mean
19      by that?
20  A. It was statements that Louise and Renea had
21      made.
22  Q. What did they say to you?
23  A. I had purchased some little angel earrings. And

Page 36

1  Renea made a statement to Louise have you seen
2  Patricia's little angel earrings? I wonder if
3  she thinks they're going to save her and protect
4  her? And then a little while later on in the
5  month, Louise -- well, Renea made the statement
6  does Patricia not realize everything that we're
7  doing to her and saying to her is things that
8  Gary Nelson has told us to say and do? And
9  Louise's response was, yeah, I wonder where her
10  Jesus is going to be when Gary does what he does
11  to her?
12  Q. What did you think they meant by that, when
13      Gary does what he's going to do to her?
14  A. I have no idea. I wondered myself.
15  Q. What did Gary do to you?
16  A. Well, a few days later he came in there and told
17      me I was going Opelika or a few weeks later. I
18      thought, well, that must have been what they
19      were talking about.
20  Q. Well, you didn't mind going to Opelika
21      though, did you?
22  A. Well, I didn't care to drive to Opelika. I had
23      already done that before for him.

Page 37

1  Q. But you were willing to go back?
2  A. To have a job I didn't have a choice. That's
3      exactly what he told me. If you want to work
4      for Nelson Electric you will go to the Opelika
5      shop.
6  Q. I want to be sure I understand. You say in
7      March I purchased a pair of angel earrings.
8      I'm reading Defendant's Exhibit 1. March, I
9      purchased a pair angel earrings. I wore
10      them to work. Louise and Renea made sure I
11      heard their conversation concerning --
12  A. Correct.
13  Q. And that happened in March then?
14  A. Yes.
15  Q. According to your notes?
16  A. Yes.
17  Q. Was there anything else that you can recall
18      or tell me today that anyone at Nelson
19      Electric did that would make the work place
20      hostile as far as your religious beliefs?
21  A. Well, just, you know, the cussing that goes on.
22      You know, it was awful. Ted, every time you'd
23      go back there is was G-D this, M-F this. It was

Page 38

1 a constant thing.
2 Q. When you say go back there you mean go back
3   to the shop?
4 A. Go back to the back of the shop.
5 Q. Did you ask them not to cuss in front of
6   you?
7 A. I did.
8 Q. What about anything else on the front of the
9   office side of the building? Did anybody
10   else in any way discriminate -- excuse me,
11   discriminate against you due to your
12   religion?
13 A. No. Just the making fun of the earrings and
14   where's her Jesus.
15 Q. Where is her Jesus now statement occurred
16   when? Could it have been in March also?
17 A. Could have been.
18 Q. March of 2006?
19 A. Uh-huh.
20 Q. Is that a yes?
21 A. Yes. I'm sorry.
22 Q. Anything else concerning religious
23   discrimination other than the cussing in the

Page 39

1 back of the shop and that one instance?
2 A. The two incidents.
3 Q. Cussing in the back of the shop and that
4   incident; is that correct?
5 A. Those are two different incidents right there
6   with Louise and Renea's conversations were at
7   two different times.
8 Q. And that occurred in March you think of
9   2006?
10 A. Correct.
11 Q. As far as the cussing in the back of the
12   shop, were they cussing at you or just
13   cussing in general?
14 A. Ted just cusses when he breaths.
15 Q. Ted who?
16 A. Ted Bradika.
17 Q. Anyone else cuss back there?
18 A. Yes, Doug.
19 Q. Were they cussing at you, or were they
20   cussing in general?
21 A. Doug cussed me out one day for doing my job. I
22   had to take care of worker's comp. I had to go
23   back there one day and get him to sit down. He

Page 40

1 had gotten injured. I said would you please sit
2   down with me. I need to get this paperwork in
3   to worker's comp. Well, he just flew off the
4   handle and started cussing. I told Gary about
5   it when he got there. And Gary said, oh, he
6   cussed you for doing your job? And I said,
7   yeah, I was trying to do my job.
8 Q. What did he say to you?
9 A. I don't have blankety-blank time to sit and fool
10   with this and write that down. It don't matter
11   whether worker's comp gets it or not. They need
12   to just be paying it.
13 Q. He wasn't cussing you then? Just cussing
14   the situation?
15 A. Cussing while he was talking.
16 Q. Anything else you can think of? Is that a
17   no?
18 A. No. I was thinking. I'm sorry. Trying to
19   think.
20 Q. Do you know what Renea Morgan was making at
21   the time of your termination? Was she
22   making more or less than you?
23 A. She was making $.25 an hour less than me.

Page 41

1 Q. Do you know what sort of bonus she received
2   the Christmas before or whenever the bonuses
3   were delivered?
4 A. I'm the one that did the bonuses, but I can't
5   tell you right off the top of my head.
6 Q. Was her bonus less or more than yours?
7 A. It's not a whole lot of difference. I think
8   hers was less.
9 Q. You make a statement in the complaint that
10   you purchased a vehicle that would use less
11   gas so you could travel to Opelika?
12 A. Correct.
13 Q. That Gary made it clear to you that he was
14   not going to pay you gas mileage, but he
15   paid Brian Voss' gas mileage?
16 A. Correct.
17 Q. When you ran errands for Nelson Electric in
18   and around Alexander City, you were
19   reimbursed for your gas, were you not?
20 A. Once a month they would pay for a fill-up.
21 Q. Right. And that's for your running around
22   doing Nelson Electric business in Alexander
23   City?

Page 42

1  A.  Correct.
2  Q.  Did you understand that Bryan Voss was also
3      delivering items to customers in and about
4      Opelika and Alex. City with his vehicle?
5  A.  Well, I do not know because I was just told he
6      was being reimbursed for his gas going back and
7      forth every month to Nelson Electric in Opelika.
8  Q.  You state in your complaint that you also
9      worked in a hostile environment due to a
10     sexual relationship between Renea and Gary.
11     Tell me facts that you know concerning that
12     sexual relationship.
13 A.  Well, there was quite a few times that I would
14     walk out into the shop and they would be like
15     real close up to each other.  And she'd be
16     staring up in his eyes batting her little
17     eyelids and grinning in his face.  And then they
18     would be like sitting right up real close to
19     each other sometimes.  And when you'd walk up
20     one of them would scatter.  And then it was some
21     things that Renea had said.
22 Q.  Let me make sure I understand.  The sexual
23     relationships you're talking about were not

Page 43

1      directed toward you?
2  A.  No.
3  Q.  I mean Gary Nelson or anyone else sexually
4      harassed you --
5  A.  No.
6  Q.  -- directly?
7  A.  No.
8  Q.  But your testimony is that there was some
9      sexual relationship between Gary and Renea?
10 A.  That was from statements that Renea had made
11     also.
12 Q.  What did Renea tell you?
13 A.  Well, one day she asked me she said, Patricia,
14     has Gary never told you that he and I have been
15     the best of friends for 17 years and that all
16     the intimate conversations that he and I have
17     had.  I said, no, and you're not either.  Then
18     there was another time she made the statement --
19     she was talking about Julia being a very strong
20     person.  I said, yes, she is.  I said to go
21     through the cancer that she had she had to be a
22     strong person because she never complained about
23     the chemo.  And she never complained about the

Page 44

1      radiation she had to take.  And she said, yeah,
2      I'm glad she's a strong person because she'll
3      survive when things come out about me and Gary.
4  Q.  Anything else?
5  A.  And Louise made a statement before Renea came to
6      work there that she knew that Renea was the one
7      that Gary Nelson was having an affair with.  She
8      had always accused him of having an affair with
9      someone ever since I had been there.  But the
10     day that she found out Renea was coming and what
11     he was going to start Renea off at she said I
12     know for a fact that's who he's been having an
13     affair with because he hangs out over there all
14     the time with her.  And he's never started a
15     woman off in this office at top dollar like he
16     is her.
17 Q.  Anything else you can think of?
18 A.  Not right off the top of my head, no.
19 Q.  When did you last recall seeing Gary and
20     Renea together in a away that you describe
21     either being close or talking very close
22     together?
23 A.  The day before Gary let me go.

Page 45

1  Q.  And when did the conversation occur with
2      Louise?
3  A.  The conversation that Louise made about Gary
4      having the affair that he knew that Renea was
5      the one that he had been having an affair with
6      all these years, the two days before she came to
7      work.
8  Q.  Did you warn Gary about Renea before he
9      hired her?
10 A.  No, I did not.  I did talk with him after Renea
11     made the statement to me that she made.
12 Q.  Did you ever see them actually touch each
13     other?
14 A.  No.
15 Q.  Did you ever hear them talk with each other
16     or what they were talking about?
17 A.  I didn't try to listen.
18 Q.  So it's simply their close contact in the
19     business place and the conversation you had
20     with Louise; is that correct?
21 A.  Correct.
22 Q.  As a result of that could you continue to do
23     your job?

a2d79574-13e9-42a9-95ec-b3349e8d8461

Page 46

1    A. I still did my job.
2    Q. I mean it didn't affect your ability to do
3       the job in the work place, did it?
4    A. No.
5    Q. Did either the religious or sexual
6       discrimination that you claim didn't affect
7       your ability to come to work every day and
8       work --
9    A. Well, it was hard, Larkin. It was very hard to
10      have to go in there. And just like the thievery
11      that Renea accused me of about water. Gary
12      liked bottled water. I liked it. From the time
13      I started working there, I started bringing
14      bottled water to work there. Then Gary would
15      drink it. Finally, one day he came in there. I
16      knew someone was drinking it, but I could have
17      cared less. And he came in there and said,
18      Patricia, I've been drinking some of your water,
19      your bottled water. I said, well, that's fine.
20      And he said how about getting some money and
21      going and buying me and you some water. So from
22      that day on for every case that I purchased
23      through Nelson Electric with Gary Nelson's

Page 47

1       money, I purchased a case with mine. And
2       anybody -- it didn't matter who it was,
3       customers, whoever, wanted water, they knew that
4       that bottled water was in the refrigerator. And
5       they got it.
6    Q. Anything else that you can think of
7       regarding your work that you couldn't
8       perform due to either the sexual
9       connotations as you saw it between Renea and
10      Gary and/or the religious issues?
11   A. Well, there was just a lot of conflict there.
12   Q. Other than sexual and religious? Is that
13      what you're saying?
14   A. There was just a lot of conflict with remarks
15      being made every day. And Renea would walk by
16      my office. I talked to Gary about it one day.
17      I said she'll walk by my office, and if I turn
18      and look she'll stick out her tongue or she'll
19      make a face. So she finally stopped that.
20      She'd just start giving me dirty looks when
21      she'd walk by if I turned around and looked to
22      see who was coming in the door.
23   Q. That had nothing to do with your religion or

Page 48

1       religious beliefs, did it, her sticking her
2       tongue out?
3    A. No, it was just her attitude.
4    Q. Wasn't any sort of sexual connotation of
5       what was going on in the office?
6    A. Just her attitude.
7    Q. Did you complain to Gary about what you saw
8       or what you conceived it to be a sexual
9       relationship between he and Renea?
10   A. No, I did not complain to him about that.
11   Q. Did you complain to him about any of the
12      religious persecution issues you've talked
13      about?
14   A. As a matter of fact, I was going to talk with
15      him about that one day. Then he told me that he
16      didn't care what Renea or Louise either one did
17      or said, nor anyone else as far as that was
18      concerned.
19   Q. So you didn't get to talk to him about it?
20   A. No.
21   Q. About the religious issues?
22   A. Correct.
23   Q. During the last two years were you employed

Page 49

1       by the church?
2    A. I was not employed by the church. I was never
3       employed by the church.
4    Q. Have you ever been treated by a psychologist
5       or psychiatrist or anyone in the mental
6       health industry?
7    A. No.
8    Q. Did you seek treatment for any mental
9       distress or emotions since your termination
10      from Nelson Electric?
11   A. No. But my nerves have certainly calmed down
12      quite a bit.
13   Q. Since your termination?
14   A. Since I'm away from them every day.
15   Q. Derrick has given to me a copy of what in
16      federal court we call initial disclosures.
17      And he has named you as a witness, and he's
18      also named employees at Nelson Electric as
19      potential witnesses. Do you know of any
20      other witnesses outside of Nelson Electric
21      that may testify on your behalf?
22   A. No, I do not.
23   Q. Do you know of anyone else that's ever

Page 50

1 complained to you or have you heard of
2 anyone complain regarding either sexual,
3 religious, or age discrimination at Nelson
4 Electric?
5 A. No, not on age.
6 Q. How about sexual discrimination? You know
7 anybody that's been sexually discriminated
8 there?
9 A. No.
10 Q. And religiously persecuted or discriminated
11 against at Nelson Electric?
12 A. No.
13 Q. You were not terminated due to some sexual
14 discrimination, were you?
15 A. He never told me why.
16 Q. Well, and you weren't discriminated against
17 by termination due to your religious
18 beliefs, were you?
19 A. He never told me why.
20 Q. So you don't know why you were terminated?
21 A. No, I do not.
22     MR. RADNEY: Thank you, ma'am. Give me one
23 second.

Page 51

1     (Break)
2     MR. RADNEY: That's all I have.
3 Thank you.
4     MR. BLYTHE: I have got a few questions just
5 to follow up.
6     EXAMINATION
7 BY MR. BLYTHE:
8 Q. Patricia, one thing that we need to clear
9 up. Did you file -- and I think this
10 happened since we started this particular
11 lawsuit. Did you file a small claims court
12 collection on somebody who didn't pay you?
13 A. Yes, I have, but it's not been --
14 Q. It's still hanging?
15 A. Uh-huh.
16     MR. BLYTHE: You had asked that question,
17 Larkin. And I knew she had, but she didn't
18 remember it.
19     MR. RADNEY: No problem.
20 Q. And let me just get straight to this,
21 Patricia. Were you fired to make room for
22 Debra Keel?
23 A. Yes, I believe I was. She was hired shortly

Page 52

1 after.
2 Q. And do you have any idea how old Debra is?
3 A. Not really. But I know she's younger than I am.
4 Q. And I know that Gary had said that he
5 couldn't keep three, I think, office
6 employees or something like that?
7 A. Three ladies in the office.
8 Q. And that was the reason he was going to let
9 you go?
10 A. Correct.
11 Q. How soon after he let you go did he hire
12 Debra Keel?
13 A. Within a couple of weeks to my understanding.
14 Q. And you make reference that she was a,
15 quote, contact at Russell Corporation. Why
16 is that important?
17 A. Because she was just like Renea. Renea was one
18 of his contacts at Russell also. They worked in
19 the office where he placed his orders. They
20 would contact him to see if he needed anything
21 when they were placing their orders, or they
22 would order through Gary actually. Actually,
23 it's what it was for things that they needed

Page 53

1 they ordered through Gary.
2 Q. Why would Renea and Debra come to work from
3 Russell for Gary? Do you have any idea?
4 A. They were his contacts. And Debra I know was
5 losing her job because they were closing -- I
6 presume she was losing her job because they were
7 closing yarn and dye.
8 Q. What about Renea when she came?
9 A. Renea's job to my knowledge was not in jeopardy.
10 Q. Did you do anything in preparation to go to
11 work in Opelika for Mr. Nelson?
12 A. Yes, I purchased a vehicle.
13 Q. What did you purchase?
14 A. 2002 Volvo.
15 Q. How much did you pay for that?
16 A. About 16,000.
17 Q. And did you have a vehicle at that time?
18 A. Yes, I did.
19 Q. What did you have?
20 A. Dodge Durango 2002.
21 Q. Why did you purchase this Volvo?
22 A. Because of the gas being so high. The Volvo
23 would have been a lot cheaper to drive back and

Page 54

1    forth to Opelika gas wise.  And the Durango is a
2    lot more expensive.
3    Q.  Were there other employees with Nelson
4       Electric that had to drive back and forth to
5       Opelika?
6    A.  Yes, there was.
7    Q.  Who were they?
8    A.  Well, Ricky Lashley for one.  But, of course, he
9       used a company vehicle to drive back and forth.
10      He was purchased a new one.  Well, he first took
11      Ricky Patterson's truck.  Then they purchased
12      him a new one later on.  And then Brian Voss
13      drove back and forth in his personal vehicle.
14   Q.  Let me stop you first about the first guy.
15      What was his name?
16   A.  Ricky Lashley.
17   Q.  And you say they purchased a company
18      vehicle.  Do you mean Mr. Nelson purchased
19      him a company vehicle?
20   A.  Yes.
21   Q.  That was for him to drive back and forth in?
22   A.  Yes, and to do company business in.
23   Q.  You say Mr. Voss drove back and forth?

Page 55

1    A.  Yes, he did.
2    Q.  Is that Brian Voss?
3    A.  That is correct.
4    Q.  Were there any special considerations made
5       by Mr. Nelson for Mr. Voss?
6    A.  Well, he paid him once -- well, sometimes twice
7       a month, at least once a month and every once in
8       a while it was twice a month $100 on each check
9       that he gave him for gas money.  That's what was
10      put on the check.  It was for gas.
11   Q.  Did he make and I say he -- did Mr. Nelson
12      make any provision to buy you gas or
13      anything like that?
14   A.  No, he did not.
15   Q.  To your knowledge is Brian Voss still
16      employed with Nelson Electric?
17   A.  To my knowledge, yes.
18   Q.  And, Patricia, did you need this job with
19      Nelson Electric?
20   A.  Yes, I did.
21   Q.  Why?
22   A.  You know, we have to have food on the table and
23      pay bills.

Page 56

1    Q.  When you started having trouble towards the
2       end of your employment with Nelson Electric,
3       were there certain things that Gary had
4       asked of you?
5    A.  Yes.
6    Q.  Just explain that to me.  What was going on
7       there at the end?
8    A.  Well, asking me to go to Opelika.  And I talked
9       with him about that.  I said, you know, I don't
10      think it's right that I should be the one to
11      have to go.  I'm the only one that does this
12      job.  There's Cara Lee, Renea, and Louise all
13      three did the same job.  None did what I did.
14      Why should I be the one having to go to
15      Opelika?  They were wanting to let Cara Lee go
16      according to Ricky Lashley because she was
17      always out of work.
18   Q.  Who is this Cara Lee?  Where was she
19      employed?
20   A.  At the Opelika shop.
21   Q.  You had actually been working for Nelson
22      Electric longer than Renea; is that correct?
23   A.  Yes, it is.

Page 57

1    Q.  Was there any explanation given to you why
2       Renea was not the person that was going to
3       have to drive to Opelika?
4    A.  Yes, it was.
5    Q.  What was that?
6    A.  Gary said he did not want her down there.  He
7       wanted her at the Alexander City office.  That's
8       when he told me that Louise would be retiring in
9       four years and that Renea by then would be able
10      to run that office by herself, and there would
11      be only one female in that office within four
12      years because by then the work load for the
13      Alexander City office would be so low it would
14      require only one person, one lady, to work in
15      the office.  And all the business would be in
16      the Opelika shop where there would be one or
17      more females in the office there.
18   Q.  Did this seem fair to you, Patricia?
19       MR. RADNEY:  Object to the form.
20   Q.  Go ahead and answer the question.
21   A.  No, I do not think it's fair.
22   Q.  Let me ask you this.  As far as you know
23      today, how many females are working in the

Page 58

1    office at Nelson Electric?
2    A. The one in Alexander City, there's three.
3    Q. Okay.
4    A. And I presume there's still just Cara Lee at the
5       Opelika shop.
6    Q. Is there some reason that you feel like that
7       Mr. Nelson didn't want to send Renea to
8       Opelika other than what he told you?
9    A. He said he wanted her up here at the Alex. City
10      office.
11   Q. After you left --
12   A. Let me verify something. When I say the office,
13      that includes the office and the shop where
14      there's Louise and Renea in the front office and
15      then there's the office in the shop where I was
16      told Debra Keel was working. That was Renea's
17      office when I left.
18   Q. That's just geography, is it not?
19   A. Yes.
20   Q. They're still doing office work?
21   A. Office work, correct.
22   Q. Patricia, I know I'm asking you to base this
23      next question on things that have been told

Page 59

1    to you and things. But since you left do
2    you have any idea about your specific job
3    duties and who's doing those now?
4    A. I do not have a clue other what I was told.
5    Q. And what were you told?
6    A. I was told that Debra Keel was hired. And she
7       went in for the office in the shop to replace
8       Renea. Renea went into Louise's office to
9       replace Louise. Louise went into my old office
10      to do my job and replace me.
11   Q. This was after you were told that the
12      business would not support this many
13      employees?
14   A. Correct.
15   Q. Now, Patricia, do you feel like you were
16      treated differently than Renea?
17   A. Yes, I do.
18   Q. Why is that?
19   A. Well, you know, it was pay raises and just the
20      way he acted in general.
21   Q. I'm not asking what he did. I'm asking why
22      do you think he treated her better than
23      you?

Page 60

1    A. Well, she's younger than I am.
2    Q. Well, do you believe there was some type
3       inappropriate relationship between the two?
4    A. I do according to the statements that Renea made
5       and just from the looks of things with the two
6       of them.
7    Q. You think that's the reason you were treated
8       differently?
9    A. I feel like it was.
10   Q. Now, these things that Louise and Renea said
11      about your Jesus, how did that make you
12      feel?
13   A. It was very uncomfortable because, you know, I
14      love my Jesus, and I'm proud of him. And I'm
15      proud of him today. He supports me 24/7. And
16      I'm going to be there for him 24/7.
17   Q. Did that make you feel like they were
18      somehow ridiculing you for being a
19      Christian?
20   A. Yes, I do.
21   Q. Do you think they wouldn't have made these
22      remarks if you were not a Christian?
23   A. I don't think they would.

Page 61

1    Q. How much were you making per year at Nelson
2       Electric when you left?
3    A. Somewhere around 23. I'm not positive about the
4       exact amount right now. I can pull income tax
5       and see. But to my knowledge somewhere close to
6       23,000 a year.
7    Q. And, Patricia, when you first started
8       working for Gary did you enjoy that job?
9    A. Yes, I did.
10   Q. And what about in the end?
11   A. No. It was very uncomfortable to go to work
12      there. I went because I had bills to pay.
13   Q. And one final question, Patricia. And I
14      know that Mr. Radney had asked this question
15      in one form. I'm just going to ask it very
16      directly. Has Mr. Nelson ever put his hands
17      on you?
18   A. Yes, he did.
19   Q. Explain that to me.
20   A. The very last day after he had let me go I was
21      packing my personal belongings. I knew I had
22      some discs over there with my personal things on
23      there and to verify some other things. And on

Page 62

1   that was my resume' that I had taken. And there
2   was some church business on there. I picked the
3   two discs up to put them in my box. When I did,
4   Gary grabbed me by my right arm and jerked the
5   discs out of my hand.
6   Q. When you say he grabbed you by your right
7   arm, what do you mean? Did he place his
8   hand on you?
9   A. No, he grabbed me. He held my arm very
10  strongly.
11  Q. Would you characterize that as an act of
12  aggression?
13  A. Yes, I do. I sure do. The way he jumped up and
14  grabbed me, yes, I do.
15  Q. Would you characterize that as some people
16  might say man handling you?
17  A. Yes.
18      MR. BLYTHE: That's all the questions I
19  have.
20          EXAMINATION
21  BY MR. RADNEY:
22  Q. I take it when Gary touched you, it wasn't a
23  in a sexual manner, was it?

Page 63

1   A. No, it was aggressive.
2   Q. This was after he had already let you go?
3   A. Yes, I was packing my things.
4   Q. Do you know whether or not Debra Keel is
5   presently employed at Nelson Electric?
6   A. No, I do not.
7   Q. Do you know when she was employed?
8   A. All I know is I was told she came there a couple
9   of weeks after I left.
10  Q. In your EEOC charge you never mentioned the
11  name of Debra Keel. Why is that?
12  A. Well, we did the day we were there because I
13  found out the night before we went.
14  Q. And in your complaint that you filed against
15  Nelson Electric, you never mentioned the
16  name Debra Keel, did you, when you filed
17  this 15 November, 2007? Do you see her name
18  in this complaint?
19  A. No, it's not.
20      MR. RADNEY: Thank you, ma'am. That's all I
21  have.
22          END OF PROCEEDINGS
23

Page 64

1          C E R T I F I C A T E
2
3   STATE OF ALABAMA        )
4                          )
5   TALLAPOOSA COUNTY       )
6                          )
7       I hereby certify that the above and
8   foregoing matter was taken down by me in
9   stenotype and was thereto reduced to computer
10  print under my supervision, and that the
11  foregoing represents a true and correct
12  transcript of said matter.
13      I further certify that I am neither of
14  counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of the said cause.
17
18
19      _____
20      FRANCES P. LOONEY, COMMISSIONER
21      ABCR NO. 81
22
23  My commission expires 12.27.2009.

Depo of Patricia Wheeles

Page 1

**A**

**ABCR** 64:21
**ability** 46:2,7
**able** 9:4 57:9
**about** 4:19 9:5 19:22
20:3,5 21:1,17,20
23:10 25:12 28:8,18
29:18 32:9,10 33:3
35:7,8,17 36:19 38:8
40:4 42:3,23 43:19
43:22,23 44:3 45:3,8
45:16 46:11,20 47:16
48:7,10,11,13,15,19
48:21 50:6 53:8,16
54:14 56:9 59:2
60:11 61:3,10
**above** 4:5 64:7
**Absolutely** 10:4
**accepted** 28:21
**according** 37:15 56:16
60:4
**account** 33:18,19
**accounting** 8:2,3
**accusations** 35:6
**accused** 44:8 46:11
**act** 62:11
**acted** 59:20
**acting** 3:19
**action** 10:6 64:15
**active** 18:22
**actually** 11:13,15,16,18
12:11 19:10 20:5
25:1 28:20 45:12
52:22,22 56:21
**additional** 23:13
**address** 5:18
**administrative** 11:5
**administrator** 25:21
**advertise** 13:12
**affair** 44:7,8,13 45:4,5
**affect** 46:2,6
**affiliation** 16:23
**afford** 20:21
**after** 11:6 12:11 19:10
20:22 21:21 22:17
26:19 45:10 52:1,11
58:11 59:11 61:20
63:2,9
**against** 9:9 10:6 17:5
20:11 38:11 50:11,16
63:14
**age** 6:14 7:7 20:11,12
20:17 50:3,5
**aggression** 62:12
**aggressive** 63:1
**agree** 29:23
**agreed** 1:13 2:1,8 29:5
29:6 30:13,13,23
**agreement** 3:12 9:13

28:14 29:9,13,18
30:12,15,22
**ahead** 7:16 21:22 23:4
57:20
**al** 1:9
**Alabama** 1:2,21 2:23
3:5,18,19,21 4:3 5:19
64:3
**Alex** 42:4 58:9
**Alexander** 1:21 2:23
3:5,18 4:2 5:19 41:18
41:22 57:7,13 58:2
**allege** 35:1
**alleged** 4:21
**already** 36:23 63:2
**always** 28:7 44:8 56:17
**amount** 27:7 29:2
31:11 61:4
**and/or** 23:4 31:3 47:10
**angel** 35:23 36:2 37:7,9
**annual** 33:1
**another** 43:18
**answer** 5:1,15 9:23
10:2 19:7 21:15,22
57:20
**answering** 19:5
**anybody** 21:19 30:6
38:9 47:2 50:7
**anyone** 18:14,18 37:18
39:17 43:3 48:17
49:5,23 50:2
**anything** 9:14 11:23
18:22 23:16 35:12
37:17 38:8,22 40:16
44:4,17 47:6 52:20
53:10 55:13
**anywhere** 14:23 15:12
**anywise** 64:15
**approximately** 1:22 4:3
9:3
**arm** 62:4,7,9
**around** 16:21 33:3
41:18,21 47:21 61:3
**asked** 30:14 43:13
51:16 56:4 61:14
**asking** 10:7,8 56:8
58:22 59:21,21
**assign** 2:13
**assigned** 11:14
**assistant** 11:5
**associate** 7:21
**associated** 15:21
**Association** 16:1
**assume** 5:1,8
**attempt** 4:23 30:9
**attempted** 14:22
**attend** 16:14
**attitude** 48:3,6
**attorney** 2:21 5:14

**attorney's** 6:9
**attorney/client** 23:3
**August** 13:5 21:1
**Avenue** 1:20 3:4 4:2
**away** 20:2 44:20 49:14
**awful** 37:22
**a.m** 1:23 4:4

**B**

**B** 3:10
**back** 22:23 30:2,11,23
31:2 37:1,23 38:2,2,4
38:4 39:1,3,11,17,23
42:6 53:23 54:4,9,13
54:21,23
**background** 4:20 5:9
7:12
**bad** 19:3
**bank** 24:11 25:18
**Baptist** 15:21,23 16:17
**Barnes** 1:20 3:3
**base** 58:22
**based** 23:12 30:11
31:10
**basically** 8:1 16:21
25:11,14
**basis** 13:16
**batting** 42:16
**become** 8:17 11:7 15:2
15:4
**before** 1:17 3:23 5:5,6
12:12 20:7,23 28:23
36:23 41:2 44:5,23
45:6,8 63:13
**behalf** 2:19 3:1 4:18
49:21
**being** 4:8 22:9 42:6
43:19 44:21 47:15
53:22 60:18
**beliefs** 37:20 48:1
50:18
**believe** 11:12 29:17
33:3 51:23 60:2
**belongings** 61:21
**benefit** 7:11
**benefits** 33:5,7
**Benjamin** 8:9
**best** 43:15
**better** 59:22
**between** 1:14 42:10
43:9 47:9 48:9 60:3
**bills** 13:11 28:22 30:10
55:23 61:12
**Birmingham** 7:15 8:4
**birth** 6:16
**bit** 49:12
**black** 22:2
**blankety-blank** 40:9
**Blue** 34:7

**Blythe** 2:20 3:15 6:8
9:11,20,22 10:10,15
14:14,16 17:19 21:22
23:1 51:4,7,16 62:18
**bonus** 41:1,6
**bonuses** 41:2,4
**both** 14:17 30:23
**bottled** 46:12,14,19
47:4
**box** 62:3
**Bradika** 39:16
**branch** 27:12
**break** 5:12,13 51:1
**breaths** 39:14
**Brian** 41:15 54:12 55:2
55:15
**bring** 14:8
**bringing** 46:13
**Brother-in-law** 16:13
**brought** 18:1
**Bryan** 42:2
**building** 38:9
**business** 12:9,10 13:10
24:5 31:10 41:22
45:19 54:22 57:15
59:12 62:2
**buy** 55:12
**buying** 46:21

**C**

**C** 2:17 64:1,1
**call** 12:1 25:20 49:16
**called** 25:22 30:23
**calmed** 49:11
**came** 3:23 20:5,7 22:3
25:19 28:23 36:16
44:5 45:6 46:15,17
53:8 63:8
**cancer** 33:9,15 43:21
**capacity** 1:9
**Cara** 56:12,15,18 58:4
**care** 15:4 22:3 36:22
39:22 48:16
**cared** 46:17
**carry** 34:18
**case** 1:6 17:1 46:22
47:1
**cause** 4:5 64:16
**Central** 1:20 3:4 4:2
**certain** 29:21 33:5 56:3
**certainly** 5:14 49:11
**certify** 3:20 64:7,13
**change** 32:11
**changed** 27:2,18 30:16
30:18
**characterize** 62:11,15
**charge** 9:9 63:10
**charged** 12:21
**cheaper** 53:23

**check** 55:8,10
**checks** 32:17
**chemo** 43:23
**children** 6:5
**choice** 37:2
**Christian** 60:19,22
**Christmas** 41:2
**church** 15:17,18,19,20
15:21 16:3,6,14,20
22:4 49:1,2,3 62:2
**City** 1:21 2:23 3:5,18
4:2 5:19 41:18,23
42:4 57:7,13 58:2,9
**Civil** 3:21
**claim** 9:15,19 10:10
17:4 20:10 46:6
**claims** 4:20 51:11
**classes** 7:14
**cleaned** 22:4
**clear** 4:23 32:9 41:13
51:8
**clipped** 22:23
**close** 10:16 14:9 16:8
42:15,18 44:21,21
45:18 61:5
**closed** 15:18 16:3
**closing** 53:5,7
**Club** 11:4
**clue** 27:4 59:4
**collection** 51:12
**college** 7:14 8:16
**come** 30:2,11 44:3 46:7
53:2
**coming** 44:10 47:22
**commencing** 1:22 4:3
**commission** 64:23
**commissioner** 1:18
3:20 64:20
**comp** 39:22 40:3,11
**company** 21:10 24:12
25:16 33:11,13,17
54:9,17,19,22
**complain** 48:7,10,11
50:2
**complained** 43:22,23
50:1
**complaint** 20:8 32:2
35:1,14 41:9 42:8
63:14,18
**completely** 5:16
**compliance** 2:5
**computer** 64:9
**computers** 8:1,1
**conceived** 48:8
**concerned** 48:18
**concerning** 28:15
37:11 38:22 42:11
**confer** 5:13
**conflict** 47:11,14

confused 32:10
connotation 48:4
connotations 47:9
consider 28:9
consideration 29:22
considerations 55:4
constant 38:1
contact 45:18 52:15,20
contacts 21:2 52:18
53:4
continue 45:22
control 11:1
controller 6:12
conversation 37:11
45:1,3,19
conversations 18:13
39:6 43:16
copies 18:11
copy 29:13 49:15
Corp 8:18,19 10:19,20
10:22
corporate 6:12
corporation 6:13 31:18
52:15
correct 5:4 6:10,20 7:1
7:2 9:7 12:16 15:16
16:4 18:2,3 20:13
22:18,19 24:14 25:23
26:4,16 27:9 30:1
32:14 34:22 35:9
37:12 39:4,10 41:12
41:16 42:1 45:20,21
48:22 52:10 55:3
56:22 58:21 59:14
64:11
correctly 20:10
counsel 1:15 2:10,12
3:23 64:14
Country 11:4
COUNTY 64:5
couple 13:19 52:13
63:8
course 4:14 6:9 17:3
54:8
courses 8:3
court 1:1 2:6 3:17 4:18
4:21 5:10 10:6 20:9
49:16 51:11
cover 29:4,8
Cross-Blue 34:7
Cullars 8:14
cuss 38:5 39:17
cussed 39:21 40:6
cusses 39:14
cussing 35:11 37:21
38:23 39:3,11,12,13
39:19,20 40:4,13,13
40:15
customer 11:1

customers 42:3 47:3
cut 32:16
CV1006-TFM 1:6
C-u-l-l-a-r-s 8:14

D
date 3:20 6:16
daughter 11:19
day 1:21 3:23 26:8,10
27:17 28:23 32:12,13
39:21,23 43:13 44:10
44:23 46:7,15,22
47:15,16 48:15 49:14
61:20 63:12
days 11:21 36:16 45:6
deal 15:5 19:8
dealing 15:5
Debra 21:1,4,6 22:20
23:19,21 51:22 52:2
52:12 53:2,4 58:16
59:6 63:4,11,16
decided 27:18
deciding 16:21
decision 15:2 23:12,17
27:7 31:11
decrease 31:11
defendant 1:10 3:1
17:10
defendants 4:16 17:1
Defendant's 3:11,12
17:21,23 22:22 29:9
29:12 37:8
degree 7:18,21 8:7
delineations 34:19
delivered 41:3
delivering 42:3
dental 33:10,15
department 15:15
depended 12:21
depends 13:19,21
deposed 5:5
deposited 25:19
deposition 1:7,15 2:3,4
2:14 5:6,9 18:1
depositions 2:7
deposits 24:11 26:13
Derrick 2:20 14:12
19:12,13,15 49:15
describe 35:4 44:20
destroy 19:21
destroyed 20:1
difference 41:7
different 11:2 22:10
28:8 39:5,7
differently 59:16 60:8
direct 25:19 26:13
directed 43:1
directly 43:6 61:16
dirty 47:20

disclose 10:8
disclosures 49:16
discriminate 38:10,11
discriminated 20:11
50:7,10,16
discrimination 38:23
46:6 50:3,6,14
discs 61:22 62:3,5
discuss 27:11,23
discussing 29:1,14
distress 49:9
DISTRICT 1:1,2
Dodge 53:20
doing 11:23 13:21 21:4
25:10,16 36:7 39:21
40:6 41:22 58:20
59:3
dollar 44:15
dollars 13:20 29:2
done 24:21 27:8 36:23
door 47:22
Doug 39:18,21
down 39:23 40:2,10
49:11 57:6 64:8
draw 13:17
drink 46:15
drinking 46:16,18
drive 36:22 53:23 54:4
54:9,21 57:3
drove 54:13,23
due 20:11,12,17 24:5
26:12 31:4 38:11
42:9 47:8 50:13,17
duly 4:8
Durango 53:20 54:1
during 10:11 12:19
48:23
duties 22:17 24:9,19,22
26:18 27:2 32:10,11
34:20,21 59:3
dye 53:7

E
E 2:17,17 3:10 64:1,1
each 42:15,19 45:12,15
55:8
earrings 35:23 36:2
37:7,9 38:13
educational 7:12
EEOC 9:9,18 10:10
17:4 63:10
effect 2:4
either 43:17 44:21 46:5
47:8 48:16 50:2
Electric 1:7 4:16 6:18
11:10,11,14,21 12:20
13:1,4 14:20 18:9,14
18:20,23 20:4 21:21
22:16 24:4,8 25:20

26:19 30:5 31:14,17
32:22 33:2,21 37:4
37:19 41:17,22 42:7
46:23 49:10,18,20
50:4,11 54:4 55:16
55:19 56:2,22 58:1
61:2 63:5,15
elsewhere 14:19
embroidery 12:9 13:9
13:18 22:4
emotions 49:9
employed 6:18 8:17
11:7,11 12:19 15:3,4
18:14 19:2 21:9 22:9
24:7,20 31:14,20
32:12 48:23 49:2,3
55:16 56:19 63:5,7
employee 23:14
employees 18:8 26:3
49:18 52:6 54:3
59:13
employer 31:17
employment 6:23 8:21
9:6 10:5 11:6 14:19
14:22 56:2
end 56:2,7 61:10 63:22
enjoy 61:8
enough 5:3
environment 35:2 42:9
errands 41:17
et 1:9
even 31:1
eventually 34:1
ever 5:5,6 18:13,18
44:9 45:12,15 49:4
49:23 61:16
every 37:22 42:7 46:7
46:22 47:15 49:14
55:7
everybody's 32:10
everyone's 25:14
everything 19:11 26:11
28:20 30:14 36:6
evidence 2:15
exact 61:4
exactly 9:2 37:3
examination 3:14,15
4:5,10 51:6 62:20
examined 4:8
except 2:10 25:10
excuse 38:10
Exhibit 3:11,12 17:21
17:23 22:22 29:9,12
37:8
expect 5:15
expensive 54:2
expires 64:23
explain 11:16 28:16
56:6 61:19

explanation 57:1
extra 12:14
eyelids 42:17
eyes 42:16
e-mails 18:8,8,11

F
F 64:1
face 42:17 47:19
fact 9:17 23:13 30:21
31:4,17 44:12 48:14
facts 42:11
fair 5:2 57:18,21
false 35:6
far 10:11 22:17 31:9
37:20 39:11 48:17
57:22
fastly 19:5
faxed 25:15,17 26:12
federal 4:18 20:9 49:16
feel 58:6 59:15 60:9,12
60:17
felt 30:4
female 57:11
females 57:17,23
few 11:20,21 36:16,17
42:13 51:4
field 7:19
file 9:9 10:6 13:22 14:1
14:3 51:9,11
filed 4:17 9:17,18 17:5
20:9 55:15 63:14,16
fill 11:20
filled 12:1
fill-up 41:20
final 61:13
finally 46:15 47:19
fine 46:19
finish 19:6
fire 15:14 28:1
fired 28:3 51:21
first 4:8 16:22 24:7
54:10,14,14 61:7
flew 40:3
follow 51:5
following 4:6
follows 4:9
food 55:22
fool 40:9
force 2:4 11:18
foregoing 3:22 64:8,11
form 2:11 57:19 61:15
forth 42:7 54:1,4,9,13
54:21,23
found 44:10 63:13
four 22:22 23:10 57:9
57:11
Frances 1:17 3:17 19:7
64:20

**friend** 11:19
**friends** 12:5 43:15
**from** 8:9,12,15 12:23
13:3,17 14:20 15:14
19:14 21:2,5 22:14
32:11 33:2 34:17
43:10 46:12,21 49:10
49:14 53:2 60:5
**front** 17:13 38:5,8
58:14
**Fruit** 6:13
**full** 2:5 30:2 31:1,3
**fully** 5:16
**fun** 38:13
**funds** 33:23
**furnish** 26:1
**further** 2:1,8 64:13

**G**

**gained** 22:14
**Gary** 1:7 23:7 28:3,15
28:20 30:16 32:2
36:8,10,13,15 40:4,5
41:13 42:10 43:3,9
43:14 44:3,7,19,23
45:3,8 46:11,14,23
47:10,16 48:7 52:4
52:22 53:1,3 56:3
57:6 61:8 62:4,22
**Gary's** 22:3,4
**gas** 41:11,14,15,19 42:6
53:22 54:1 55:9,10
55:12
**gave** 19:12,13,15 55:9
**general** 39:13,20 59:20
**geography** 58:18
**gets** 40:11
**getting** 46:20
**girl** 11:18 12:4
**give** 7:11 13:16 25:6
28:14 50:22
**given** 25:2 49:15 57:1
**giving** 47:20
**glad** 44:2
**glasses** 29:15
**go** 7:16 8:16,21 17:20
20:23 21:22 23:4
27:14,16,17,19,19
29:1 37:1,4,23 38:2,2
38:4 39:22 43:20
44:23 46:10 52:9,11
53:10 56:8,11,14,15
57:20 61:11,20 63:2
**goes** 37:21
**going** 4:18 14:16 15:7
16:21 23:2 27:11,19
27:20 28:18 29:11
30:6,9 35:11 36:3,10
36:13,17,20 41:14

**H**

**H** 3:10
**habit** 19:3
**hand** 62:5,8
**handle** 40:4
**handling** 62:16
**hands** 61:16
**handwritten** 20:1
**hanging** 51:14
**hangs** 44:13
**Hannah** 6:4,8,8
**happened** 30:15 37:13
51:10
**happening** 20:4 21:20
**harassed** 43:4
**hard** 46:9,9
**having** 26:13 34:10
44:7,8,12 45:4,5 56:1
56:14
**head** 41:5 44:18
**health** 16:9 33:10,15
49:6
**hear** 45:15
**heard** 37:11 50:1
**held** 62:9
**help** 19:7 28:22
**helps** 13:11
**her** 7:7 9:22 12:1,7
24:1,2,3 25:2,2,7
27:2 36:3,4,7,7,9,11
36:13 38:14,15 41:6
42:16 44:14,16 45:9
47:18 48:1,1,3,6 53:5
53:6 57:6,7 58:9
59:22 63:17
**herself** 57:10
**high** 8:11,15 53:22
**him** 21:14 36:23 39:23
44:8 45:10 48:10,11
48:15,19 52:20 54:12
54:19,21 55:6,9 56:9
60:14,15,16

42:6 44:11 46:21
48:5,14 52:8 56:6
57:2 60:16 61:15
**gone** 17:17 30:22 31:2
**good** 28:5,9
**Goodwater** 8:12
**gotten** 40:1
**grabbed** 62:4,6,9,14
**graduate** 8:9,11
**graduation** 8:15
**great** 19:8
**grinning** 42:17
**grounds** 2:13
**guess** 20:5 28:11 31:13
**guy** 22:2 54:14
**G-D** 37:23

**I**

**idea** 13:16 24:1 36:14
52:2 53:3 59:2
**identification** 17:22
29:10
**immediately** 8:16
26:19
**important** 52:16
**inappropriate** 60:3
**incident** 39:4
**incidents** 39:2,5
**includes** 18:13
**income** 12:8,15 13:9,17
13:23 14:5,5,13 33:1
61:4
**indicate** 32:2
**individual** 4:16
**individually** 1:8
**industry** 49:6
**information** 21:8 22:14
23:3 26:2,15
**initial** 49:16
**injured** 40:1
**instance** 39:1
**instead** 5:11
**instructed** 9:15,22
**insurance** 28:22 29:3,4
29:8,22 30:10 33:8,9
34:4,10
**interested** 64:15
**interpersonal** 30:7
**interrupt** 19:4
**intimate** 43:16
**involved** 17:3
**IRA** 34:2
**issues** 47:10 48:12,21
**items** 42:3

**J**

**January** 6:17
**jeopardy** 53:9
**jerked** 62:4
**Jerry** 16:11
**Jesus** 36:10 38:14,15
60:11,14

**hire** 11:22 52:11
**hired** 20:19 21:1 22:20
23:19 45:9 51:23
59:6
**hobby** 12:12,13,15,20
**home** 11:23
**Hon** 2:20 3:2
**honest** 9:5 12:7 32:23
**hostile** 35:2 37:20 42:9
**hour** 40:23
**hours** 25:15 26:5
**hundred** 13:19
**husband** 15:10 34:10

**J**

**job** 10:18 12:11 19:10
21:6,7 22:17 23:20
24:8,19,22 25:2,2
26:7,7,23 27:2 28:21
30:4 32:11,16,19,20
34:19,21 37:2 39:21
40:6,7 45:23 46:1,3
53:5,6,9 55:18 56:12
56:13 59:2,10 61:8
**joined** 16:20
**judge** 10:1
**Julia** 43:19
**jumped** 62:13
**junior** 7:13
**just** 8:1 9:16 10:8 11:2
11:23 12:12,13,13
13:19,21 15:3,7
16:20 19:6,23 20:1
21:14 23:1,2,7 25:12
27:19 35:11 37:21
38:13 39:12,14 40:3
40:12,13 42:5 46:10
47:11,14,20 48:3,6
51:4,20 52:17 56:6
58:4,18 59:19 60:5
61:15

**K**

**Keel** 21:1,4,6 22:20
23:21 51:22 52:12
58:16 59:6 63:4,11
63:16
**keep** 52:5
**kept** 18:7
**Kevin** 6:8
**kin** 64:14
**knew** 44:6 45:4 46:16
47:3 51:17 61:21
**know** 4:14 5:8 7:5,7
9:16 10:2 12:22 16:5
16:23 17:3 21:4,19
23:21 26:18,22 27:2
27:16 28:12 30:17
33:9 37:21,22 40:20
41:1 42:5,11 44:12
49:19,23 50:6,20
52:3,4 53:4 55:22
56:9 57:22 58:22
59:19 60:13 61:14
63:4,7,8
**knowledge** 21:5 28:13
53:9 55:15,17 61:5

**L**

**L** 1:12 3:10
**ladies** 24:16 27:9 52:7
**lady** 57:14
**Lands** 8:22 9:1,7,10,14
10:6,7 11:3,6 15:15

17:5 34:17
**large** 1:19 3:19 32:18
**Larkin** 1:19 3:2 4:1,15
9:11 23:1 46:9 51:17
**Lashley** 27:23 28:1,3,6
28:10 54:8,16 56:16
**last** 28:22 44:19 48:23
61:20
**later** 36:4,16,17 54:12
**law** 1:19 2:21 4:1
**laws** 2:6
**lawsuit** 4:17 17:4,8
51:11
**lawsuits** 17:6,10
**leading** 2:11
**learn** 23:11
**least** 55:7
**leave** 29:2
**Lee** 56:12,15,18 58:4
**left** 6:23 9:6 10:5 21:10
21:21 22:17 25:11
58:11,17 59:1 61:2
63:9
**less** 40:22,23 41:6,8,10
46:17
**let** 19:6 20:22 22:21
23:5 27:17,19 28:23
30:21 42:22 44:23
51:20 52:8,11 54:14
56:15 57:22 58:12
61:20 63:2
**Liberty** 15:20
**like** 10:15 14:6 15:5
18:15,16 28:16 30:4
34:16,17 42:14,18
44:15 46:10 52:6,17
55:13 58:6 59:15
60:9,17
**liked** 46:12,12
**list** 22:8,11,12
**listen** 45:17
**little** 12:9 35:23 36:2,4
42:16
**load** 57:12
**long** 5:22 8:19 12:10
15:9
**longer** 56:22
**look** 22:8 47:18
**looked** 47:21
**looks** 47:20 60:5
**Looney** 1:17 3:17
64:20
**losing** 53:5,6
**lost** 12:11 19:10
**lot** 31:6 35:11 41:7
47:11,14 53:23 54:2
**Louise** 3:9 7:5 21:7
23:10 24:13 25:1,3,6
25:9 30:6 31:20,22

32:15 34:20 35:20
36:1,5 37:10 39:6
44:5 45:2,3,20 48:16
56:12 57:8 58:14
59:9,9 60:10
**Louise's** 21:7 32:20
36:9 59:8
**love** 60:14
**low** 57:13

---

**M**

**made** 2:10 15:2 17:16
17:23 18:5,11,22
24:11 27:6 35:21
36:1,5 37:10 41:13
43:10,18 44:5 45:3
45:11,11 47:15 55:4
60:4,21
**maiden** 8:13
**mainly** 21:17 22:14
**majority** 25:7
**make** 2:12 4:23 20:14
20:15 32:17 35:17
37:19 41:9 42:22
47:19 51:21 52:14
55:11,12 60:11,17
**making** 23:12 38:13
40:20,22,23 61:1
**man** 62:16
**manner** 62:23
**many** 57:23 59:12
**March** 1:22 4:1 37:7,8
37:13 38:16,18 39:8
**marked** 17:21 29:9,11
**married** 5:20,22 6:1
**Marshall** 22:7
**matter** 10:9 40:10 47:2
48:14 64:8,12
**may** 1:17 2:12 10:15
17:18 49:21
**maybe** 13:20
**ma'am** 10:21 50:22
63:20
**McBee** 25:22 26:1,12
26:15
**mean** 28:12 35:5,18
38:2 43:3 46:2 54:18
62:7
**meant** 36:12
**mediation** 10:12
**Medicaid** 34:16
**Medicare** 34:16
**member** 15:17 16:18
**memorandums** 18:21
**memos** 18:21
**mental** 49:5,8
**mentioned** 63:10,15
**met** 24:1
**Methodist** 16:22

---

**MIDDLE** 1:2
**might** 9:12 13:17 62:16
**Mike** 21:12,16 22:12
22:13
**mileage** 41:14,15
**mind** 27:18 30:16,18
36:20
**mine** 21:7 25:3,8 33:20
47:1
**mistaken** 20:23
**moment** 28:1
**money** 12:14 30:10
31:5 33:17,19 46:20
47:1 55:9
**moneys** 26:3
**month** 36:5 41:20 42:7
55:7,7,8
**Moose** 5:19
**more** 40:22 41:6 54:2
57:17
**Morgan** 3:8 24:20
31:20 40:20
**mornings** 26:17
**mostly** 12:17
**mother** 11:22
**Motor** 1:7 31:15
**much** 12:17 13:17
14:11 31:6 53:15
61:1
**must** 23:18 36:18
**myself** 4:22,23 36:14
**M-F** 37:23

---

**N**

**N** 1:12 2:17
**name** 4:12 8:13 12:2,4
12:7 15:19 22:1,6,7
54:15 63:11,16,17
**named** 49:17,18
**names** 22:11
**necessary** 2:9 29:23
**need** 5:12,13 21:19
23:13 40:2,11 51:8
55:18
**needed** 23:18 24:12
28:21 29:7 30:3,9
31:4 52:20,23
**needing** 11:20
**neither** 64:13
**Nelson** 1:8 4:15 6:18
11:10,11,14,21 12:20
13:1,3 14:20 18:9,14
18:20,23 20:4 21:20
22:16 23:7 24:4,8
25:20 26:19 27:6
30:5 31:9,17 32:3,22
33:2,21 36:8 37:4,18
41:17,22 42:7 43:3
44:7 46:23 49:10,18

---

49:20 50:3,11 53:11
54:3,18 55:5,11,16
55:19 56:2,21 58:1,7
61:1,16 63:5,15
**Nelson's** 1:7 31:14
46:23
**nerves** 49:11
**never** 24:1 43:14,22,23
44:14 49:2 50:15,19
63:10,15
**new** 54:10,12
**next** 8:21 58:23
**night** 63:13
**nondisclosure** 9:13
**None** 56:13
**North** 1:20 3:4 4:2
**Notary** 1:18 3:18
**notes** 3:11 17:12,16,21
17:23 18:4,21 19:9
19:11,13,15,19,22,23
20:3 37:15
**nothing** 12:18 25:1
47:23
**notice** 17:12
**November** 63:17
**Numerous** 7:17

---

**O**

**O** 1:12
**object** 23:2 57:19
**objections** 2:9,12
**obligation** 10:2
**obtain** 33:22
**obviously** 27:14
**occur** 45:1
**occurred** 10:8 22:16
38:15 39:8
**off** 40:3 41:5 44:11,15
44:18
**offered** 2:14 28:20
**office** 20:22 23:8,9
24:13,17 27:8 28:8
31:12 38:9 44:15
47:16,17 48:5 52:5,7
52:19 57:7,10,11,13
57:15,17 58:1,10,12
58:13,14,15,17,20,21
59:7,8,9
**offices** 1:19 4:1
**official** 1:8
**oh** 40:5
**Okay** 5:17 29:17 35:7
58:3
**old** 6:21 7:3 23:21 52:2
59:9
**older** 7:9,10
**once** 41:20 55:6,7,7
**one** 9:11,17 14:1,3
16:16 21:2,12,17

---

22:12,19 35:6 39:1
39:21,23 41:4 42:20
43:13 44:6 45:5
46:15 47:16 48:15,16
50:22 51:8 52:17
54:8,10,12 56:10,11
56:14 57:11,14,14,16
58:2 61:13,15
**ones** 20:1
**only** 15:14 22:12 24:1
24:16 32:15 56:11
57:11,14
**Opelika** 27:11,12,21
36:17,20,22 37:4
41:11 42:4,7 53:11
54:1,5 56:8,15,20
57:3,16 58:5,8
**oral** 4:5
**order** 52:22
**ordered** 53:1
**ordering** 10:1
**orders** 52:19,21
**organize** 26:14
**other** 17:1,6,8 18:4,8
19:19 33:20 38:23
42:15,19 45:13,15
47:12 49:20 54:3
58:8 59:4 61:23
**others** 21:16
**out** 7:13 10:23 13:14
19:9,11 22:9 23:20
39:21 42:14 44:3,10
44:13 47:18 48:2
56:17 62:5 63:13
**outside** 49:20
**over** 11:18 21:6,7 23:9
23:19,23 25:15,18
26:23 32:15,17,19
34:2,18 44:13 61:22

---

**P**

**P** 1:12,17 2:17,17 3:17
64:20
**packing** 61:21 63:3
**Page** 3:11,12,14,15
**pages** 22:22
**paid** 25:17 33:13,15
41:15 55:6
**pair** 37:7,9
**paperwork** 40:2
**Pardon** 13:2
**part** 15:23
**particular** 7:18 26:7,8
51:10
**parties** 1:14 2:12 64:14
**Partika** 3:9 7:5 31:20
**party** 25:21
**part-time** 29:4,6,23
30:2 31:1,2

---

**pastor** 16:10
**pastor's** 16:9
**Patricia** 1:4,8,16 4:4,7
4:13 17:12 19:2 20:8
21:23 23:5 36:6
43:13 46:18 51:8,21
55:18 57:18 58:22
59:15 61:7,13
**Patricia's** 36:2
**Patterson's** 54:11
**pay** 13:11 20:21 28:22
29:2,3 30:10 33:11
33:11,14 41:14,20
51:12 53:15 55:23
59:19 61:12
**payables** 24:10 32:16
32:17
**paying** 31:12 40:12
**payroll** 24:10 25:10,11
25:13,16,18,21,22
26:1,7,14
**pays** 34:8
**people** 12:18 13:21
15:5 20:14,15 21:9
22:8 31:6 35:7 62:15
**per** 61:1
**perform** 47:8
**persecuted** 50:10
**persecution** 35:18
48:12
**person** 19:4 22:13
43:20,22 44:2 57:2
57:14
**personal** 54:13 61:21
61:22
**personnel** 31:12
**phone** 24:2
**photographs** 18:18
**pick** 5:11
**picked** 62:2
**place** 33:17,18 37:19
45:19 46:3 62:7
**placed** 52:19
**placing** 52:17
**plaintiff** 1:5 2:19 17:8
**plans** 16:5
**plant** 28:2
**please** 4:12 40:1
**point** 9:6 11:4 15:20
**policy** 34:13
**portion** 32:15,18 33:14
33:20,20
**position** 11:20
**positive** 61:3
**potential** 49:19
**preparation** 53:10
**PRESENT** 3:7
**presently** 12:8 34:4
63:5

preserved 23:2
presume 53:6 58:4
pretty 31:6
previously 21:9
print 64:10
prior 2:15 6:1
privileged 23:3
problem 51:19
Procedure 3:22
proceedings 4:6 63:22
produce 12:15
product 23:4
protect 36:3
proud 60:14,15
provide 29:21
provision 55:12
psychiatrist 49:5
psychologist 49:4
public 1:18 3:18 10:9
    15:4
publicly 15:3
pull 61:4
purchase 53:13,21
purchased 35:23 37:7,9
    41:10 46:22 47:1
    53:12 54:10,11,17,18
pursuant 3:21
put 9:12 20:18 55:10
    61:16 62:3

---
**Q**

quality 11:1
question 4:21 5:2 19:5
    19:6 21:23 51:16
    57:20 58:23 61:13,14
questions 2:10,11 4:19
    5:16 9:21 51:4 62:18
quite 42:13 49:12
quote 52:15

---
**R**

R 2:17 64:1
radiation 44:1
Radney 1:19,20 3:2,3
    3:14 4:2,11,15 9:16
    9:21 10:4 14:12,15
    14:18 22:21 50:22
    51:2,19 57:19 61:14
    62:21 63:20
raises 59:19
ran 41:17
read 20:8,18 35:14
reading 2:2 37:8
ready 26:13
real 9:4 42:15,18
realize 36:6
really 25:1 32:23 52:3
reason 31:7 52:8 58:6
    60:7

recall 10:13 12:23
    14:10 22:6 33:1
    37:17 44:19
received 41:1
recognize 22:11
record 4:12 9:12 10:9
    22:21 23:1
recorded 18:13,15
recorder 18:16
reduced 64:9
reference 52:14
refrigerator 47:4
refute 23:16
regarding 47:7 50:2
regardless 30:5
regards 9:14,23
reimbursed 41:19 42:6
relating 2:6
relationship 28:5,10
    42:10,12 43:9 48:9
    60:3
relationships 30:8
    42:23
religion 38:12 47:23
religious 16:23 35:18
    37:20 38:22 46:5
    47:10,12 48:1,12,21
    50:3,17
religiously 50:10
remarks 47:14 60:22
remember 8:23 12:3,6
    32:23 51:18
Renea 3:8 20:5,19 21:6
    23:9,11 24:20 25:2,6
    30:6 31:20 32:7,19
    32:20 35:20 36:1,5
    37:10 40:20 42:10,21
    43:9,10,12 44:5,6,10
    44:11,20 45:4,8,10
    46:11 47:9,15 48:9
    48:16 52:17,17 53:2
    53:8 56:12,22 57:2,9
    58:7,14 59:8,8,16
    60:4,10
Renea's 21:6 23:20
    26:18 39:6 53:9
    58:16
reopen 16:7
reopening 16:5
repeat 4:22
replace 59:7,9,10
replaced 34:20
report 25:14
reporter 3:17 5:11
represent 4:15
represents 64:11
require 57:14
respective 1:14
response 36:9

responsibilities 10:18
    25:2,7 26:23
result 45:22 64:16
resume 62:1
retired 15:10,14
retirement 34:11,17
retiring 23:10 57:8
return 14:13
Rhonda 6:8,9 12:5,6
Rhonda's 11:19
Ricky 27:23 28:1,3,6
    28:10 54:8,11,16
    56:16
ridiculing 60:18
right 19:10 22:7,15
    39:5 41:5,21 42:18
    44:18 56:10 61:4
    62:4,6
Road 5:19
roll 34:2
Ronny 6:4
room 10:23 20:14,15
    20:20 23:8 51:21
rotation 21:5
rules 2:6 3:21 5:9
run 57:10
running 41:21
Russell 6:12 8:9,18,19
    8:22,23 9:7,9,13 10:5
    10:7,19,20,22 11:3,6
    15:15 17:5 21:2,3
    34:17 52:15,18 53:3

---
**S**

S 1:12,12 2:17 3:10
same 24:4 24:21 56:13
save 36:3
saw 47:9 48:7
saying 10:1 20:16 35:8
    36:7 47:13
says 10:1
scatter 42:20
school 8:11,15
second 50:23
see 17:18 28:3 45:12
    47:22 52:20 61:5
    63:17
seeing 44:19
seek 14:22 49:8
seem 35:1 57:18
seen 36:1
semesters 7:13
send 27:20 58:7
sense 13:16
separated 12:23 13:3
    32:13
separation 14:20
series 4:19
service 11:1 31:15

Services 1:7 31:18
settled 10:11,13
seven 24:21
several 7:13
sewing 10:23
sexual 42:10,12,22 43:9
    46:5 47:8,12 48:4,8
    50:2,6,13 62:23
sexually 43:3 50:7
she'd 42:15 47:20,21
she'll 44:2 47:17,18,18
Shield 34:7
shop 23:20 37:5 38:3,4
    39:1,3,12 42:14
    56:20 57:16 58:5,13
    58:15 59:7
shortly 51:23
show 14:5,11 29:11
side 38:9
sign 13:14,15
signature 2:2
simply 45:18
since 13:8 14:19 27:3
    44:9 49:9,13,14
    51:10 59:1
sit 39:23 40:1,9
sitting 11:23 42:18
situation 8:16 40:14
Sixth 16:17
small 12:9 51:11
some 8:2 9:6 12:17
    17:12 19:21 20:6
    35:17,23 42:20 43:8
    46:18,20,21 50:13
    58:6 60:2 61:22,23
    62:2,15
somebody 51:12
somehow 60:18
someone 11:7,20,22
    23:18 44:9 46:16
something 10:15 12:12
    52:6 58:12
sometimes 13:19,20,20
    42:19 55:6
somewhat 5:8
somewhere 10:17 33:4
    61:3,5
son 6:11
soon 52:11
sorry 6:17 13:7 30:20
    38:21 40:18
sort 35:17 41:1 48:4
sought 14:19
source 12:8 13:9 21:8
Southern 15:23
speak 15:8 34:20
special 55:4
specific 59:2
spend 16:22

spending 12:14
staring 42:16
start 20:3 44:11 47:20
started 12:11 29:1 40:4
    44:14 46:13,13 51:10
    56:1 61:7
state 1:18 3:19 4:12
    22:21 42:8 64:3
statement 36:1,5 38:15
    41:9 43:18 44:5
    45:11
statements 24:11 35:17
    35:20 43:10 60:4
STATES 1:1
stay 21:14
stenotype 64:9
stick 47:18
sticking 48:1
still 25:10 30:4 32:16
    46:1 51:14 55:15
    58:4,20
STIPULATED 1:13
    2:1,8
stipulation 3:22
stop 13:7 54:14
stopped 47:19
stopping 28:7
straight 51:20
Street 2:22 16:17
strong 43:19,22 44:2
strongly 62:10
study 7:23
sufficient 27:7
supervise 31:21
supervision 64:10
supervisor 31:22,23
    32:3,7
supervisors 32:5
support 59:12
supports 60:15
suppose 31:11
sure 9:4,16 11:17 14:14
    17:19 29:16 32:9
    37:6,10 42:22 62:13
surrounding 9:14
survive 44:3
sworn 4:8
system 34:11

---
**T**

T 1:12,12 3:10,10 64:1
    64:1
table 55:22
take 5:13 8:3 23:9
    32:19 39:22 44:1
    62:22
taken 1:17 5:6 7:14
    18:18 25:3 26:22
    62:1 64:8

**taking** 2:6 20:3
**talk** 24:3 45:10,15
48:14,19
**talked** 21:19 24:2 28:7
47:16 48:12 56:8
**talking** 19:4,22 28:8
29:18 36:19 40:15
42:23 43:19 44:21
45:16
**TALLAPOOSA** 64:5
**tape** 18:16
**tax** 13:23 14:5,13 61:4
**Taylor** 21:12,17 22:12
22:13
**Ted** 37:22 39:14,15,16
**telephone** 24:3
**tell** 24:8 27:20 30:17
31:9 37:18 41:5
42:11 43:12
**telling** 16:19 35:7
**temp** 11:13,15,18 12:2
**terminated** 20:12,17
23:6 27:6 31:10
32:13 33:22 50:13,20
**termination** 24:23 25:4
26:20 27:3 28:15
40:21 49:9,13 50:17
**Terrel** 5:20,22
**testified** 4:9
**testify** 49:21
**testimony** 27:5 43:8
**Thank** 50:22 51:3
63:20
**their** 1:14 22:1 37:11
45:18 52:21
**thereto** 2:15 64:9
**thievery** 46:10
**thing** 9:11 21:5 24:21
38:1 51:8
**things** 10:22 11:2 12:17
17:16,17 20:4,6
23:11 28:8 35:7,8
36:7 42:21 44:3
52:23 56:3 58:23
59:1 60:5,10 61:22
61:23 63:3
**think** 9:18,20 13:7 14:6
14:8 16:2 22:1,2,7
35:13 36:12 39:8
40:16,19 41:7 44:17
47:6 51:9 52:5 56:10
57:21 59:22 60:7,21
60:23
**thinking** 40:18
**thinks** 36:3
**third** 25:21
**Thirteen** 5:23
**though** 36:21
**thought** 36:18

**three** 4:16 20:20,21
23:8 27:8 52:5,7
56:13 58:2
**threw** 20:2
**through** 1:14 13:9
25:19 30:22 34:11
43:21 46:23 52:22
53:1
**till** 32:12
**time** 2:13,14 12:19 13:8
16:22 20:5 24:7,19
24:22 25:4 28:22
30:3 31:1,3 37:22
40:9,21 43:18 44:14
46:12 53:17
**times** 12:21 22:10 39:7
42:13
**title** 31:15
**today** 18:1 31:9 37:18
57:23 60:15
**together** 22:23 44:20
44:22
**told** 20:18,20 21:17
22:19 23:7 27:17
36:8,16 37:3 40:4
42:5 43:14 48:15
50:15,19 57:8 58:8
58:16,23 59:4,5,6,11
63:8
**tongue** 47:18 48:2
**top** 41:5 44:15,18
**touch** 45:12
**touched** 62:22
**toward** 43:1
**towards** 56:1
**transcript** 64:12
**transfer** 26:2
**travel** 41:11
**treated** 49:4 59:16,22
60:7
**treatment** 49:8
**trial** 2:13
**trouble** 56:1
**truck** 54:11
**true** 35:8 64:11
**try** 45:17
**trying** 22:1,2 40:7,18
**turn** 25:17,17 47:17
**turned** 47:21
**Twenty-two** 8:20
**twice** 55:6,8
**two** 6:5 24:16 32:5 39:2
39:5,7 45:6 48:23
60:3,5 62:3
**type** 19:9 28:14 33:9
60:2
**typed** 19:11,23 22:9

**U** 1:12
**UAB** 7:15 8:5
**ugh-uh** 5:12
**uh-huh** 5:12 19:16
25:10 38:19 51:15
**uncomfortable** 60:13
61:11
**under** 9:13 10:3 23:23
64:10
**understand** 4:22 20:9
21:16 27:5 34:19
37:6 42:2,22
**understanding** 52:13
**understood** 5:2
**Undoubtedly** 23:18
**United** 1:1 16:22
**until** 11:21
**use** 23:2 41:10
**used** 54:9

**V**

**various** 10:22 11:2
17:16
**vehicle** 41:10 42:4
53:12,17 54:9,13,18
54:19
**vehicles** 22:3,5
**verify** 58:12 61:23
**very** 14:11 43:19 44:21
46:9 60:13 61:11,15
61:20 62:9
**vicinity** 10:17 33:4
**Volvo** 53:14,21,22
**Voss** 41:15 42:2 54:12
54:23 55:2,5,15
**VS** 1:6

**W**

**Wachovia** 25:18
**wages** 32:21
**waived** 2:3
**walk** 42:14,19 47:15,17
47:21
**walked** 28:2
**want** 9:16 11:16 14:16
16:21 32:9 37:3,6
57:6 58:7
**wanted** 23:9 47:3 57:7
58:9
**wanting** 56:15
**warn** 45:8
**wasn't** 27:7,20 40:13
48:4 62:22
**water** 46:11,12,14,18
46:19,21 47:3,4
**way** 30:21 38:10 59:20
62:13
**Wednesday** 26:11,12
26:16,17

**week** 26:5
**weekly** 13:16
**weeks** 11:21 36:17
52:13 63:9
**well** 7:13 9:12 11:22
20:5,14,18 23:5
25:15,17 28:7,16
29:1 30:13 32:15
33:8,9 34:16 35:6
36:5,16,18,20,22
37:21 40:3 42:5,13
43:13 46:9,19 47:11
50:16 54:8,10 55:6,6
56:8 59:19 60:1,2
63:12
**went** 8:18,23 18:22
59:7,8,9 61:12 63:13
**were** 4:6 6:1,18,21 7:3
10:18 11:11,13,13,19
12:19,21,23 13:3
17:16,17 19:2 20:4
20:12 21:9 23:6 24:7
24:9,16,19,22 26:18
27:5 31:14 32:11,12
32:13,21,21 36:19
37:1 39:6,12,19,19
41:3,18,19 42:23
45:16 48:23 50:13,14
50:18,20 51:21 52:21
53:4,5,6 54:3,7 55:4
56:3,15 59:5,11,15
60:7,17,22 61:1
63:12
**weren't** 20:16 35:8
50:16
**we'll** 5:13 21:14
**we're** 10:2 16:20 19:4
36:6
**Wheeles** 1:4,8,16 4:4,7
4:13,14 5:20 9:15
16:11
**while** 19:2 22:10 24:4
32:21 36:4 40:15
55:8
**whole** 41:7
**wife** 6:11
**willing** 37:1
**Willow** 11:4 15:20
**wise** 54:1
**witness** 2:3 4:4 9:18
49:17
**witnesses** 49:19,20
**woman** 44:15
**wonder** 36:2,9
**wondered** 36:14
**wore** 37:9
**work** 8:18,19 13:18
15:3,7,12 18:20 20:6
20:22 23:4 26:5 27:8

**week** 26:5

29:3,6,23 30:2 31:1,6
35:2 37:3,10,19 44:6
45:7 46:3,7,8,14 47:7
53:2,11 56:17 57:12
57:14 58:20,21 61:11
**worked** 10:22,23 11:1
11:4 24:4 31:2 35:2
42:9 52:18
**worker's** 39:22 40:3,11
**working** 11:13,15 28:5
28:10 32:21 46:13
56:21 57:23 58:16
61:8
**workshops** 7:17
**wouldn't** 60:21
**write** 30:19 40:10

**X**

**X** 3:10 29:2

**Y**

**yarn** 53:7
**yeah** 13:11 14:18 31:8
36:9 40:7 44:1
**year** 8:23 14:7,9 33:3
61:1,6
**years** 5:23 8:20 23:10
24:21 43:15 45:6
48:23 57:9,12
**Yep** 15:9
**younger** 7:9 52:3 60:1
**y'all** 24:16 30:21,22

**S**

**$100** 55:8

**1**

**1** 3:11 17:21,23 22:22
37:8
**1st** 6:17
**10:00** 1:23 4:4
**100** 13:20
**1083** 5:19
**12.27.2009** 64:23
**126** 2:22
**15** 63:17
**16th** 13:5
**16,000** 53:16
**17** 3:11 43:15
**19,000** 14:6,7,9
**1950** 6:17,17
**1999** 6:19 32:12

**2**

**2** 3:12 29:9,12
**20th** 6:17
**2000** 13:6
**2002** 53:14,20
**2006** 6:23 14:1,10,15

32:14 38:18 39:9
**2007** 14:3,9,13 63:17
**2008** 1:22 4:1
**23** 33:3 61:3
**23,000** 33:3 61:6
**24/7** 60:15,16
**25** 40:23
**29** 3:12

---
**3**

**3:07** 1:6
**31st** 1:21 3:23 21:1
**35010** 1:21 2:23 3:5 4:3

---
**4**

**4** 3:14
**40** 23:23,23 26:5
**401K** 33:8,17,23

---
**5**

**5** 13:7
**50** 6:22 13:20
**51** 3:15 6:22
**56** 7:4
**58** 6:15

---
**6**

**6** 13:7,7
**62** 3:14

---
**8**

**80** 1:20 3:4 4:2
**81** 64:21

---
**9**

**99** 10:14 11:12